UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHEMOIL CORP.,

               Plaintiff,

      -v-

UNITED STATES OF AMERICA,

               Defendant.

No. 19 Civ. 6314 (ALC) (JW)

---

**MEMORANDUM OF LAW IN SUPPORT OF
THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2663/2677
jennifer.jude@usdoj.gov
samuel.dolinger@usdoj.gov

JENNIFER JUDE
SAMUEL DOLINGER
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...............................................................................................................3

    A.       Regulatory Background ....................................................................3

            1.      The Alcohol Fuel Mixture Excise Tax Credit.....................................3

            2.      The Excessive Claims Penalty for Fuel Credits................................4

    B.       Factual Background ......................................................................5

            1.      The Astra Transactions ...........................................................6

            2.      The Gunvor Transactions.........................................................11

            3.      The IRS Audit and Chemoil's Appeal ......................................18

    C.       Procedural History .....................................................................20

ARGUMENT ..................................................................................................................20

I.      CHEMOIL IS NOT ENTITLED TO THE TAX CREDITS ASSOCIATED WITH
THE ASTRA AND GUNVOR TRANSACTIONS ........................................22

    A.       Chemoil Cannot Recover the Tax Credits Because the Transactions at
Issue Lack Economic Substance ....................................................22

            1.      Chemoil Lacked an Objectively Reasonable Expectation of Pre-
Tax Profit in the Transactions.................................................25

            2.      Chemoil Lacked a Non-Tax Business Purpose for Engaging in the
Transactions ....................................................................29

            3.      The Overall Analysis Demonstrates That the Transactions Lack
Economic Substance .............................................................32

    B.       Chemoil Did Not Satisfy Several Statutory Requirements for Claiming the
Credits ..................................................................................34

            1.      There Were No *Bona Fide* Sales of Alcohol Fuel Mixtures in the
Astra-1 and Astra-3 Transactions ..........................................34

            2.      No Credits Are Available for the Sale of Ethanol to Which No
Gasoline Was Added.............................................................42

            3.      Chemoil Did Not Sell the Mixtures "for Use as a Fuel"...........................44

          4.       The Gunvor-7 Sale Occurred After the Credit Expired ............................46

II.     CHEMOIL IS NOT ENTITLED TO A REFUND OF THE EXCESSIVE CLAIMS PENALTY ........................................................................................51

     A.     Chemoil Did Not Have Reasonable Cause to Claim Credits for the Gunvor-7 Transaction ............................................................................51

     B.     The Doctrine of Variance Bars Chemoil's I.R.C. § 6751(b) Argument ...............55

     C.     The Penalty Was Approved in Accordance with § 6751(b) .................................57

CONCLUSION ...................................................................................................................59

# TABLE OF AUTHORITIES

## CASES

*303 W. 42nd St. Enterprises, Inc. v. IRS,*
 181 F.3d 272 (2d Cir. 1999) ............................................................................................ 55

*Ad Inv. 2000 Fund LLC v. Comm'r,*
 142 T.C. 248 (2014) .......................................................................................................... 53

*ADVO, Inc. v. Comm'r,*
 141 T.C. 298 (2013) ..................................................................................................... 36, 37

*Affordable Bio Feedstock, Inc. v. United States,*
 No. 16 Civ. 1926, 2017 WL 3616894 (M.D. Fla. June 28, 2017) ........................................ 46

*Alternative Carbon Res., LLC v. United States,*
 939 F.3d 1320 (Fed. Cir. 2019) .................................................................................. *passim*

*Altria Group, Inc. v. United States,*
 658 F.3d 276 (2d Cir. 2011) ............................................................................. 35, 36, 42, 47

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) .......................................................................................................... 21

*Anemone v. Metro. Transp. Auth.,*
 629 F.3d 97 (2d Cir. 2011) ............................................................................................... 21

*Angelus Milling Co. v. Comm'r,*
 325 U.S. 293 (1945) .......................................................................................................... 55

*Anschutz Co. v. Comm'r,*
 664 F.3d 313 (10th Cir. 2011) .......................................................................................... 35

*Arevalo v. Comm'r,*
 469 F.3d 436 (5th Cir. 2006) ..................................................................................... *passim*

*AT&T Advert., L.P. v. United States,*
 147 Fed. Cl. 478 (2020) .................................................................................................... 36

*Bailey v. Comm'r,*
 912 F.2d 44 (2d Cir. 1990) ..................................................................................... 35, 47, 48

*Bank of N.Y. Mellon Corp. v. Comm'r,*
 801 F.3d 104 (2d Cir. 2015) ..................................................................................... *passim*

*Benenson v. Comm'r,*
 910 F.3d 690 (2d Cir. 2018) .............................................................................................. 48

iii

*Blum v. Comm'r*,
  737 F.3d 1303 (10th Cir. 2013) ...................................................... 25, 33

*Boyd v. United States*,
  762 F.2d 1369 (9th Cir. 1985) ........................................................ 55, 56

*Brown v. Eli Lilly & Co.*,
  654 F.3d 347 (2d Cir. 2011).......................................................... 21, 32

*Burlington N. Inc. v. United States*,
  684 F.2d 866 (Ct. Cl. 1982) ................................................................ 55

*Calloway v. Comm'r*,
  691 F.3d 1315 (11th Cir. 2012) ........................................................... 35

*Caplin v. United States*,
  718 F.2d 544 (2d Cir. 1983).............................................................. 58

*Carione v. United States*,
  291 F. Supp. 2d 141 (E.D.N.Y. 2003) ............................................. 55, 56

*Casebeer v. Comm'r*,
  909 F.2d 1360 (9th Cir. 1990) ............................................................ 33

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................... 20

*Chai v. Comm'r*,
  851 F.3d 190 (2d Cir. 2017).............................................................. 58

*Clark v. United States*,
  No. 11 Civ. 471, 2012 WL 6709624 (N.D. Cal. Dec. 26, 2012) ............................ 39

*Colliot v. United States*,
  No. 19 Civ. 212, 2021 WL 2709676 (W.D. Tex. Mar. 24, 2021) ............................ 57

*Coltec Indus., Inc. v. United States*,
  454 F.3d 1340 (Fed. Cir. 2006)...................................................... 22, 23

*DeMartino v. Comm'r*,
  862 F.2d 400 (2d Cir. 1988)............................................................... 22

*Derr v. Comm'r*,
  77 T.C. 708 (1981)............................................................................ 47

*Diggs v. Comm'r*,
  281 F.2d 326 (2d Cir. 1960)............................................................... 23

*Exelon Corp. v. Comm'r,*
    147 T.C. 230 (2016) ................................................................................ 58

*Exelon Corp. v. Comm'r,*
    906 F.3d 513 (7th Cir. 2018) ................................................................ 47

*Frank Lyon Co. v. United States,*
    435 U.S. 561 (1978) ...................................................................... *passim*

*Franklin's Est. v. Comm'r,*
    544 F.2d 1045 (9th Cir. 1976) .............................................................. 39

*Gilman v. Comm'r,*
    933 F.2d 143 (2d Cir. 1991) ................................................................. 25

*Ginsburg v. United States,*
    17 F.4th 78 (11th Cir. 2021) ................................................................. 56

*Goldman v. Comm'r,*
    39 F.3d 402 (2d Cir. 1994) ................................................................... 53

*Gregory v. Helvering,*
    293 U.S. 465 (1935) ............................................................................. 22

*Grodt & McKay Realty, Inc. v. Comm'r,*
    77 T.C. 1221 (1981) ................................................................. 39, 41, 42

*Houchins v. Comm'r,*
    79 T.C. 570 (1982) ........................................................................ 39, 40

*In re CM Holdings, Inc.,*
    301 F.3d 96 (3d Cir. 2002) ................................................................... 23

*In re Michigan BioDiesel, LLC,*
    466 B.R. 413 (Bankr. W.D. Mich. 2011) ............................................. 46

*J.J. Powell, Inc. v. United States,*
    125 Fed. Cl. 73 (2016) ................................................................... 51, 52

*Kirsh v. United States,*
    258 F.3d 131 (2d Cir. 2001) ................................................................. 56

*Lee v. Comm'r,*
    155 F.3d 584 (2d Cir. 1998) ................................................................. 22

*Long Term Capital Holdings v. United States,*
    330 F. Supp. 2d 122 (D. Conn. 2004) .................................................. 58

*Magnone v. United States,*
902 F.2d 192 (2d Cir. 1990) ......................................................................... 55

*Makric Enters., Inc. v. Comm'r,*
T.C. Mem. 2016-44, 2016 WL 910229 (2016) ............................................ 54

*Matsushita Elec. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ..................................................................................... 21

*Mortensen v. Comm'r,*
440 F.3d 375 (6th Cir. 2006) ...................................................................... 53

*Neonatology Assocs., P.A. v. Comm'r,*
115 T.C. 43 (2000) ....................................................................................... 54

*New Phoenix Sunrise Corp. v. Comm'r,*
408 F. App'x 908 (6th Cir. 2010) ................................................................ 53

*Nicole Rose Corp. v. Comm'r,*
320 F.3d 282 (2d Cir. 2003) ........................................................................ 25

*Perkins v. United States,*
464 F. Supp. 3d 519 (W.D.N.Y. 2020) ....................................................... 56

*Plano Holding LLC v. Comm'r,*
T.C. Mem. 2019-140, 2019 WL 5212791 (2019) ....................................... 58

*Rische v. United States,*
No. 20 Civ. 33, 2021 WL 2856598 (W.D. Wash. July 8, 2021) ................ 56

*Route 231, LLC v. Comm'r,*
810 F.3d 247 (4th Cir. 2016) ...................................................................... 35

*Sacks v. Comm'r,*
69 F.3d 982 (9th Cir. 1995) ......................................................................... 24

*Salem Fin., Inc. v. United States,*
102 Fed. Cl. 793 (2012) ............................................................................... 53

*Salem Fin., Inc. v. United States,*
786 F.3d 932 (Fed. Cir. 2015) .......................................................... 23, 24, 33

*Scovill Mfg. Co. v. Fitzpatrick,*
215 F.2d 567 (2d Cir. 1954) ........................................................................ 56

*Shannon v. N.Y.C. Transit Auth.,*
332 F.3d 95 (2d Cir. 2003) .......................................................................... 21

*Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*,
    575 F.3d 199 (2d Cir. 2009) ................................................................. 21

*Sparkman v. United States*,
    No. 08 Civ. 87, 2009 WL 5103165 (D. Haw. Dec. 28, 2009) .................................. 24

*Stobie Creek Invs., LLC v. United States*,
    608 F.3d 1366 (Fed. Cir. 2010) ........................................................ 25, 52

*Sunoco, Inc. v. United States*,
    908 F.3d 710 (Fed. Cir. 2018) .............................................................. 3

*Upham v. Comm'r*,
    923 F.2d 1328 (8th Cir. 1991) ...................................................... 35, 36, 47

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000) ................................................................ 21

*Yates v. United States*,
    No. 19 Civ. 6384, 2020 WL 2615011 (N.D. Cal. May 22, 2020) ........................... 55, 57

## STATUTES

I.R.C. § 4081 ........................................................................... 3, 4

I.R.C. § 6426 ........................................................................ *passim*

I.R.C. § 6427 .......................................................................... 4, 5

I.R.C. § 6675 ........................................................................ *passim*

I.R.C. § 6751 ........................................................................ *passim*

I.R.C. § 7422 ........................................................................... 55

I.R.C. § 7491 ........................................................................... 58

I.R.C. § 7525 ........................................................................... 14

I.R.C. § 7701 ........................................................................... 23

American Jobs Creation Act of 2004,
    Pub. L. No. 108-357, 118 Stat. 1418 ....................................................... 3

**ADMINISTRATIVE MATERIALS**

Treas. Reg. § 1.6664-4(b) ............................................................................................... 52

IRS Notice 2006-92,
   *Alternative Fuel & Alternative Fuel Mixtures; Blood Collector Organizations*,
   2006-2 C.B. 774, 2006 WL 2792807 (Sept. 30, 2006)....................................................... 44, 46

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 108-755 (2004),
   *reprinted in* 2004 U.S.C.C.A.N. 1341 ........................................................................ 3

Defendant the United States of America (the "United States" or the "government"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

In this tax refund case, Chemoil seeks more than $6 million in excise tax credits that were disallowed by the Internal Revenue Service ("IRS") following an audit, along with the return of more than $4 million that it paid as a penalty, plus interest. The undisputed facts demonstrate that Chemoil is not entitled to any refund. Chemoil does not qualify for the credits at issue—alcohol fuel mixture credits that were available under Section 6426(b) of the Internal Revenue Code until the end of 2011—and IRS appropriately assessed a penalty based on Chemoil's plainly improper attempt to claim credits for a particular transaction it conducted after the credit had expired.

The credits at issue relate to seven transactions that Chemoil conducted in or around the last quarter of 2011. In each of those, Chemoil purported to sell to a counterparty a large volume of ethanol into which it had mixed a relatively small amount of gasoline, and then claimed a credit of 45 cents per gallon of ethanol for having created and sold an "alcohol fuel mixture." Chemoil was not entitled to those credits, however, for several reasons.

First, the transactions lack economic substance. In all seven transactions, Chemoil lost a substantial amount of money pre-tax—totaling several million dollars—by buying ethanol (sometimes at above-market prices), then buying and adding a small amount of gasoline, and reselling the resulting mixtures at below-market prices. It had no legitimate business reason to engage in these money-losing transactions, and did so in order to claim the tax credit—the only way these transactions were profitable. Indeed, Chemoil's sole reason for creating the mixtures was the generation of tax benefits; its counterparties in the transactions did not request, and had

no need for, the addition of gasoline to the product they were purchasing. These transactions thus lack economic substance considering the objective and subjective factors in the economic substance case law, and Chemoil is not entitled to tax benefits from them.

Second, Chemoil did not satisfy several of the statutory requirements for claiming the credits. In two of the deals, Chemoil did not engage in *bona fide* sales with its counterparty, as it never obtained the benefits and burdens of ownership of the product it purported to buy and then sell. In two other deals, substantial amounts of the product Chemoil sold was ethanol with no gasoline mixed in; these were plainly not "alcohol fuel mixtures." Chemoil also cannot demonstrate that it sold the mixtures "for use as a fuel," as the statute requires, because the mostly-ethanol product it sold could not be used as a fuel without being blended with other fuels or undergoing further processing. Last, one of the transactions—the largest, for which Chemoil claimed more than $2 million in tax credits—took place in 2012, after the statutory tax credit provision expired. The United States is thus entitled to summary judgment as to Chemoil's claim to a refund of all of the tax credits at issue.

The United States is also entitled to summary judgment on Chemoil's claim for a refund of the penalty IRS assessed in connection with the 2012 transaction. Chemoil did not have reasonable cause to claim tax credits for that transaction, which was plainly consummated after the statutory credit expired; indeed, Chemoil attempted to backdate title-transfer documents to December 31, 2011, demonstrating that the company appreciated this issue. Moreover, while Chemoil now argues that an IRS manager failed to approve the penalty in writing before it was asserted in a notice of deficiency, as required, the company did not raise this argument administratively, so it is barred by the doctrine of variance, which is akin to administrative

exhaustion; and in any event, the record demonstrates that the appropriate written managerial approval was obtained.

The United States' motion for summary judgment should thus be granted in full.

## BACKGROUND

### A.    Regulatory Background

#### 1.    The Alcohol Fuel Mixture Excise Tax Credit

The tax credits at issue in this case are alcohol fuel mixture credits that were available pursuant to Section 6426(b) of Title 26 of the U.S. Code, the Internal Revenue Code ("I.R.C.") (also known as the Volumetric Ethanol Excise Tax Credit ("VEETC")), until the end of 2011, for taxpayers who created qualifying fuel mixtures and met other statutory requirements.

The alcohol fuel mixture credit was created by the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 301, 118 Stat. 1418, 1459. That statute eliminated a reduced rate of tax on alcohol-blended fuels and replaced it with a tax credit based on the number of gallons of alcohol used to make alcohol fuel mixtures. *See* H.R. Rep. No. 108-755, 303-05 (2004), *reprinted in* 2004 U.S.C.C.A.N. 1341, 1380-85; *see generally Sunoco, Inc. v. United States*, 908 F.3d 710, 713-14 (Fed. Cir. 2018). As relevant here, the VEETC was "allowed as a credit" against "the tax imposed by [I.R.C. §] 4081," I.R.C. § 6426(a)—which includes an excise tax on non-aviation gasoline, *id.* § 4081(a)(2)(A).

Between 2009 and 2011, I.R.C. § 6426(a)(1) and (b)(1) allowed a $0.45 credit against a claimant's excise-tax liability for each gallon of alcohol used by the claimant to produce an alcohol fuel mixture.[1] The term "alcohol fuel mixture" means a mixture of alcohol (which

---

[1] I.R.C. § 6426(b)(5) provides that "[f]or purposes of determining under [§ 6426(a)] the number of gallons of alcohol with respect to which a credit is allowable under [§ 6426(a)], the volume of alcohol shall include the volume of any denaturant (including gasoline) which is added under any

includes ethanol, *see id.* § 6426(b)(4)(A)) and a taxable fuel (which includes gasoline, *see id.* § 4083(a)(1)) that "is sold by the taxpayer producing such mixture to any person for use as a fuel" or that "is used as a fuel by the taxpayer producing such mixture." *Id.* § 6426(b)(3). Pursuant to I.R.C. § 6426(b)(6), the alcohol fuel mixture credit was not available for "any sale, use, or removal for any period after December 31, 2011." The credit has not been renewed.

I.R.C. § 6427(e) provides that if a taxpayer produces an alcohol fuel mixture as described in § 6426, then the IRS shall pay the person an amount equal to the alcohol fuel mixture credit with respect to that mixture. However, no amount is payable under this provision if a credit under § 6426 has been allowed with respect to the mixture at issue. *Id.* § 6427(e)(3). Effectively, this provision allows taxpayers who do not or cannot claim a credit under § 6426 (for example, because they have insufficient excise tax liability under I.R.C. § 4081 against which to claim the credit) to obtain an equal benefit by obtaining a direct payment equal to the amount of the credit.

### 2.      The Excessive Claims Penalty for Fuel Credits

Under I.R.C. § 6675, "if a claim is made under [I.R.C. §] 6427 . . . for an excessive amount, unless it is shown that the claim for such excessive amount is due to reasonable cause, the person making such claim shall be liable to a penalty in an amount equal to whichever of the following is the greater: (1) Two times the excessive amount; or (2) $10." This penalty applies to both claims for payment made under § 6427 and claims for credit made under § 6426. *See Alternative Carbon Res., LLC v. United States*, 939 F.3d 1320, 1332-33 (Fed. Cir. 2019) ("A taxpayer who wrongly claims a credit under § 6426 may be liable for up to 200% of the 'excessive amount' claimed unless they show that 'the claim for such excessive amount is due to

formulas approved by the Secretary to the extent that such denaturants do not exceed 2 percent of the volume of such alcohol (including denaturants)."

reasonable cause.'" (citing I.R.C. § 6675(a))). I.R.C. § 6675(b) defines "excessive amount" as the amount of the credit claimed under § 6427 over the amount allowed under that section for the relevant tax period.

### B.   Factual Background

Chemoil was founded in 1981 as a marine-fuel distribution company, *see* Declaration of Evan K. Cohen, Ex. A ("Cohen Rpt.") ¶ 11, and started its U.S. renewable-fuels business in late 2010 or early 2011, *see* Ex. 1[2] ("Skrinar Dep.") 14:23-15:2. Chemoil's renewables desk was headed by John Skrinar. Skrinar Dep. 22:11-13. Skrinar's direct reports included Aaron Parrish, who worked in ethanol trading, and Steven Basler, who provided logistics support for ethanol transactions. *Id.* at 39:9-17; Ex. 2 ("Parrish Dep.") 56:17-22, 57:9-13. As a part of its renewables business, Chemoil traded in ethanol, biodiesel, and other renewable fuels. Skrinar Dep. 22:4-10.

In or around late 2011, Chemoil entered into seven transactions in which it claimed to have created alcohol fuel mixtures giving rise to the tax credits at issue in this case—three transactions with Astra Oil Company ("Astra"), a U.S.-based energy-trading company (referred to as "Astra-1," "Astra-2," and "Astra-3") and four with Gunvor S.A. ("Gunvor"), a Swiss energy-trading company (referred to as "Gunvor-4," "Gunvor-5," "Gunvor-6," and "Gunvor-7"). The transactions took place at the Vopak Deer Park Terminal in Deer Park, Texas, outside of Houston, where Chemoil leased shore tanks from Vopak, the terminal operator. *See* Ex. 9; *see generally* Declaration of Michael Leister, Ex. A ("Leister Rpt.") § 5.

---

[2] Unless specifically noted otherwise, all exhibits referenced herein are exhibits to the Declaration of Jennifer Jude, submitted herewith, and all page citations for exhibits (other than deposition transcripts and expert reports) refer to the final two digits of the exhibit's Bates numbers.

### 1.    The Astra Transactions

As detailed below, in all three Astra transactions, Chemoil purported to buy ethanol *from Astra*, paid to add a small volume of gasoline to the ethanol, and then sold the ethanol-plus-gasoline mixture *back to Astra* at a substantially cheaper price than it had paid for the plain ethanol just days earlier. *See* Cohen Rpt. ¶¶ 13-22.

**Astra-1.** In the Astra-1 transaction, Chemoil purported to purchase ethanol from Astra, and then to sell the same volume of ethanol—meeting the same fuel specifications—back to Astra at a discount days later. Specifically, a contract governing the first leg of the deal (dated December 20, 2011) provides for Chemoil's purchase of 72,000 barrels of ethanol from Astra on December 21, 2011, for $2.46 per gallon. *See* Ex. 10. A contract governing the second leg of the deal (dated December 2011, without a day specified) provides for Chemoil's sale of 72,000 barrels of ethanol to Astra no later than December 27, 2011, for $2.06 per gallon. *See* Ex. 11. Product specifications in the two contracts were identical: and both provide for the sale of "Fuel Grade Ethanol" meeting "ANP latest specifications," a Brazilian ethanol standard. *See* Exs. 10, 11; Parrish Dep. 84:22-85:15. Both contracts specified delivery by in-tank transfer in Vopak Tank 503, Exs. 10, 11, which was leased to Astra at the time. *See* Ex. 12 ("TK503 Rpt.").

Both Astra-1 contracts stated that they originated from an agreement between Aaron Parrish, a Chemoil trader, and Andre Raposo, a trader at Astra, on December 7, 2011. *See* Exs. 10, 11. They refer to the agreement of that date as "regarding the sale/purchase of approx. 72,000 barrels of "Fuel Grade Ethanol." *Id.* In their communications, Astra and Chemoil personnel discussed the "purchase and sale of the 72,000 barrels of product on tank 503" in tandem. *See* Ex. 13. In internal emails, Chemoil referred to each pair of purchase and sale transactions as a single "deal." Ex. 14. Likewise, Chemoil communicated to Astra an intention to net out (*i.e.*, offset) the invoices from the buy/sell exchange and simply pay the difference on the due date of

the second leg of the transaction. *See* Ex. 15. In other words, only one payment was transferred between the parties: Chemoil paid Astra the difference between Chemoil's "purchase" price for the ethanol on December 21 and its "sale" of the same volume of ethanol (plus a small amount of gasoline), at 40 cents per gallon *less*, a total of $1,157,193.69, on December 27. *See* Ex. 16.

Reports from the Vopak terminal for Tank 503 show that the fuel Chemoil "purchased" remained in the same tank until Chemoil sold it back to Astra. TK503 Rpt. On December 20, 2011, Astra invoiced Chemoil for the purchase of the 2,914,941 gallons of ethanol in Astra's Tank 503. Ex. 17. No fuel movement was reported in Tank 503 on that day. TK503 Rpt. The next day, Sun Coast Resources ("Sun Coast"), a gasoline distributor, invoiced Chemoil for its purchase of 2,988 gallons of gasoline at $2.634 per gallon, Ex. 18, and Vopak arranged for the delivery of the gasoline into Tank 503, at Astra's request, Ex. 19. By volume, the added gasoline represented approximately 0.1% of the total volume of the fuel in the tank after the addition. *See* TK503 Rpt. Finally, on December 27, 2011, Chemoil invoiced Astra for the sale of the 2,919,205 gallons of ethanol (plus gasoline) in Tank 503, reported on the invoice as "delivered" on December 23. *See* Ex. 20. The report for Tank 503 does not indicate any movement of fuel on this date, either. *See* TK503 Rpt. Indeed, according to the tank report, there was no activity other than the addition of the gasoline during the period when Chemoil purportedly owned the fuel, between December 20 and 23, 2011. *See id.*

In internal emails regarding the Astra-1 transaction, Chemoil trader Aaron Parrish explained that there would be a "buy from Astra" and then Chemoil would "sell/transfer [the fuel] right back to Astra a day or two later." Ex. 21. When another Chemoil employee asked, "Are we selling at a Loss? (we bought from Astra @ $ 2.46 / gallon, but we sell back @ $ 2.06/gallon)?," Parrish responded, "As far as the price we are blending this product for them

and we are collecting a 45c per gallon tax credit. Therefore netting 5c per gallon." Ex. 14. In another email, Parrish explained, "Please keep in mind we are collecting a 45c per gallon tax credit. So we are making 5c per gallon"—again apparently in order to explain the fact that the "purchase" price was 40 cents per gallon less than the "sale" price, Ex. 22.

**Astra-2.** Like Astra-1, in the Astra-2 transaction Chemoil purchased ethanol from Astra and then sold the same volume of ethanol back to Astra soon afterward for 40 cents per gallon less than the purchase price. Specifically, the first contract for Astra-2 (dated December 20, 2011) provided for Chemoil's purchase of 27,000 barrels of ethanol from Astra for $2.45 per gallon. *See* Ex. 23. The second contract (also dated December 20, 2011) provided for Chemoil's sale of 27,000 barrels of ethanol to Astra for $2.05 per gallon. *See* Ex. 24. Product specifications in the contracts were identical, both referring to "Fuel Grade Ethanol" meeting the "ANP latest specifications." *See* Exs. 23, 24. Both contracts specified delivery during the period December 1-31, 2011. *Id.*

Like the Astra-1 contracts, the Astra-2 contracts indicated that they originated from an agreement between Parrish of Chemoil and Raposo of Astra dated December 7, 2011. *Id.* As noted above, the Astra-2 contracts were both dated December 20 and refer to the agreement as a "sale/purchase." *Id.* As in Astra-1, Chemoil netted the invoices from the sale/purchase and scheduled a single payment to Astra for the transaction, reflecting the difference of $440,380.80 between Chemoil's purchase price and the lower resale price back to Astra. *See* Ex. 25; *see also* Exs. 26, 27.

To carry out the delivery of fuel in the Astra-2 transaction, by order dated December 13, 2011, Chemoil ordered Vopak to move 27,000 barrels of fuel-grade ethanol owned by Astra from a barge into Tanks 538 and 615, with the tanks to receive 25,000 barrels (equivalent to

1,050,000 gallons) and 2,000 barrels (equivalent to 84,000 gallons), respectively. *See* Ex. 28. The Vopak tank reports for Tanks 615 and 538 reflect these transfers on December 19 and December 20. *See* Ex. 29 ("TK615 Rpt.") at -19; Ex. 30 ("TK538 Rpt.") at -02. Then, Chemoil made two purchases of gasoline from Sun Coast, one for 3,592 gallons and one for 1,499 gallons. *See* Ex. 31.

By order dated December 16, 2011, Chemoil ordered Vopak to move the gasoline from Sun Coast trucks into Tanks 615 and 538, *see* Ex. 32, which took place on December 19 and 20, respectively, *see* TK615 Rpt. at -18; TK538 Rpt. at -02. In total, these additions of gasoline represented 0.45% of the total volume of fuel added to Tanks 538 and 615. *See* TK615 Rpt. at -18-19; TK538 Rpt. at -02. Finally, Chemoil transferred the fuel back to Astra, partially by tank-to-tank transfer and partially by delivery to a shipping vessel designated by Astra called the *Bow Americas*. *See id.* Other than the addition of the relatively small volumes of gasoline into the tanks, the tank reports reflect no activity between when Chemoil received the ethanol in its tanks and when it was transferred out days later.

**Astra-3.** The Astra-3 transaction also proceeded similarly to Astra-1: Chemoil purchased ethanol from Astra. Then, while the fuel remained in a tank controlled by Astra, Chemoil added a small amount of gasoline; Chemoil then sold the same fuel back to Astra at a lower price. The first contract related to Astra-3 (dated December 11, 2011) provided for Chemoil's purchase of 26,000 barrels of ethanol from Astra on December 24, 2011, for $2.48 per gallon, *see* Ex. 33, and the second contract provided for Chemoil's sale of 26,000 barrels of ethanol to Astra no later than December 30, 2011, for $2.08 per gallon, *see* Ex. 34. Like in Astra-1, the contracts for Astra-3 specified delivery via in-tank transfer, this time specifying in-tank transfer in Tank 531. *See* Exs. 33, 34. As reflected in a Vopak tank report, Tank 531 was leased by Astra at the time.

9

*See* Ex. 35 ("TK531 Rpt."). The fuel specifications in the contracts were again identical, though in this instance both contracts referred to "Fuel Grade Ethanol" meeting "ASTM D-4806 latest specifications," Exs. 33, 34; *see also* Leister Rpt. § 1.1 (ASTM D-4806 is an ethanol specification used in the United States). Like the contracts governing the other Astra transactions, both contracts reported that they originated from an agreement between Parrish of Chemoil and Raposo of Astra on December 7, 2011, and referred to the transaction as a combined "sale/purchase." *See* Exs. 33, 34.

On December 23, 2011, Astra invoiced Chemoil for the sale of 1,097,453 gallons (approximately 26,000 barrels) of ethanol to Chemoil. *See* Ex. 36 at -90. Also that day, in response to an Astra order, Vopak added 1,704 gallons of gasoline from Sun Coast, which Chemoil purchased for $2.7325 per gallon. *See* Exs. 37, 38. By volume, this gasoline represented approximately 0.16% of the volume in Tank 531. *See* TK531 Rpt. Finally, Chemoil invoiced Astra for the sale of 1,098,279 gallons of product on December 30, recording a delivery date of December 23, 2011. Ex. 36 at -91. Chemoil's records show that, like in Astra-1 and Astra-2, the payments for this transaction were netted out, such that Chemoil made a single payment to Astra of $437,263.23—the difference between its higher purchase price of $2.48 per gallon and its lower sale price of $2.08 per gallon back to Astra. Ex. 36 at -90.

Vopak's reports for Tank 531 show that Chemoil sold back to Astra the same fuel it had purchased days earlier on December 23,[3] modifying it only by adding the gasoline. *See* TK531

---

[3] On December 23, Tank 531 only held approximately 588,498 gallons of ethanol, but additional ethanol was transferred in by tank-to-tank transfer on the morning of December 24, 2011, resulting in a reported 1,095,393 gallons of ethanol before gasoline was added to the truck later that day. *See* TK531 Rpt.

Rpt. The tank records do not reflect any other activity associated with the "purchase" and "sale" transactions. *See id.*

## 2.      The Gunvor Transactions

Also in or around late 2011, Chemoil entered into four transactions with Gunvor. *See* Cohen Rpt. ¶¶ 23-33. All four Gunvor Transactions were governed by the same master contract, dated August 17, 2011. Ex. 39. In this contract, Chemoil agreed to sell ethanol to Gunvor, listing five separate deliveries over five separate time periods. *Id.* § 4.[4] Initial contract prices were pegged to the Chicago Platts ethanol price, a floating standard based on a commercial index, minus $0.1250 to $0.1500 per gallon, depending on the particular delivery window. *Id.* § 6; Parrish Dep. 184:1-17. Prices specific to each transaction were later confirmed via term sheets and email correspondence and, as revised, ranged from $0.1250 to $0.2800 per gallon below the Chicago Platts price. *See* Exs. 40, 41, 42, 43. The contract further provided that if the VEETC was "not available between 1st November/ 31st December 2011 buyer is to pay seller 45c per gallon over the agreed sales price of ethanol loaded." Ex. 39 § 19; Parrish Dep. 186:4-8.

The contract's "Title and Risk" provision specified that "[t]he risk and property in the ethanol supplied under the terms of the agreement shall pass to buyers at the loading port as the ethanol passes the vessel's permanent hose connection, at which point of delivery seller's responsibility shall cease." Ex. 39 § 14; *see also* Parrish Dep. 185:8-19 (under contract provision, product's "risk and title transfer when it goes basically on to the buyer's vessel"); Herndon Dep. 59:19-60:15; Ex. 3 ("Basler Dep.") 61:21-63:4.

---

[4] One of these deals was later cancelled and is not at issue in this case. *See* Ex. 4 ("Herndon Dep.") 56:24-57:2, 80:8-81:6, 84:16-85:5.

**Gunvor-4.** In October 2011, Chemoil ordered several million gallons of ethanol, which was delivered into Tanks 538, 614, 615, and 748 at the Vopak terminal via railcars beginning on October 15. *See* TK538 Rpt.; Ex. 44 ("TK614 Rpt."); TK615 Rpt.; Ex. 45 ("TK748 Rpt."). Chemoil also purchased approximately 2,000 gallons of gasoline from Sun Coast, which was delivered to Tank 748 on November 1. Ex. 46 at -94; TK748 Rpt. Following the addition of ethanol, Tank 748 held 435,876 gallons of ethanol, such that the added gasoline represented approximately 0.46% of the total tank volume. TK748 Rpt. at -94.

For the Gunvor-4 transaction, ethanol stored in Chemoil's Tanks 538, 614, and 615 was loaded onto the *MT Puze*, a shipping vessel designated by Gunvor, for a shipment to Brazil on November 11. Ex. 47; TK538 Rpt. at -00; TK614 Rpt. at -41; TK615 Rpt. at -15; Ex. 48. Before loading, a portion of the ethanol in Tank 748 (which contained some gasoline) was transferred to Tank 614. TK748 Rpt. at -94; TK614 Rpt. at -41. However, there is no record of gasoline (or any mixture containing gasoline) being put into Tanks 538 and 615 before the ethanol in those tanks was loaded onto the vessel as part of the Gunvor-4 shipment. Cohen Rpt. ¶ 28; TK538 Rpt.; TK615 Rpt.

**Gunvor-5.** After the movement of ethanol onto the *MT Puze* in the Gunvor-4 transaction, some of the remaining ethanol in Tanks 538, 614, and 748 was consolidated into Tank 538 and then transferred onto a different vessel, the *MT Chembulk Ulsan*, for a shipment to Brazil on November 20, which fulfilled its ethanol sale obligation for the Gunvor-5 transaction. Ex. 49; TK538 Rpt. at -00; TK614 Rpt. at -41; TK748 Rpt. at -95.

**Gunvor-6.** Leading up to the Gunvor-6 shipment, Chemoil ordered additional ethanol, which arrived via railcars and was delivered into Tanks 538, 614, 615, and 748. TK538 Rpt. at -00-02; TK614 Rpt. at -41-43; TK615 Rpt. at -16-18; TK748 Rpt. at -95. Chemoil also ordered

gasoline from Sun Coast, which delivered 1,985 gallons into Tank 748 on November 28. Ex. 50; TK748 Rpt. at -95. Just prior to this, Tank 748 held 376,217 gallons of ethanol, so the gasoline addition represented approximately 0.52% of the total volume in that tank. TK748 Rpt. at -95. On December 2, 2011, Chemoil transferred 284,912 gallons of product from Tank 748 to Tank 538. *Id.*; TK538 Rpt. at -02.

Between December 12 and 14, 2011, Chemoil transferred ethanol from Tanks 538, 614, and 615 onto the vessel *MT Kate Maersk* for a shipment to fulfill Chemoil's ethanol sale obligation for the Gunvor-6 transaction. Ex. 51 at -67; TK538 Rpt. at -02; TK614 Rpt. at -43; TK615 Rpt. at -18. According to its bill of lading, the *MT Kate Maersk* departed on December 14, 2011, to Brazil. Ex. 51 at -72.

**Gunvor-7.** In the Gunvor-7 transaction, Chemoil delivered 4,554,000 gallons of product onto the vessel *MT Nord Nightingale*. Ex. 52 at -50; Ex. 78 at -30, -47, -57. Because the VEETC expired at the end of 2011, Chemoil had intended to complete this transaction no later than December 31, 2011. Parrish Dep. 95:19-97:1, 99:13-24; Basler Dep. 143:24-145:25, 155:22-156:11. Indeed, as Chemoil employees explained to Vopak personnel, "[i]t is imperative that Chemoil get all these cars unloaded by December 31 for tax reasons." Ex. 53 at -58-59; *see* Ex. 54 at -91 ("We need to have all the cars unloaded and the trucks delivered by the 31st at the latest."); Ex. 55 at -03-04 (12/29 email from Basler to Vopak about unloading Chemoil railcars "by the 31st"); *id.* at -200-01 (12/29 email from Basler to Vopak: "Do you for[e]see any issues with getting everything unloaded by 12/31 the latest?"); Skrinar Dep. 101:19-103:15. However, logistical issues at the terminal slowed the unloading of ethanol that Chemoil had purchased from railcars that arrived in mid-to-late December. Parrish Dep. 97:2-99:24; 224:17-225:12; Herndon Dep. 32:23-33:3; Basler Dep. 140:23-142:15.

13

As the end of the year approached, Chemoil employees discussed the looming deadline for the VEETC by email. On December 29, 2011, John Skrinar emailed Aaron Parrish to inquire about the "20kb [20,000 barrels] of phys[ical] product that is unsold" per Chemoil's internal transaction tracking system. Ex. 56 at -52. Parrish replied that it was "that extra amount that we will be adding to this guvnor boat loading in the next few days," *id.*, referring to the Gunvor-7 transaction. Skrinar responded that "all of these bbls [barrels] need to be sold to Gunvor prior to Dec. 31." *Id.* Parrish responded, "Does this mean the invoice needs to be dated dec. 31 with a due date later than that? . . . Can we load the boat then generate the invoice and back date it to say the 31st?" Skrinar responded, "I would check with Phillip Lau. It's my understanding that it needs to be sold by Dec. 31. What constitutes a sale, whether that be an invoice or payment, I'm not sure. See if Phillip can help." *Id.*[5]

On December 30, 2011, Parrish emailed a Vopak employee expressing further concern over terminal delays affecting the Gunvor-7 transaction. He wrote, "Can you ensure the cars will be unloaded by days end tomorrow? . . . If we don't have these cars unloaded by days end tomorrow we lose 45c per gallon . . . Will vopak be compensating chemoil for all moneys lost by lack of railcars being unloaded?" Ex. 57 at -36. Parrish confirmed at his deposition that in writing "45c per gallon" he was referring to the VEETC, which would expire on December 31— *i.e.*, by the end of the following day. Parrish Dep. 215:11-216:5; *see also* Basler Dep. 157:21-158:20.[6]

---

[5] Phillip Lau was Chemoil's in-house tax manager at the time. Parrish Dep. at 219:8-15. Chemoil's ethanol traders did consult with Lau, but Chemoil has claimed that those communications are subject to the I.R.C. § 7525 tax practitioner's privilege, so they were not produced in discovery. Ex. 90; *see also* Parrish Dep. 219:14-21; Skrinar Dep. 103:16-105:1.

[6] Ultimately, not all of the ethanol at issue was unloaded from the arriving railcars into shore tanks by the end of 2011; three or four of the railcars were unloaded only in early 2012. *See*

In early January 2012, as Chemoil had not yet loaded any product onto the *MT Nord Nightingale*, it began making arrangements to designate the sale of the Gunvor-7 product as having occurred in December 2011 for tax purposes. On January 4, 2012, Parrish emailed Chemoil accountant Mark Pena and asked him to do what he had proposed to Skrinar several days earlier—backdate the invoice for the Gunvor-7 transaction. Parrish wrote, "We have one thing that has to be invoiced dated 12-31-11. The issue is we haven't loaded the vessel yet. It is loading the 6th." Ex. 58. In response, Pena wrote, "In this case since it won't deliver until after January 6th, we will invoice it in Jan on Jan books. However, we can modify the delivery date on the invoice to the customer to read 12-31-11. Not a problem." *Id.* Parrish also spoke to Wayne Herndon, Gunvor's representative in the United States, *see* Herndon Dep. 38:8-39:8, and "[a]sk[ed] him if [Gunvor] can take title before the end of the year." Parrish Dep. 252:17-253:5; *see also* Herndon Dep. 34:11-18.

But even while making these arrangements in early January, Chemoil had not yet identified exactly what ethanol it would deliver to the vessel to satisfy its obligation to Gunvor under the terms of the deal. On January 1, 2012, Parrish wrote to Vopak personnel (and Skrinar, his boss):

> We have given approximates for what we will be loading. We are waiting for tank 614 results to come back. Depending on what that comes back will determine if we have to load an additional 8mb [8,000 barrels] roughly of astm denatured via Astra/ADM [Archer Daniels Midland] . . . . Also the volumes from our tanks will vary depending on when Chemoil gets confirmation of what and how many railcars have actually been unloaded and into which tanks.

---

Parrish Dep. 217:6-18, 225:3-12, 234:3-10; Basler Dep. 158:21-159:1; *see also* Herndon Dep. 32:23-33:3. The ethanol in those railcars was ultimately not part of the product sold in the Gunvor-7 transaction. *See* Parrish Dep. 234:11-235:12 (explaining that ethanol remained in tank at Vopak).

Ex. 59 at -26-27. On January 4, 2012, Parrish forwarded his email correspondence with Vopak to Gunvor representatives and explained that Vopak would not allow him to load certain product without additional testing and suggesting that he "trade some of my 'undenatured' for ASTM" with "another trader" (*i.e.*, Astra or ADM) and load that ethanol into the *MT Nord Nightingale* instead. *Id.* at -22. The following day, Parrish set the plan to substitute ethanol from another trader into motion, emailing Astra to request that some of its ethanol (stored in a tank leased by ADM) be loaded onto the *MT Nord Nightingale*, which Astra agreed to do. Ex. 61.

On January 9, 2012, Robert Morant, Chemoil's assistant controller, emailed Parrish about "the three invoices that I submitted for 2011 Sales for Gunvor" for which "the POs [purchase orders] were created in January." Ex. 60 at -04-05. Morant asked Parrish to procure an email "from the vendor [*i.e.*, Gunvor] that states title passed in December 2011 . . . . Without some documentation, I am not sure whether or not they will allow the accrual to stay as 2011 Sales." *Id.* at -05; *see* Parrish Dep. 248:22-249:13. Morant also forwarded this email chain to Parrish's supervisor, Skrinar, and noted that in Chemoil's system, "these gallons [] still show[] as inventory and not sales. In order to include[] them in 2011, we need the third party email stating that title transferred to them in December 2011—still waiting on Aaron for this email." Ex. 60 at -04. Pena also emailed Steven Basler, a Chemoil trader who had worked on the logistical aspects of the deal, and requested "anything on that Dec deal where the customer took title in tank to garner the tax credit? We may still have a chance to get it posted in Dec." Ex. 62; *see* Skrinar Dep. 111:11-23.

Also on January 9, 2012, Parrish followed up on his earlier email conversation with Herndon of Guvnor, and provided draft language stating that Gunvor agreed that title to the Gunvor-7 product transferred retroactively with an "effective date" of December 31, 2011. Ex.

63. Parrish wrote, "Please note this i[s] for my back office and tax purposes. This will not be invoiced until the product has loaded. [I] just need you to reply that you agree to this. My back office is requesting it today. Thanks for your swift reply." *Id.*[7] Herndon forwarded Parrish's request email to two Gunvor employees, asking: "Please advise if ok for me to confirm back to Aaron [Parrish] acceptance of the below to Chemoil on behalf of Gunvor." Ex. 64. One of the Gunvor employees agreed, *id.*, and Herndon in turn responded to Parrish's email, stating "I'm happy to confirm on the behalf of Gunvor SA the below title transfer," Ex. 65.[8] At his deposition, Herndon explained that Parrish's January 9th email "requested that we agree to take title—or Gunvor take title to the product sitting in [Chemoil's] tank on December 31st, asking us to do that retroactively seven or eight days later. We had had conversations about us possibly agreeing to do that. And this is my response to him saying that Gunvor is confirming the title transfer at the end of the year." Herndon Dep. 118:21-119:3 (discussing Ex. 65). Herndon further

---

[7] With respect to the statement in Parrish's email that Chemoil would not invoice Gunvor for the transaction "until the product is loaded," Herndon explained that ordinarily the transfer of title would "start the clock on us having to make payment," and that Parrish was agreeing to wait until after the product was actually delivered to the vessel to start the payment clock. *See* Herndon Dep. 93:22-94:15, 97:16-98:4. That is consistent with both the master contract and the term sheet for this transaction, which specified that payment was due three calendar days after receipt of the invoice and upon presentation of certain documents, including the bill of lading. Ex. 39 § 7; Ex. 43.

[8] At their depositions, both Parrish and Herndon testified that the reason for agreeing that title transferred on December 31, 2011, was to avoid a Texas inventory tax, not to claim the VEETC. *See* Parrish Dep. 216:6-25; Herndon Dep. 34:11-35:2; Ex. 64. Both Parrish and Herndon testified that they believed (incorrectly) that the product merely needed to be blended by the end of the year in order to obtain the VEETC. *See* Parrish Dep. 256:19-257:17; Herndon Dep. 36:16-22, 99:25-100:12. Basler and Skrinar, however, understood that in order to claim the VEETC, it was necessary to both blend (*i.e.*, create an ethanol/gasoline mixture) and sell the mixture before the statutory credit expired, Basler Dep. 40:20-41:4, 43:5-18; Skrinar Dep. 103:16-105:1, 109:3-16, which is consistent with the statutory text, *see* I.R.C. § 6426(b)(3) (credit requires that alcohol fuel mixture be "sold . . . for use as a fuel" or be "used as a fuel").

testified that he understood the parties to have modified their agreement so that the title transfer was "[i]n-tank in name only." *Id.* at 119:11-22.

Ultimately, the ethanol that Chemoil delivered for the Gunvor-7 transaction did not begin loading onto the *MT Nord Nightingale* until January 9, 2012, and was not fully loaded until January 14, 2012. Ex. 66 ("TK723 Rpt."); Ex. 67; *see also* Herndon Dep. 105:7-21. The product was transferred onto the vessel from Tanks 410, 614, 615, 723, and 748. Ex. 67. At the time, Tank 723 was leased to Astra, TK723 Rpt., and Tank 410 was leased to ADM,[9] Ex. 67; Ex. 61. Of the more than 4.5 million gallons that Chemoil sold as part of this transaction, 706,929 gallons of ethanol were loaded from Tank 410, Ex. 68, which did not contain any gasoline prior to loading onto the vessel, Ex. 69.[10] According to the ship's bill of lading, the Gunvor-7 product shipped to Oman on January 14, 2012. Ex. 52 at -46. Chemoil sent the invoices for this deal (backdated to December 31, 2011) to Gunvor on January 19, 2012. Ex. 52.

### 3.     The IRS Audit and Chemoil's Appeal

In its Form 720, "Quarterly Federal Excise Tax Return," for the quarter ending December 31, 2011, Chemoil claimed alcohol fuel tax credits totaling $6,682,529.25 from its sale of alcohol fuel mixtures containing a reported 14,850,065 gallons of ethanol. Ex. 70 at -59.[11]

---

[9] Although there is some confusion as to which entity was leasing Tank 410 at the time of the Gunvor-7 transaction, *see* Parrish Dep. 236:4-16, it appears that ADM was leasing the tank but that Chemoil purchased the ethanol disbursed from that tank into the *MT Nord Nightingale* from Astra, *see* Ex. 67.

[10] This is consistent with the fact that Chemoil permitted ADM to choose which of three tanks—410, 411, or 919—the ethanol would be transferred from, and ADM in turn "instructed VOPA[K] to pick [which] tank." Ex. 61 at -05. Chemoil apparently made no effort to ensure that the ethanol sourced from ADM was blended with gasoline before being loaded for use as part of the Gunvor-7 transaction, and thus was indifferent to which of ADM's tanks was used.

[11] Form 720 does not require a taxpayer to itemize its claimed credits by transaction. However, during the audit, Chemoil represented that "the only alcohol fuel mixture credits that were taken

IRS audited Chemoil's return and determined that the company was not entitled to the credits on any of the seven Astra and Gunvor transactions that made up the claimed tax credits. *See* Ex. 72. On July 30, 2014, IRS issued a Revenue Agent's Report to Chemoil proposing the disallowance of the credits. *Id.* Additionally, IRS proposed an excessive claims penalty under I.R.C. § 6675 against Chemoil with respect to the Gunvor-7 transaction, which took place after the tax credit expired. *See* Ex. 73. The amount of the penalty was $4,098,600, two times the $2,049,300 in credits that Chemoil had claimed for this transaction. *Id.* IRS issued a separate Revenue Agent's Report to Chemoil regarding the penalty on August 19, 2014. *Id.*

On August 18, 2014, the day before IRS sent the Revenue Agent's Report regarding the penalty, the determination to assess the penalty was approved in writing by an IRS supervisor. The IRS revenue agent who conducted the Chemoil audit, Alan Anderson discussed assessing a penalty with his supervisor, group manager Tom Deis, who "concur[red] that the excessive claim should be applied." Ex. 74 at -83; Ex. 6 ("Anderson Dep.") 133:8-134:24. IRS's administrative file contains copies of the "E500 Penalty Check Sheet" that memorializes Mr. Deis's written approval of the penalty on that date. *See* Exs. 75, 76.

Chemoil responded to both Revenue Agent's Reports with a written protest dated August 29, 2014. Ex. 71. Chemoil then administratively appealed the penalty and the denial of the credits, filing a Form 843, "Claim for Refund and Request for Abatement," on September 23, 2014. *See* Ex. 77. During a conference with the IRS Office of Appeals on May 18, 2016, Chemoil presented a deck of slides summarizing its position that it was entitled to the tax credits and that the excessive claims penalty was not warranted. *See* Ex. 78. Those slides were later

---

are for the three Astra transactions and four Gunvor transactions," Ex. 71 at -70, the seven transactions that IRS reviewed during the audit, *see* Ex. 72 at -12-16.

annotated to reflect the IRS audit team's response to Chemoil's arguments, and Chemoil's further response. *Id.* After efforts to resolve Chemoil's appeal consensually were unsuccessful, the Appeals Office formally disallowed Chemoil's claims relating to the tax and the excessive claims penalty in two letters dated October 6, 2017. *See* Ex. 79.

### C.  Procedural History

Chemoil filed its complaint in this action on July 8, 2019. Dkt. No. 1, Complaint ("Compl."). The complaint seeks a refund of the $6,682,529.25 in disallowed alcohol fuel mixture credits, $335,435.03 in interest, and the $4,098,600 penalty, as well as any additional allowable interest on those amounts and costs. *Id.* ¶¶ 1, 36. In addition to alleging that it met the statutory requirements for receiving the credits, *id.* ¶¶ 21-23, 38, Chemoil's complaint also claims that IRS should not have assessed a penalty because the company "acted with reasonable cause," *id.* ¶¶ 45-46, and asserts that the penalty cannot stand because IRS did not comply with the requirement of I.R.C. § 6751(b) that certain penalties be approved in writing by a manager, *id.* ¶¶ 47-48.

In the course of discovery, the United States disclosed two expert witnesses: Evan Cohen, an economist, who opined about the expected economic outcomes of the seven transactions at issue, *see* Cohen Rpt.; and Michael Leister, an expert in fuel markets, who opined about the types, uses, and specifications for ethanol, as well as customary industry practices for transporting, blending, sampling, and pricing it, *see* Leister Rpt. Chemoil did not disclose any experts.

### ARGUMENT

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving

party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) (citing *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see also* Fed. R. Civ. P. 56(c)(1).

In reviewing a summary judgment motion, courts construe the evidence "in the light most favorable to the non-movant and draw[s] all reasonable inferences in that party's favor." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011). However, "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), and a factual dispute does not preclude summary judgment where "the evidence is merely colorable, or is not significantly probative," *Anderson*, 477 U.S. at 249 (citation omitted).

Chemoil bears the burden of proving it properly claimed the alcohol fuel mixture tax credits at issue here. *Alternative Carbon*, 939 F.3d at 1328. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a summary judgment motion, but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

I.   **CHEMOIL IS NOT ENTITLED TO THE TAX CREDITS ASSOCIATED WITH THE ASTRA AND GUNVOR TRANSACTIONS**

A.   **Chemoil Cannot Recover the Tax Credits Because the Transactions at Issue Lack Economic Substance**

"The 'economic substance' doctrine is a common law rule that allows courts to question the validity of a transaction and deny taxpayers benefits to which they are technically entitled under the [Internal Revenue] Code if the transaction at issue lacks 'economic substance.'" *Bank of N.Y. Mellon Corp. v. Comm'r* ("*BONY Mellon*"), 801 F.3d 104, 113 (2d Cir. 2015) (citing *Gregory v. Helvering*, 293 U.S. 465, 468-70 (1935)); *accord Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1354 (Fed. Cir. 2006) ("[T]he economic substance doctrine is . . . a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance.").

Transactions "lack economic substance" when they "can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." *Lee v. Comm'r*, 155 F.3d 584, 586 (2d Cir. 1998) (quotation marks omitted). In other words, "[t]o be 'valid' and not just a 'sham,' a transaction must involve more than just tax benefits: it must have independent economic substance." *BONY Mellon*, 801 F.3d at 108 (citing *DeMartino v. Comm'r*, 862 F.2d 400, 406 (2d Cir. 1988) ("A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions.")). Or, as the Federal Circuit has framed the inquiry: "[t]he economic substance doctrine seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is legitimate, and creating a

transaction to generate a tax benefit, which is illegitimate." *Salem Fin., Inc. v. United States*, 786 F.3d 932, 942 (Fed. Cir. 2015) (quotation marks omitted).[12]

There are no "categorical exemptions" from this doctrine. *BONY Mellon*, 801 F.3d at 114. A "taxpayer carries an unusually heavy burden in seeking to show that anti-abuse doctrines like economic substance do not apply to the situation at hand." *Id.* (citing *Diggs v. Comm'r*, 281 F.2d 326, 330 (2d Cir. 1960)) (rejecting argument that the "economic substance doctrine cannot be applied to disallow foreign tax credits"). As the Second Circuit has explained, the "economic substance doctrine exists to provide courts a 'second look' to ensure that particular uses of tax benefits comply with Congress's purpose in creating that benefit." *Id.* at 113.[13] Other courts have concurred that "economic substance is a prerequisite to the application of any [Internal Revenue] Code provision allowing deductions." *Coltec Indus.*, 454 F.3d at 1356 (brackets and quotation marks omitted); *accord, e.g.*, *Salem*, 786 F.3d at 942 (economic substance doctrine permits a court to disregard transactions that are "devised to comply with the letter of governing statutes and regulations," but are in fact "contrivances that are inconsistent with the purposes served by the Code provisions"); *In re CM Holdings, Inc.*, 301 F.3d 96, 102 (3d Cir. 2002) (holding that

---

[12] The economic substance doctrine originated as a judicially created doctrine. Congress later "codified the two-part economic substance test used in many Circuits, including [the Second Circuit], and affirmed decades of judge-made law from around the country on economic substance," with respect to certain types of tax situations. *BONY Mellon*, 801 F.3d at 114 (discussing I.R.C. § 7701(o)). However, the statutory version of the doctrine does not apply in this case, as it applies only to income taxes, not excise taxes. *See* I.R.C. § 7701(o)(5)(A) (stating that statutory version applies only to "subtitle A" of the I.R.C.). Instead, the government's argument relies on the common law economic substance doctrine, which continues to apply with full force post-codification. *See id.* § 7701(o)(5)(C) ("The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted.").

[13] The Second Circuit in *BONY Mellon* also observed that the codification of the doctrine supported its view that the doctrine applied broadly, because Congress "did not create categorical exceptions to the doctrine, for foreign tax credits or otherwise." 801 F.3d at 114.

"[e]conomic substance is a prerequisite to the application of any Code provision allowing deductions"; "even if a transaction complies precisely with all requirements for obtaining a deduction, if it lacks economic substance it simply is not recognized for federal taxation purposes" (quotation marks omitted)).

The economic substance doctrine applies even when the tax scheme at issue may have been intended to incentivize certain behavior, including transactions that might otherwise be unprofitable. *See Alternative Carbon*, 939 F.3d at 1331 (a "'careful review'" under the economic substance doctrine is appropriate where "a taxpayer engages in a transaction that is otherwise unprofitable in order to collect tax credits" (quoting *Salem*, 786 F.3d at 950)); *see also, e.g.*, *Sacks v. Comm'r*, 69 F.3d 982, 992 (9th Cir. 1995) (conducting economic substance doctrine when the tax benefit in question was "intended to induce investments which otherwise would not have been made," but concluding that the transactions did in fact have economic substance); *Sparkman v. United States*, No. 08 Civ. 87, 2009 WL 5103165, at *6 (D. Haw. Dec. 28, 2009) (holding that economic substance doctrine applied even where "Congress purposely used tax incentives . . . to change investors' conduct"). Indeed, the Federal Circuit recently applied an economic substance analysis in a case involving a different fuel mixture credit in I.R.C. § 6426, the alternative fuel mixture credit. *See Alternative Carbon*, 939 F.3d at 1322. In so doing, the court rejected the taxpayer's argument that the economic substance doctrine was inapplicable because it the taxpayer was seeking to "claim[] energy credits." *Id.* at 1331. To the contrary, the court held that the "economic substance doctrine is therefore indisputably relevant" to the analysis of whether a taxpayer is entitled to credits under I.R.C. § 6426. *Id.*

"The preliminary step of the economic substance inquiry is to identify the transaction to be analyzed." *BONY Mellon*, 801 F.3d at 115. "Even if the transaction at issue is part of a larger

series of steps, 'the relevant inquiry is whether the transaction that generated the claimed deductions had economic substance.'" *Id.* (quoting *Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 284 (2d Cir. 2003)) (alterations omitted). Once the relevant transaction is identified, the court analyzes two factors. First, it "determin[es] the objective economic substance of the transaction at issue"—that is, "whether the taxpayer had an objectively reasonable expectation of profit, apart from tax benefits, from the transaction." *Id.* (citing *Gilman v. Comm'r*, 933 F.2d 143, 147-48 (2d Cir. 1991)). Second, the court determines "the taxpayer's subjective business purpose in entering the transaction," and in particular, "whether the taxpayer had a subjective non-tax business purpose in entering the transaction." *Id.* The court then "consider[s] both the objective and subjective analysis to make a final determination of economic substance." *Id.* However, the economic substance analysis is not a "rigid . . . process with discrete prongs," and instead is a "flexible analysis," in which both the objective and subjective "prongs are factors to consider in the overall inquiry into a transaction's practical economic effects." *Id.* (quotation marks omitted); *see Gilman*, 933 F.2d at 148.

### 1.    Chemoil Lacked an Objectively Reasonable Expectation of Pre-Tax Profit in the Transactions

At the first step of the analysis, Chemoil cannot show that the transactions at issue had objective economic substance—that is, that Chemoil had an "objectively reasonable expectation of profit, apart from tax benefits," with respect to any of these transactions. *BONY Mellon*, 801 F.3d at 115. "The probability of earning a profit must be reasonable, not a mere possibility." *Blum v. Comm'r*, 737 F.3d 1303, 1312 (10th Cir. 2013) (citing *Stobie Creek Invs., LLC v. United States*, 608 F.3d 1366, 1376 (Fed. Cir. 2010)). Undisputed facts demonstrate that this was not the case for any of the seven transactions.

**Astra transactions.** Chemoil did not expect to earn a pre-tax profit from any of the Astra transactions. As set forth above, Chemoil engaged in linked "buy/sell" transactions with Astra, in which it bought fuel-grade ethanol from Astra and then re-sold the same ethanol (with a small amount of gasoline added) to Astra at 40 cents per gallon *less* than the purchase price. *See* Exs. 10, 11, 23, 24, 33, 34. The buy and sell transactions were negotiated at the same time, so the transactions locked in Chemoil's pre-tax loss of 40 cents per gallon (not including the cost of the gasoline that Chemoil purchased to add to the ethanol). The government's expert economist calculates that, on a pre-tax basis, Chemoil lost $1,175,262 in Astra-1, $467,643 in Astra-2, and $444,344 in Astra-3. Cohen Rpt. ¶¶ 68-73 & tbl.2.

Moreover, based on contemporaneous market values, the government's expert opines that Chemoil's ethanol purchase prices were between 25 and 31 cents per gallon above the market price for ethanol at the time of the Astra transactions, and its sales prices were between 9 and 14.5 cents below the market price. *See id.* ¶¶ 69, 71, 73. These contract prices, which were untethered to market prices, are additional evidence that Chemoil had no expectation of pre-tax profit, as Chemoil contracted to buy ethanol from Astra at prices well in excess of then-existing market prices and to re-sell it at 40 cents per gallon less. *See id.* ¶¶ 14-22. This structure essentially guaranteed that Chemoil—which took title to the fuel for only a few days—would incur a significant pre-tax loss, since it had no realistic prospect of any other profitable use or disposition of the fuel in the meantime (and certainly not one that could make up for a 40-cent-per-gallon deficit). *See id.* ¶¶ 41, 54-62.

The record contains no evidence that Chemoil had any objectively reasonable expectation of profit, except from claiming the tax credits. Rather, because the Astra transactions involved

significant pre-tax losses, without any possibility of offsetting gains, the transactions lack objective economic substance.

**Gunvor Transactions**. Chemoil also lacked an objective expectation of pre-tax profit in the Gunvor transactions. In each of these transactions, Chemoil agreed to sell ethanol to Gunvor in Houston (where the Vopak terminal is located) at prices below the Chicago Platts market price, despite the fact that prices in Houston were higher than Chicago market prices at the time. *Id.* ¶¶ 36, 42-49 & figs.8-9. As a result, the Gunvor transactions resulted in pre-tax losses of around 20 cents per gallon for Chemoil (more precisely, between $0.1913 and $0.2274 per gallon, depending on the transaction). *See id.* ¶¶ 42-48.

To the extent Chemoil argues it could have received certain non-tax economic benefits from the Astra and Gunvor transactions, such benefits could not render these transactions profitable on a pre-tax basis. First, to the extent Chemoil claims that the transactions could have provided it with potential benefits related to Renewable Identification Numbers ("RINs"), *see* Ex. 80 at Responses to RFAs 6, 15, 23, such benefits could not outweigh the significant pre-tax losses built into the transactions. Cohen Rpt. ¶¶ 52-53. RINs are credits generated by the production of renewable fuel, which can be sold on a secondary market when "separated" from the fuel.[14] *Id.* ¶ 52. As the government's economics expert explains, the type of RINs at issue in this transaction sold for between $0.01 and $0.04 per gallon in 2011. *Id.* ¶ 53. Even assuming that the transactions at issue here created RINs and that those RINs could be sold at the maximum $0.04-per-gallon value, this potential benefit is far below what would be required to offset losses of approximately 20 or 40 cents per gallon that Chemoil incurred in each of the transactions. *Id.*

---

[14] For additional background on RINs, *see* Leister Rpt. § 5.4.

Second, to the extent Chemoil claims the transactions could have provided it with certain "inventory benefits," such benefits were both improbable and insufficient to outweigh the pre-tax losses built into the transactions. The alleged inventory benefits that Chemoil has argued it received arose from the Astra transactions, *see* Ex. 80 at Responses to RFAs 6, 15, 23, and were principally focused on the notion that having additional ethanol available could permit Chemoil to engage in other transactions or avoid expenses from delayed deliveries. *See* Cohen Rpt. ¶¶ 54-55. But the windows of time during which Chemoil purportedly owned the ethanol in the Astra transactions were very short—only a few days—making it highly unlikely that Chemoil could logistically arrange for interim transactions and then replace the ethanol so it could be sold back to Astra on the agreed schedules. *Id.* ¶ 56. Moreover, there is no evidence that Chemoil reasonably believed the price of ethanol would fluctuate enough during the brief periods at issue to create the possibility of profit from arbitrage, particularly given the significant per-gallon loss built into the Astra transactions. *Id.* ¶¶ 57-58.

Accordingly, all of the transactions at issue lacked objective economic substance, because Chemoil had no reasonable expectation of a profit without the benefit of the VEETC.[15]

---

[15] To the extent Chemoil argues that its lack of pre-tax profit should not be considered as part of the economic substance analysis, the Court should reject the argument. While courts conducting an economic substance analysis have concluded that, in uncommon circumstances, "a legitimate transaction could conceivably lack economic profit," *BONY Mellon*, 801 F.3d at 119, this does not mean a lack of pre-tax profit is not relevant. Rather, the Second Circuit has held that "[d]etermining whether a given transaction has economic substance under the objective prong therefore requires *both* a calculation of pre-tax profit and a consideration of the transaction's overall economic effect." *Id.* Particularly because the overall economic effect of the transactions here (unlike in more complicated transactions) is that Chemoil incurred pre-tax losses that it had no possibility of recouping other than through the VEETC, this gloss on the analysis does not help Chemoil.

2.      **Chemoil Lacked a Non-Tax Business Purpose for Engaging in the Transactions**

The undisputed record evidence also demonstrates that Chemoil's subjective intent in engaging in the transactions was to generate tax credits, and that it had no non-tax business purpose for engaging in these otherwise unprofitable transactions.

Chemoil's traders repeatedly acknowledged in contemporaneous emails that the true purpose of the transactions was to generate tax credits for Chemoil. For example, when a Chemoil accountant inquired by email whether, in one of the Astra deals, Chemoil was "selling at a Loss? (we bought from Astra @ $ 2.46 / gallon, but we sell back @ $ 2.06/gallon)?," Chemoil trader Aaron Parrish responded that the profit for the deal came from the VEETC: "As far as the price we are blending this product for them and we are collecting a 45c per gallon tax credit. Therefore netting 5c per gallon." Ex. 14. In another internal Chemoil email, Parrish noted with respect to the Astra-1 transaction—again presumably to explain the 40-cent-per-gallon difference between Chemoil's purchase price of $2.46 and re-sale price of $2.06 per gallon— "Please keep in mind we are collecting a 45c per gallon tax credit. So we are making 5c per gallon." Ex. 22; *see also* Parrish Dep. 81:24-82:17 ("[W]e had agreed to sell product back to [Astra] and that we were getting a tax credit for blending product.").

Chemoil employees admitted at their depositions that these transactions were tax-motivated. Both Parrish and Skrinar admitted that the Astra-1 transaction would have resulted in a 40-cent-per-gallon loss for Chemoil, but for the 45-cent-per-gallon tax credit. Parrish Dep. 132:4-8; Skrinar Dep. 133:13-20 (referring to the VEETC as a "critical piece" of the deal). Similarly, Parrish conceded that, aside from the tax credit, Chemoil incurred a loss in the Astra-2 transaction. Parrish Dep. 135:22-136:7. He did not know of any purpose for that transaction other than claiming the tax credit. Parrish Dep. 136:8-13. And Parrish also conceded that

Chemoil engaged in the Astra-3 transaction at a loss but for the tax credit. *Id.* at 155:23-156:2. Indeed, Parrish admitted that, in "hindsight," the transactions did not "ma[k]e sense" without the tax credit, because the deals "would not have made money had there not been a tax credit." *Id.* at 88:12-24 (testimony regarding Astra-1); *see also* Basler Dep. 207:20-208:9 (agreeing that the Astra-3 transaction would result in a 40-cent-per-gallon loss for Chemoil, assuming the two contracts comprising the deal were related).

The evidence also demonstrates that Chemoil's purpose in entering into the Gunvor transactions was to generate the 45-cent-per-gallon tax credit. The centrality of the credit was baked into the deals: the Chemoil-Gunvor master contract provided that if the VEETC "was not available between 1st November/ 31st December 2011 buyer is to pay seller 45c per gallon over the agreed sales price of ethanol loaded." Ex. 39 § 19. Moreover, the importance of the VEETC is evident from the fact that Chemoil viewed it as "imperative" to complete ethanol-related movements "by December 31 for tax reasons," *i.e.*, before the credit expired. Ex. 53 at -59. Furthermore, as Gunvor's representative testified, the below-market pricing of the Gunvor deals "reflects the value of the VEETC" as a source of profit for Chemoil. Herndon Dep. 57:22-58:3.

Significantly, Chemoil's creation of the ethanol-gasoline mixtures in all seven transactions was done solely to claim the tax credit—that is, there was no non-tax business purpose for adding a small amount of gasoline to the ethanol. Chemoil traders repeatedly admitted this during their depositions. *See* Parrish Dep. 83:21-84:5 ("purpose" of adding gasoline in Astra-1 was "to get a tax credit"); *id.* at 159:4-7 (Parrish acknowledging that gasoline was added to ethanol in Astra-3 for purposes of claiming the tax credit); Basler Dep. 49:11-21 (Chemoil trader Steven Basler stated that the reason Chemoil added gasoline to ethanol was "[t]o claim the VEETC"); *id.* at 155:14-21 (Basler acknowledged that "[t]here would be no other

reason" for adding gasoline except to claim the tax credit); *id.* at 188:15-24 (gasoline added to ethanol in order to claim tax credit); *id.* at 217:10-13 (Chemoil's addition of gasoline with respect to Astra-3 was "[p]robably to claim the tax credit"); Skrinar Dep. 50:22-51:11, 52:3-8 (Chemoil added gasoline to ethanol to claim the tax credit, not due to another business requirement). Indeed, Astra and Gunvor, Chemoil's counterparties, contracted simply to buy *ethanol* and were largely indifferent to Chemoil's addition of gasoline to it. *See, e.g.*, Ex. 5 ("Raposo Dep.") 119:18-23 (disclaiming knowledge of why gasoline was shipped to Astra as part of the Chemoil/Astra transactions at issue); Herndon Dep. 72:16-73:3 (Gunvor's representative was aware of no reason to add gasoline to the product Gunvor purchased in the Gunvor transactions other than to collect the VEETC), 109:5-10 (same). Chemoil's counterparties simply did not "care[] one way or the other" whether gasoline was added to the ethanol they were purchasing, as "[i]f they did, they would have specified it" as a requirement in the contracts.[16] Parrish Dep. 181:14-25 (testimony regarding Gunvor transactions); Ex. 81 (email from Astra to Chemoil regarding the addition of gasoline to Astra-3: "as you are the one collecting the [tax] credit, feel free to factor any volume margin [of gasoline] you may deem necessary . . .").

---

[16] Astra and Gunvor contracted to buy ethanol from Chemoil using ethanol fuel specifications that did not require that Chemoil add any gasoline, but instead *capped* the total amount of hydrocarbons or denaturants (including gasoline) that could be added to the ethanol. Parrish Dep. 85:25-86:25 (testimony regarding ANP standard used in Astra-1 and Astra-2 transactions), 152:22-154:24, 160:19-161:20 (testimony regarding ASTM D-4806 ethanol standard used in Astra-3 transaction), 181:3-25 (testimony regarding specifications used in Gunvor transactions); Herndon Dep. 53:1-18 (Gunvor-Chemoil contract specified maximum, but not minimum, gasoline amount). Thus, the counterparties' only interest was to ensure that Chemoil did not add too much gasoline and "cause a problem with [the] spec" applicable to the transaction. Ex. 82 (regarding Astra-3); *see* Parrish Dep. 160:12-18.

Further, the record does not reflect any legitimate non-tax business purpose for the transactions at issue. Some Chemoil personnel speculated at their depositions that there could have been other non-tax business purposes for the transactions, including potential benefits from the availability of ethanol inventory. *See* Parrish Dep. 156:7-22 (stating that "hold[ing] the product" for "six days" could provide "options of stuff to do" with it); Skrinar Dep. 132:13-133:3 ("the ability to have more fuel at one time or purchases and subsequent sales at a different date added flexibility to our book"). But such speculation does not create a question of fact about the *actual* business purpose of the transactions, as there is no evidence that any such purported non-tax purpose was *in fact* the reason Chemoil undertook the transactions at issue. *See Brown*, 654 F.3d at 358 ("unsubstantiated speculation" is insufficient to defeat summary judgment (quotation marks omitted)). Nor would any of these purported purposes make sense as the motivation for the transactions as they could not generate sufficient benefits to outweigh the pre-tax losses priced into the transactions. *See* Cohen Rpt. ¶¶ 50-62.

In sum, the undisputed record demonstrates there was no non-tax business purpose for Chemoil to engage in the Astra and Gunvor transactions, which would have led to significant losses without the VEETC. Instead, Chemoil's creation of fuel mixtures for these transactions was "entirely predicated on the tax benefits it involved," and thus "lacked a subjective business purpose beyond tax avoidance." *BONY Mellon*, 801 F.3d at 122.

### 3.    The Overall Analysis Demonstrates That the Transactions Lack Economic Substance

As a last step, the court "consider[s] both the objective and subjective analysis to make a final determination of economic substance." *BONY Mellon*, 801 F.3d at 115. Here, the overall analysis of the objective and subjective portions of the test leads ineluctably to the conclusion that the transactions lack economic substance.

"One rule of thumb is that a transaction has economic substance if it is 'likely to produce economic benefits aside from a tax [benefit].'" *Blum*, 737 F.3d at 1312 (quoting *Casebeer v. Comm'r*, 909 F.2d 1360, 1365 (9th Cir. 1990)). Here, Chemoil entered into transactions that were unprofitable without the associated tax benefits. In the Astra deals, Chemoil bought ethanol at above-market prices from Astra, paid a third party to add small volumes of gasoline to the ethanol, and then resold the resulting mixture at below-market prices, at a loss of 40 cents per gallon of ethanol in each of the three transactions. In the Gunvor deals, Chemoil sold ethanol (after adding small volumes of gasoline) at below-market prices and would not have profited without the VEETC. Moreover, the contemporaneous communications demonstrate that the purpose of engaging in these otherwise irrational transactions was to claim the tax credit; they do not reveal any other legitimate business purpose.

When a taxpayer engages in transactions and creates fuel mixtures for the sole purpose of generating tax credits under § 6426, without the possibility of pre-tax profit and without a valid, non-tax business purpose for the structure of the transactions, the credits must be disallowed under the economic substance doctrine. *See Alternative Carbon*, 939 F.3d at 1329-31. Here, the undisputed record contains "no evidence [Chemoil] ever 'reasonably expected' to generate any profit apart from the tax credits." *Id.* at 1330. Chemoil entered into the transactions at issue for the "illegitimate" reason of creating tax benefits, and would not have engaged in them otherwise. *Salem*, 786 F.3d at 942. Because the deals with Astra and Gunvor lack economic substance, the Court should disallow any tax benefits that Chemoil has claimed that derive from these transactions.

### B.    Chemoil Did Not Satisfy Several Statutory Requirements for Claiming the Credits

Even if the transactions had economic substance, Chemoil could not recover its disallowed tax credits because it did not meet all of the requirements of I.R.C. § 6426 for claiming them. First, in two of the transactions (Astra-1 and Astra-3), Chemoil did not actually engage in a "sale" of a fuel mixture. Second, with respect to a substantial portion of the product in two of the transactions (Gunvor-4 and Gunvor-7), Chemoil did not create an "alcohol fuel mixture" because it did not add any gasoline to the ethanol before selling it. Third, Chemoil did not sell the product in any of the transactions "for use as a fuel," as the mixtures it created could not be so used without modification. And fourth, Chemoil did not sell the product for the Gunvor-7 transaction before the credit expired.

### 1.    There Were No *Bona Fide* Sales of Alcohol Fuel Mixtures in the Astra-1 and Astra-3 Transactions

Chemoil is not entitled to claim the VEETC for the Astra-1 and Astra-3 transactions, because those transactions did not involve *bona fide* sales. Because the benefits and burdens of ownership of the relevant product did not transfer from Astra to Chemoil, and back again from Chemoil to Astra, no sale took place for tax purposes; thus, the Court should conclude that no credit can be claimed for these transactions.

A taxpayer may only claim the alcohol fuel mixture credit for "producing any alcohol fuel mixture for sale or use in a trade or business of the taxpayer." I.R.C. § 6426(b)(1). An "alcohol fuel mixture" is defined as "a mixture of alcohol and a taxable fuel" that is either "sold by the taxpayer producing such mixture to any person for use as a fuel," or "used as a fuel by the taxpayer producing such mixture." *Id.* § 6426(b)(3).

The statute "offers no specific definition of what it means for a[] . . . fuel mixture to be 'sold by the taxpayer.'" *Alternative Carbon*, 939 F.3d at 1328. "When interpreting the Internal

Revenue Code, 'the term "sale" is given its ordinary meaning and is generally defined as a transfer of property for money or a promise to pay money.'" *Calloway v. Comm'r*, 691 F.3d 1315, 1327 (11th Cir. 2012) (quoting *Anschutz Co. v. Comm'r*, 664 F.3d 313, 324 (10th Cir. 2011)). "The determination of ownership of an asset for tax purposes is to be based on an analysis of many different factors indicative of ownership, not always on the bare legal title." *Bailey v. Comm'r*, 912 F.2d 44, 47 (2d Cir. 1990).

"Where two parties purport to transfer an interest in an asset, courts may disregard the purported transfer, for federal tax purposes, 'where the transferor continues to retain many of the benefits and burdens of ownership.'" *Altria Group, Inc. v. United States*, 658 F.3d 276, 285 (2d Cir. 2011) (quoting *Bailey*, 912 F.2d at 47); *see also Bailey*, 912 F.2d at 47 (collecting cases). The question of which party has the benefits and burdens of ownership is "a question of fact to be determined by reference to the written agreements and the attendant facts and circumstances." *Upham v. Comm'r*, 923 F.2d 1328, 1334 (8th Cir. 1991).

Factors commonly considered in determining whether ownership has transferred include:

(1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation and disposition of the property.

*Arevalo v. Comm'r*, 469 F.3d 436, 439 (5th Cir. 2006) (quoting *Upham*, 923 F.2d at 1334). However, "[n]o one of these factors controls, as the determination of ownership is based on all the facts and circumstances of a particular case, and some factors may be 'ill-suited or irrelevant' to a particular case." *Route 231, LLC v. Comm'r*, 810 F.3d 247, 260 (4th Cir. 2016) (quoting *Calloway*, 691 F.3d at 1327); *see Altria*, 658 F.3d at 286 (noting that factfinder must consider "all the relevant facts and circumstances," such that "no single factor is determinative"

(quotation marks omitted)); *accord AT&T Advert., L.P. v. United States*, 147 Fed. Cl. 478, 486

(2020) (benefits-and-burdens assessment involves a "highly fact intensive inquiry"); *ADVO, Inc.*

*v. Comm'r*, 141 T.C. 298, 325 n.21 (2013).

Chemoil's claimed credits for the Astra-1 and Astra-3 transactions were properly

disallowed because there was no *bona fide* sale for tax purposes as part of those transactions. In

both transactions, the vast majority of the fuel involved (more than 99.8%) was ethanol that

Astra brought to the transaction, and which remained in tanks controlled by Astra throughout the

transactions. *See* TK503 Rpt.; TK531 Rpt.; Exs. 10, 11, 33, 34. Chemoil's role was limited to

purchasing a small amount of gasoline that was added to the ethanol before Chemoil transferred

title back to Astra. Application of the factors discussed above demonstrates that the benefits and

burdens of ownership of the product were never transferred from Astra to Chemoil, or back again

to Astra.

**Lack of control over the product.** As the Supreme Court has held, courts have "refused

to permit the transfer of formal legal title to shift the incidence of taxation attributable to

ownership of property where the transferor continues to retain significant control over the

property transferred." *Frank Lyon Co. v. United States*, 435 U.S. 561, 572-73 (1978) (collecting

cases). Thus, control over the property is a significant consideration in the benefits-and-burdens

analysis. *See Upham*, 923 F.2d at 1334 ("[W]here the transferor continues to retain significant

control over the property transferred, the transfer of formal legal title will not operate to shift the

incidence of taxation attributable to ownership of the property."); *see also Altria*, 658 F.3d at 286

(reviewing benefits-and-burdens analysis including factor of "control over the facility").

Here, Astra indisputably maintained control over the fuel throughout the Astra-1 and

Astra-3 transactions. The fuel at issue remained in tanks leased by Astra for the duration of the

supposed sale to Chemoil and the sale back to Astra. *See* TK503 Rpt. (Astra-1), TK531 Rpt. (Astra-3). As noted above, the only action that Chemoil took with respect to the fuel during the transactions was to order gasoline from third-party Sun Coast for addition into Astra's tanks. *See* Ex. 18 (Chemoil gasoline order for Astra-1); Ex. 38 (Chemoil gasoline order for Astra-3). In order for the gasoline to be added to the ethanol—the principal step that Chemoil purportedly undertook to create "mixtures" supporting the tax credit—*Astra*, not Chemoil, directed Vopak to pipe the Sun Coast gasoline into the relevant tanks, *see* Ex. 19 (Vopak order for Astra-1); Ex. 37 (Vopak order for Astra-3)—even though this took place when Chemoil purportedly "owned" the fuel.

Thus, the record indicates that Astra maintained control over the fuel in the tanks it leased throughout the transactions, including the brief periods when title purportedly transferred to Chemoil. This factor strongly indicates that no *bona fide* sales took place in the Astra-1 and Astra-3 transactions.

**The parties' intent and treatment of the transactions.** The structure of the Astra-1 and Astra-3 transactions also indicates that the parties treated the dual "purchase" and "sale" comprising each of these transactions as linked, and the fuel as effectively remaining an asset of Astra's throughout the period covered by the transactions. *See ADVO*, 141 T.C. at 326 ("We are less concerned with the label that the parties give the transaction; we look to what the parties actually intended to happen."). The contracts for the Chemoil-Astra transactions refer to a prior agreement between Aaron Parrish of Chemoil and Andre Raposo of Astra on December 7, 2011, which governed Chemoil's purchases of ethanol from Astra and the sale of fuel from Chemoil back to Astra in each of the transactions. *See* Exs. 10, 11 (Astra-1 contracts); Exs. 33, 34 (Astra-3 contracts). In both of the pairs of transactions that make up Astra-1 and Astra-3,

Chemoil purportedly purchased from Astra and then sold back to Astra days later exactly the same number of barrels of "Fuel Grade Ethanol," meeting the same specifications, held in the same tanks, at a price exactly 40 cents higher. *See id.* In communications, the participants discuss the "buy" and "sell" transactions in tandem. *See* Ex. 13 (email transmitting "contracts for the purchase and sale of the 72,000 barrels of product on tank 503" relating to Astra-1); Ex. 83 (describing Astra-3 transaction as "the third one," for "26000 bbls of astm [specification ethanol] in tank 531"); Ex. 84 (Chemoil trader describing Astra-3 as "an in tank deal that we just put a [gasoline] truck into" in "their [Astra's] tank 531").

Because the fuel ultimately had to continue to meet the specifications for fuel-grade ethanol stated in the applicable contracts, the parties' intent for these transactions was that Astra would both sell to Chemoil and, days later, buy back the same quantity of the same product—fuel-grade ethanol—without any material change having been made to it by Chemoil (other than Chemoil's addition of a small amount of gasoline that would not exceed the specification, as to which Astra was apparently indifferent). *See, e.g.*, Ex. 21 (email describing a "buy from Astra"; stating that Chemoil "will then sell/transfer it right back to Astra a day or two later"); Ex. 22 (email describing "[t]he sell back to Astra" of the same volume of fuel grade ethanol and same specification); Parrish Dep. 131:20-132:3 (Parrish referring to the Astra transactions as "three separate buys and sells").[17]

---

[17] As discussed above, the addition of gasoline by Chemoil was not required by the contracts. Rather, Astra's only apparent concern in this regard was that the addition of gasoline not cause the ethanol to fall outside of the specifications governing the transaction—*i.e.*, to ensure that not too much gasoline was added, which would cause the product to no longer meet the specification for fuel-grade ethanol. *See, e.g.*, Ex. 82 (in email regarding Astra-3, Chemoil employee asks Astra trader whether addition of gasoline "will cause a problem with [Astra's] spec").

Further, as noted above, Astra and Chemoil offset the payments for the buy-sell transactions against each other. *See* Ex. 15 (email regarding netting out Astra-1 invoices); Ex. 36 (invoices for Astra-3 with handwritten remarks indicating they were netted out). Thus, money only changed hands only once for each set of transactions—through Chemoil's payment to Astra for the 40-cent-per-gallon difference between the purchase prices and the sale prices. *See id.*; Ex. 85 (email stating that, for Astra-1, Chemoil "owe[s] Astra" for the "two invoices already created," and response stating that "we [Chemoil] are paying Astra for the netted difference" between the two invoices). This further indicates that Chemoil did not in fact purchase ethanol and then re-sell it to Astra; rather, the parties did not intend any *bona fide* change of ownership through the pair of transactions except to the extent necessary to claim the associated tax benefits.

**No equity interest in the transactions.** Courts also consider whether the purchaser acquired an equity interest in the relevant property. *Arevalo*, 469 F.3d at 439. Here, this analysis includes determining whether Chemoil could retain any profit from an increase in value of the fuel. *See, e.g.*, *Clark v. United States*, No. 11 Civ. 471, 2012 WL 6709624, at *6 (N.D. Cal. Dec. 26, 2012) (equity includes "right to retain all profits"). However, a taxpayer does not obtain an equity interest where the "purchase price exceeds the then existing fair market value." *Franklin's Est. v. Comm'r*, 544 F.2d 1045, 1048 (9th Cir. 1976) (describing sale and leaseback arrangement); *see Houchins v. Comm'r*, 79 T.C. 570, 599 (1982) (finding that "an excessive purchase price and the resultant failure to acquire an equity in the property caused the transaction to lack the substance of a sale" in the context of personal property); *Grodt & McKay Realty, Inc. v. Comm'r*, 77 T.C. 1221, 1239 (1981) (same).

Here, the structure of the transactions indicates that Chemoil's supposed ownership of the fuel was premised upon, and limited by, the fact that Chemoil had already promised to transfer back to Astra the same volume of fuel, at a built-in loss of 40 cents per gallon that had been negotiated beforehand. *See* Exs. 10, 11 (Astra-1 contracts); Exs. 33, 34 (Astra-3 contracts). The pre-negotiation of buy and sell prices means that Chemoil did not have any realistic chance of benefiting from the gain (or a realistic risk of loss) from any fluctuation in the market price of ethanol while it purportedly owned the fuel. Chemoil could not have disposed of the ethanol in other, more profitable transactions—*i.e.*, "a) take[n] title for the ethanol, b) f[ound] a more efficient use for its ethanol and s[old] it, c) acquire[d] new ethanol, and then d) deliver[ed] it to Astra, all within a few days." Cohen Rpt. ¶ 57. Moreover, in Astra-1, Chemoil purchased ethanol from Astra "at $0.31 per gallon above its market value, and sold the ethanol at $0.09 per gallon below its market value." *Id.* ¶ 69 (footnote omitted). In Astra-3, Chemoil purchased ethanol from Astra "at $0.2550 per gallon above its market value, and sold the ethanol at $0.1450 per gallon below its market value." *Id.* ¶ 73 (footnote omitted). And beyond these significant departures from market prices for the purchase and sale prices, the government's expert economist concluded there was "no evidence supporting an expectation that ethanol prices would fluctuate enough within such a short period of time to overcome the built-in $0.40 per gallon" pre-tax loss for Chemoil that was structured into the transactions. *Id.* ¶ 58.

Thus, Chemoil thus lacked a true equitable interest in the property, as it did not have any reasonable expectation that the market value for the ethanol would exceed its losses from the 40-cent-per-gallon disparity between purchase and sale prices. *See Houchins*, 79 T.C. at 602 (concluding that taxpayer did not "acquire[] the benefits of ownership" where the "only opportunity to profit from the sale of the [property] was in the highly improbable event that the

[property] sold for a price in excess of" the above-market purchase price); *Grodt & McKay*, 77

T.C. at 1242-43 (the "allocation of speculative future profits is inadequate to support a sale for

Federal tax purposes").

**No benefit from the property.** For similar reasons, Chemoil received no material

"benefit from the operation and disposition of the property," *Arevalo*, 469 F.3d at 439, during the

period when it supposedly owned the fuel. As stated above, from the outset of these transactions,

Chemoil contracted to purchase fuel from Astra and had obligated itself to re-sell to Astra mere

days later the same volume of fuel, meeting the same specifications, in the same tanks. *See* Exs.

10, 11 (Astra-1 contracts); Exs. 33, 34 (Astra-3 contracts). The record does not reflect that

Chemoil had any ability to use or otherwise sell the fuel during the period of its ownership,

which remained in tanks leased by Astra over which Chemoil had no control. *See* TK503 Rpt.

(Astra-1); TK531 Rpt. (Astra-3). Because Chemoil bought and then re-sold the same fuel days

later, it received no benefit from the operation or disposition of the fuel—other than through its

claimed tax credits. *See Grodt & McKay*, 77 T.C. at 1244 (concluding that the "the only benefits

petitioners can expect from the transactions are tax benefits" where an "[a]nalysis of the

transactions involved reveal[ed]" no "realistic possibility of economic reward").

**The remaining factors.** Although the contracts between Chemoil and Astra purport to

transfer legal title and risk of loss, *see* Exs. 10, 11 (Astra-1 contracts); Exs. 33, 34 (Astra-3

contracts), these factors provide only formalistic support for Chemoil's contention that it

acquired ownership, which is insufficient in light of the facts and circumstances here.[18] *See, e.g.*,

*Frank Lyon Co.*, 435 U.S. at 573 ("In the field of taxation, administrators of the laws and the

---

[18] Notably, Vopak's tank records show no indication of any change in ownership, and do not
reflect Chemoil's supposed ownership of the fuel while it remained in tanks leased by Astra. *See*
TK503 Rpt. (Astra-1); TK531 Rpt. (Astra-3).

courts are concerned with substance and realities, and formal written documents are not rigidly binding." (quotation marks omitted)). Indeed, the Supreme Court has specifically indicated that the transfer of "formal legal title" is insufficient to constitute a sale for tax purposes where the benefits and burdens of ownership are not transferred, on consideration of all the facts and circumstances. *Id.* at 572-73; *see Altria*, 658 F.3d at 280, 284-86 (concluding that transactions in which title was transferred did not shift benefits and burdens of ownership for purposes of tax treatment); *Arevalo*, 469 F.3d at 439-40 (same).

An analysis of the benefits and burdens of ownership based on the undisputed facts demonstrates that the Astra-1 and Astra-3 transactions did not involve *bona fide* sales. Rather, Astra "continue[d] to retain many of the benefits and burdens of ownership," despite its purported transfers to Chemoil. *See Altria*, 658 F.3d at 285. The Court should thus "disregard the purported transfer, for federal tax purposes," *id.*, and not refund any credits premised on the Astra-1 and Astra-3 transactions. *See Grodt & McKay*, 77 T.C. at 1245-46.

### 2.  No Credits Are Available for the Sale of Ethanol to Which No Gasoline Was Added

To be entitled to the tax credits at issue, the taxpayer must produce a mixture of alcohol (such as ethanol) and a taxable fuel (such as gasoline) and then either sell or use the mixture. *See* I.R.C. § 6426(b)(3). Chemoil is not entitled to credits with respect to a substantial portion of the product that it sold in the Gunvor-4 and Gunvor-7 transactions because there is no evidence that it added gasoline to the ethanol in certain tanks before selling it to Gunvor. For that portion— more than 2 million gallons of product, representing almost $1 million in claimed credits— Chemoil did not produce or sell an "alcohol fuel mixture" as required to be eligible for the credit.

As set forth above, in Gunvor-4, Chemoil sold a total of 1,931,549 gallons of product to Gunvor that was loaded from Tanks 538, 614, and 615 onto a shipping vessel. Per the "Risk and

Title" provision of Chemoil's contract with Gunvor, title to the product transferred when the product passed the vessel's permanent hose connection. Ex. 39 § 14. There is no record of any gasoline being transferred into Tanks 538 or 615 before product from those tanks was transferred into the vessel.[19] TK538 Rpt.; TK615 Rpt. The 1,424,784 gallons of ethanol transferred from Tank 538 (778,286 gallons) and Tank 615 (646,498 gallons) into the vessel as part of the Gunvor-4 transaction thus was not an alcohol fuel mixture at the time of sale—*i.e.*, when the product passed onto the vessel. On this basis, Chemoil is not entitled to $641,152.80 (1,424,784 gal. x $0.45/gal.) in claimed tax credits associated with this product.

Similarly, as set forth above, in the Gunvor-7 transaction Chemoil sold 4,554,000 gallons of product to Gunvor that was loaded from Tanks 614, 615, 748, 723, and 410 onto a vessel. Testing performed on the contents of Tank 410 "[b]efore loading vessel NORD NIGHTINGALE" demonstrated that it contained no gasoline. Ex. 69 (reporting "Hydrocarbons" at "Zero"); *see* Parrish Dep. 86:10-25.[20] Thus, Chemoil has not shown that the portion of the product that came from this tank (706,929 gallons, *see* Ex. 68 at -15) contained any gasoline (or other taxable fuel) before it was sold such that it could qualify as an alcohol fuel mixture. As such, Chemoil is not entitled to $318,118.05 (706,929 gal. x $0.45/gal.) in claimed credits associated with this product.

---

[19] By contrast, records show that Chemoil added approximately 2,000 gallons of gasoline to ethanol in Tank 748 and then transferred a portion of the ensuing mixture into Tank 614. Cohen Rpt. ¶ 28; TK614 Rpt.; TK748 Rpt.

[20] Chemoil is thus not entitled to credits for this portion of the Gunvor-7 product even if it successfully argues that its sale occurred on December 31, 2011 "in tank," *see infra* Part I.B.4, because there are no records showing that Tank 410 contained gasoline (or another taxable fuel) at any point in time.

### 3.  Chemoil Did Not Sell the Mixtures "for Use as a Fuel"

In order to qualify for the tax credits, Chemoil was required to create an "alcohol fuel mixture." I.R.C. § 6426(b). The statute defines this as a mixture of alcohol and taxable fuel that "is sold by the taxpayer producing such mixture to any person *for use as a fuel*" or that "*is used as a fuel* by the taxpayer producing such mixture." *Id.* § 6426(b)(3) (emphases added). Chemoil is not entitled to the disallowed credits for the mixtures it created in any of the Astra and Gunvor transactions because it did use or sell those mixtures "for use as a fuel."

The statute does not define the phrase "sold . . . for use as a fuel." An IRS notice provides guidance on the meaning of that phrase in the context of alternative fuel mixtures. IRS Notice 2006-92, *Alternative Fuel & Alternative Fuel Mixtures; Blood Collector Organizations*, 2006-2 C.B. 774, 2006 WL 2792807 (Sept. 30, 2006). According to that notice, "[a] mixture producer sells a mixture *for use as a fuel* if the producer has reason to believe that the mixture will be used as a fuel either by the person buying the mixture from the producer or by any later buyer of the mixture." *Id.* § 2(f)(2). The notice further explains that "[a] mixture is *used as a fuel* when it is consumed in the production of energy. Thus, for example, a mixture is used as a fuel when it is consumed in an internal combustion engine to power a vehicle or in a furnace to produce heat." *Id.* § 2(f)(1).

It is undisputed that Chemoil sold (rather than used) the mixtures created as part of the at-issue transactions. *See* Compl. ¶ 22. Chemoil stated in its protest to the Revenue Agent's Reports that "the ethanol blends produced by Chemoil and sold to Astra were exported to Brazil." Ex. 71 at -67. Similarly, the bills of lading for the Gunvor transactions indicate that the product sold in Gunvor-4, Gunvor-5, and Gunvor-6 was exported to Brazil, and that the product sold in Gunvor-7 was exported to Oman. Ex. 47 (Gunvor-4); Ex. 49 (Gunvor-5); Ex. 51 (Gunvor-6); Ex. 52 (Gunvor-7).

Chemoil did not sell the mixtures "for use as a fuel" because the mixtures could not, in the form in which they were sold, be used as fuel. The mixtures that Chemoil produced and purportedly sold in the Astra and Gunvor transactions were anhydrous ethanol (ethanol with low water content), with small amounts of gasoline added (known as "E99"). Leister Rpt. §§ 1.1, 3.1-3.7; Ex. 8 ("Leister Dep.") 97:13-22.

As the government's fuel expert explained, anhydrous E99 is not used as a fuel anywhere in the world. Leister Rpt. § 1.4. Indeed, its typical use is as base to blend with additional gasoline to produce a fuel. *See* Leister Dep. 99:25-100:6. Anhydrous ethanol can be used as a fuel in the United States only after it is blended with more gasoline to create E10 (10% ethanol and 90% gasoline), E15 (10.5-15% ethanol and the remainder gasoline), or E85 (51-83% ethanol and the remainder gasoline). Leister Rpt. § 1.3; Leister Dep. 48:13-25. Outside of the United States, the leading consumer of ethanol is Brazil, and most of the product at issue in this case was exported there.[21] Leister Rpt. § 1.4 & tbl.1; *see also* Leister Dep. 88:23-89:6; Exs. 47, 49, 51, 71. However, the only ethanol fuels used in Brazil during the relevant time period were (1) blends of ethanol and gasoline containing 18-25% ethanol and the remainder gasoline (referred to as E18 to E25), or (2) E100 *hydrous* ethanol fuel, which is composed of about 95% ethanol and 5% water, with no gasoline added. Leister Rpt. § 1.4; Leister Dep. 89:7-90:5. Thus, in order to be used as a fuel in Brazil, additional gasoline would have needed to be added (to turn the mixture into E18-E25), or chemical processing would have needed to be performed (and water added) to convert the anhydrous ethanol into hydrous ethanol. Leister Rpt. §§ 1.1, 1.4; Leister Dep. 83:22-84:4, 85:5-17, 93:5-10, 94:4-10, 96:5-97:7.

---

[21] The investigation of the government's fuel expert into Oman's ethanol usage indicated no consumption of ethanol as fuel there from 2008 to 2019. Leister Rpt. § 1.4; *see* Leister Dep. 102:13-103:12, 106:19-108:9.

As noted above, the statute defines "alcohol fuel mixture," in relevant part, as "a mixture of alcohol and a taxable fuel which . . . is sold by the taxpayer producing such mixture to any person for use as a fuel." I.R.C. § 6426(b)(3)(A). Per this definition, it is *the mixture that is sold by the taxpayer* that must itself be used as a fuel.[22] A taxpayer may not claim the tax credit for selling a mixture that cannot be used as fuel in its existing state at the time of sale. Relatedly, Chemoil, a global energy company, did not have "reason to believe" that its mixtures would "be used as a fuel either by the person[s] buying the mixture[s] . . . or by any later buyer of the mixture[s]." IRS Notice 2006-92, § 2(f)(2). This "reason to believe" requirement enables a seller to claim credits even if it has no control over the buyer's ultimate use of the mixture, but it does not alter the requirement that the mixture it sells must be usable as a fuel. Because the mixtures created by Chemoil could not be used as fuel without further blending or processing, they are not "alcohol fuel mixture[s]" and Chemoil is not entitled to credits for selling them.

### 4.    The Gunvor-7 Sale Occurred After the Credit Expired

Finally, I.R.C. § 6426(b)(6) provides that the tax credit is not available for "any sale, use, or removal for any period after December 31, 2011." Undisputed facts demonstrate that Chemoil's sale of product in the Gunvor-7 transaction occurred after December 31, 2011. Thus, Chemoil is not entitled to recover the $2,049,300 in disallowed credits for the Gunvor-7 transaction.

---

[22] In cases interpreting the definition of "alternative fuel mixture," which includes the same "sold . . . for use as a fuel" language and is in the same statutory section, courts have examined the product that was sold by the taxpayer and disregarded modifications to that product made either before or after sale. *See Affordable Bio Feedstock, Inc. v. United States*, No. 16 Civ. 1926, 2017 WL 3616894, at *3 (M.D. Fla. June 28, 2017) ("[T]he combination of Brown Grease and diesel fuel was not an 'alternative fuel mixture,' because it was never sold. What was actually sold was the Refined Mixture . . . ."); *In re Michigan BioDiesel, LLC*, 466 B.R. 413, 418-20 (Bankr. W.D. Mich. 2011) (debtor did not meet statutory definition of "alternative fuel mixture" where it sold pure glycerin but mixture was created by combining glycerin with coal, which only occurred after debtor's sale; "The Debtor, as claimant, did not sell the 'mixture'.").

Under the "substance-over-form doctrine," courts must consider "the objective economic realities of a transaction rather than the particular form the parties employed." *Exelon Corp. v. Comm'r*, 906 F.3d 513, 523 (7th Cir. 2018) (quoting *Frank Lyon Co.*, 435 U.S. at 573) (quotation marks omitted). As discussed *supra* in Part I.B.1, to determine ownership for tax purposes, courts look beyond legal title and analyze whether there was a *bona fide* transfer of the benefits and burdens of ownership. *See Bailey*, 912 F.2d at 47; *Derr v. Comm'r*, 77 T.C. 708, 723 (1981). "[C]ourts may disregard [a] purported transfer, for federal tax purposes, 'where the transferor continues to retain many of the benefits and burdens of ownership.'" *Altria*, 658 F.3d at 285 (quoting *Bailey*, 912 F.2d at 47).

As discussed previously, courts consider several factors when determining whether a sale occurred, including:

> (1) [w]hether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation and disposition of the property.

*Arevalo*, 469 F.3d at 439 (quoting *Upham*, 923 F.2d at 1334). Although these factors typically are used to determine *whether* a sale has occurred, logically, they can also be used to analyze *when* a sale occurred, *i.e.*, when the benefits and burdens of ownership transferred to a purchaser.

These factors demonstrate that Chemoil's sale of the Gunvor-7 product did not occur until the product was physically loaded onto the vessel in January 2012. Under the Chemoil-Gunvor contract, title and risk to the product for all of the Gunvor transactions transferred upon loading the product on the vessel "as the ethanol passes the vessel's permanent hose connection." Ex. 39 § 14. Consistent with this provision, the parties also agreed that Gunvor's payment for the Gunvor-7 shipment was "due at 3 calendar days after receipt of invoice" and would "be made

against presentation of" original copies of the invoice, as well as several documents that would be created after loading—the inspector's report, certificate of origin, and bill of lading. Ex. 43; *see also* Ex. 39 § 7 (specifying interest amount for late payments).

Chemoil attempted to retroactively alter the timing of the sale only after it became clear that it could not load the product for the Gunvor-7 transaction onto the vessel by the year's end, thus missing the VEETC deadline. Chemoil attempted to effectuate this by (1) backdating the invoices for the transaction to December 31, 2011, and (2) procuring Gunvor's agreement that title had transferred on an "effective date" of December 31, 2011. There is no question that this formalistic maneuver was motivated by the tax treatment of the transaction. Chemoil explicitly said so in emails, explaining that the backdating of the title transfer was for "back office and tax purposes," Ex. 64, and "to garner the tax credit," Ex. 62; *see* Skrinar Dep. 111:11-23. Gunvor's representative also understood the retroactive change to the agreement to be artificial: he testified that the parties modified their agreement so that the title transfer was "[i]n-tank *in name only*." Herndon Dep. 119:11-22 (emphasis added). Under the substance-over-form doctrine, however, parties' shifting of a "bare legal title" does not alone transfer ownership. *See Bailey*, 912 F.2d at 47; *Frank Lyon Co.*, 435 U.S. at 573. The purpose of the doctrine to is "to prevent taxpayers from mislabeling transactions to avoid tax consequences they don't like"—exactly what Chemoil attempted here. *Benenson v. Comm'r*, 910 F.3d 690, 699 (2d Cir. 2018) (quotation marks omitted). The remaining factors demonstrate that the benefits and burdens of ownership remained with Chemoil until the product was loaded onto the vessel in January 2012.

**How the parties treated the transaction.** In every substantive respect, "the parties treat[ed] the transaction" as if the sale occurred when the product was loaded onto the vessel, and not before. *See Arevalo*, 469 F.3d at 439. Not only did Chemoil tell Gunvor that the retroactive

title transfer was purely for form (for "back office and tax purposes"), it also assured Gunvor that it would otherwise treat the transaction as if the sale had only occurred upon loading, explaining that Gunvor would "not be invoiced until the product ha[d] loaded," Ex. 64. Thus, Gunvor's "clock on . . . having to make payment" would not start until loading. Herndon Dep. 93:22-94:15, 97:16-98:4. Indeed, while the invoices for the transaction were backdated to December 31, 2011, Chemoil did not actually send those invoices to Gunvor until January 19, 2012. Ex. 52. Chemoil also treated the sale as if it occurred in January on its books, as confirmed by Chemoil's accountant. Ex. 58 ("[S]ince it won't deliver until after Jan 6th, we will invoice it in Jan on Jan books. However, we can modify the delivery date on the invoice to the customer to read 12-31-11.").

**Control over the product.** Chemoil retained control over the product, which was stored in its tanks or tanks of third parties with whom it had contracted, until the product was loaded onto Gunvor's vessel. Consistent with this, Chemoil continued to be responsible for the logistics of the transaction, communicating with Vopak and Astra about loading the product onto the vessel, ensuring that the product was tested prior to loading, and handling certain paperwork.[23] *See, e.g.*, Exs. 60, 86, 87, 88, 89. There is no evidence that Gunvor had or exercised any authority over the product while it remained in the shore tanks. Indeed, at the time of the supposed "sale" on December 31, 2011, Chemoil had not yet identified what product, in which tanks, would be sold to Gunvor as part of the transaction: first, several of the railcars containing Chemoil's ethanol had not been fully unloaded into shore tanks as of the end of December, *see* Parrish Dep. 217:6-18, 225:3-12, 234:3-10; Basler Dep. 158:21-159:1; *see also* Herndon Dep.

---

[23] Even though Gunvor supposedly "owned" the product as of December 31, 2011, the carrier still considered Chemoil to be the shipper and issued the bill of lading to Chemoil, not Gunvor, following the completion of loading on January 14, 2012. *See* Ex. 87.

32:23-33:3; second, the ethanol in the railcars had not yet been mixed with any gasoline such that it could qualify as an "alcohol fuel mixture" as of December 31, 2011, *see* Parrish Dep. 225:13-17; and third, on or around January 4, 2012, Chemoil decided to either add or substitute additional ethanol it had purchased from Astra (that was stored in one of ADM's tanks), changing the overall composition of the sale from what had been contemplated on December 31, 2011, Exs. 59, 61.

**Risk of loss, right to benefits, equity.** Chemoil also bore all risk for the product and was entitled to receive any benefit from the product as of December 31, 2011. There is no evidence that Chemoil and Gunvor agreed to modify the timing when the risk of loss or damage to the product transferred—the Herndon-Parrish email specified "title transfer" only, Ex. 65, while the master contract provision addressed "risk and title," Ex. 39 § 14. Indeed, risk could not have transferred earlier given the parties' retroactive modification of the title transfer. Gunvor and Chemoil's supposed modification of the title transfer provision was made on January 9, 2012. *See* Ex. 65. Thus, during the critical period between December 31, 2011, when title supposedly transferred, and January 9, 2012, when the product began to be loaded onto the shipping vessel, any damage to the product would have been at Chemoil's risk, not Gunvor's, because the purported modification of the contract had not yet been made. Similarly, any benefits of ownership of the product—such as due to an increase in its market value—during that time period would have accrued to Chemoil, not Gunvor.

In sum, an analysis of the benefits and burdens of ownership based on the undisputed facts makes clear that Chemoil did not sell product to Gunvor for the Gunvor-7 transaction until after December 31, 2011, by which point the VEETC had expired. Accordingly, Chemoil is not entitled to any tax credits associated with this transaction.

50

## II.    CHEMOIL IS NOT ENTITLED TO A REFUND OF THE EXCESSIVE CLAIMS PENALTY

As discussed above, IRS assessed an excessive claims penalty under I.R.C. § 6675 against Chemoil with respect to credits it claimed for the Gunvor-7 transaction because Chemoil's sale occurred after the VEETC expired. The government is entitled to summary judgment as to three issues related to the penalty, which together indicate that Chemoil is ineligible for a refund of the penalty. First, Chemoil did not have "reasonable cause" (a defense to the penalty per I.R.C. § 6675) to claim the credits associated with Gunvor-7. Second, Chemoil did not raise its argument about the timing of the penalty's approval, under I.R.C. § 6751(b)(1), with IRS before filing this suit; thus, under the doctrine of variance, Chemoil cannot raise it before this Court. Third, even if Chemoil had properly raised the § 6751(b) penalty approval issue, IRS fully complied with the requirement that the penalty be timely approved by a manager in writing.

### A.    Chemoil Did Not Have Reasonable Cause to Claim Credits for the Gunvor-7 Transaction

Chemoil's complaint alleges that the company is entitled to a refund of the penalty because it "acted with reasonable cause in filing its original claim for refund during the period in issue." Compl. ¶¶ 45-46. This is a reference to I.R.C. § 6675, which provides that a taxpayer is not liable for an excessive claims penalty if "it is shown that the claim for such excessive amount is due to reasonable cause." The taxpayer bears the burden to prove that it had reasonable cause. *Alternative Carbon*, 939 F.3d at 1333.

As the statute does not define "reasonable cause," courts have "examine[d] analogous cases to determine the nature and scope of the 'reasonable cause' exception in [I.R.C.] § 6675." *J.J. Powell, Inc. v. United States*, 125 Fed. Cl. 73, 86 (2016). The determination whether there is reasonable cause is made on a case-by-case basis considering "all the pertinent facts and

circumstances." *Alternative Carbon*, 939 F.3d at 1333 (citation and quotation marks omitted); *see also* Treas. Reg. § 1.6664-4(b). Overall, "the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability, judged in the light of the taxpayer's experience, knowledge, and education." *Alternative Carbon*, 939 F.3d at 1333 (quoting *Stobie Creek*, 608 F.3d at 1381) (quotation marks and alterations omitted); *see also* Treas. Reg. § 1.6664-4(b) ("Generally, the most important factor [in the reasonable cause analysis] is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability."); *see also Stobie Creek*, 608 F.3d at 1381 (noting that the reasonable cause defense under I.R.C. § 6664 is "a narrow defense"). Further, "ignorance of the law does not generally provide 'reasonable cause' to excuse tax penalties." *J.J. Powell*, 125 Fed. Cl. at 86-87.

As an initial matter, Chemoil, a global energy trading company, is a highly sophisticated taxpayer. At the time of the transactions at issue, Chemoil was "one of the top two renewable fuel trading shops in the United States"; it "actively traded [ethanol] both domestically as well as internationally," and "ran a very large book and did a tremendous amount of volume." Herndon Dep. 43:11-23, 45:22-47:2. Chemoil employed both an in-house tax manager and a general counsel. *See* Ex. 90. As such, its "experience, knowledge, and education" related to tax issues for its line of business, including the VEETC, was high.

Despite Chemoil's sophistication, however, it expended minimal effort to ascertain whether it could properly claim more than $2 million in tax credits for the Gunvor-7 transaction in light of that transaction's timing and the VEETC's expiration. Chemoil was aware that the timing of the transaction presented an issue for its claim of tax credits; indeed, by late December, Chemoil traders were reminding Vopak employees who handled railyard logistics of the December 31, 2011, deadline. Ex. 53 at -59; Ex. 54 at -91; Ex. 55 at -00-01, -04; Ex. 57 at -36.

But Aaron Parrish, Chemoil's lead trader on the deal, appears to have overlooked the fact that in order to claim the credits, Chemoil would have to not only create an alcohol fuel mixture before the end of the year, but also sell it by then. *See* I.R.C. § 6426(b)(3). It was only on December 29, 2011, when Chemoil supervisor John Skrinar checked in with Parrish about the "20kb of phys[ical] product that is unsold" that Chemoil recognized the problem, with Skrinar telling Parrish on December 30, "It's my understanding that it needs to be sold by Dec 31" and to consult with Chemoil's tax manager about "[w]hat constitutes a sale." Ex. 56.

The record contains no indication as to what Chemoil then did to determine whether it had completed a sale by the deadline—and thus had a valid claim to the VEETC for Gunvor-7. While Parrish did consult with Chemoil tax manager Phillip Lau, *see supra* note 5, Chemoil has asserted that the contents of those conversations are protected by the tax advisor's privilege. It thus cannot rely on those conversations to establish it had a reasonable cause to claim the credits.[24] Given Chemoil's failure to present any evidence on "the most important factor" in the reasonable cause analysis, *Alternative Carbon*, 939 F.3d at 1333 (quotation marks and alterations

---

[24] Chemoil has listed emails between its traders and Lau, and between its traders and James Baker, Chemoil's General Counsel, on its privilege log. Ex. 90. A taxpayer's "good faith reliance on professional advice concerning the tax laws" can establish reasonable cause for a tax position, but "the advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment," *Mortensen v. Comm'r*, 440 F.3d 375, 387 (6th Cir. 2006), and must be objectively reasonable, *Goldman v. Comm'r*, 39 F.3d 402, 408 (2d Cir. 1994). Chemoil has not asserted an "expert reliance" defense in this case, nor has it produced an opinion letter or any other evidence showing that it relied on expert advice in support of its claim to credits for the Gunvor-7 transaction. For Chemoil to assert such a defense, it would have needed to waive the attorney-client privilege, *see New Phoenix Sunrise Corp. v. Comm'r*, 408 F. App'x 908, 919 (6th Cir. 2010); *Ad Inv. 2000 Fund LLC v. Comm'r*, 142 T.C. 248, 257-58 (2014), as well as the tax practitioner's privilege, *see Salem Fin., Inc. v. United States*, 102 Fed. Cl. 793, 798 (2012), with respect to that advice, which it did not do in this case. Moreover, even if Chemoil had waived its privilege over the advice provided by either tax manager Lau or general counsel Baker, it is unlikely that either of them were "independent" advisors as required for this defense.

omitted), it cannot carry its burden to show that it had reasonable cause to claim the credits. *See Makric Enters., Inc. v. Comm'r*, T.C. Mem. 2016-44, 2016 WL 910229, at \*24 (2016) (tax court was "not persuaded that [taxpayer] took reasonable steps" with respect to tax issue given absence of evidence in record on issue); *Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 99-101 (2000) (noting absence of evidence, and in particular the absence of an opinion letter from an expert), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

In any event, regardless of any advice Chemoil received, it cannot provide a reasonable basis for the claimed credits for Gunvor-7. Any advice that Chemoil sought would have come too late for the company to change the fact that it did not consummate a sale by December 31, 2011, under the terms of its original deal with Gunvor and based on objective economic and logistical realities. Instead, Chemoil attempted to paper over its failure to consummate the transaction before the end of the year by backdating invoices and purporting to make an after-the-fact modification of the terms of its deal with Gunvor. But Chemoil could not have been unaware that under the "substance over form" doctrine, a bedrock principle of tax law, these efforts would not alter the timing of a sale for tax purposes. As the Supreme Court explained in 1978, for decades the federal courts have used the "doctrine of substance over form" to analyze "the objective economic realities of a transaction rather than to the particular form the parties employed." *Frank Lyon Co.*, 435 U.S. at 572-73. "[T]he transfer of formal legal title" will not "shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred," and "the simple expedient of drawing up papers" has never been deemed "controlling for tax purposes when the objective economic realities are to the contrary." *Id.* (quotation marks omitted). It was thus not reasonable for Chemoil to believe that its solution, "the simple expedient of drawing up papers," *id.*, would

alter the economic reality of the timing of the Gunvor-7 transaction and entitle it to avoid the expiration of the VEETC. Chemoil thus made an excessive claim for credits with respect to Gunvor-7 that IRS properly penalized under § 6675.

###### B.   The Doctrine of Variance Bars Chemoil's I.R.C. § 6751(b) Argument

Chemoil's complaint alleges that it is entitled to a refund of the penalty at issue because the IRS agent who assessed it did not obtain the necessary supervisory approval required by I.R.C. § 6751(b). *See* Compl. ¶¶ 47-48. The Court lacks subject matter jurisdiction to consider this argument, however, because Chemoil failed to raise it administratively with IRS.

An administrative claim for a refund filed with IRS is a jurisdictional prerequisite to bringing a tax refund suit in federal court. I.R.C. § 7422(a); *Magnone v. United States*, 902 F.2d 192, 193 (2d Cir. 1990). The refund claim must "set[] forth in detail the ground for the refund and facts sufficient to apprise the IRS of the basis for the refund." *303 W. 42nd St. Enterprises, Inc. v. IRS*, 181 F.3d 272, 277-78 (2d Cir. 1999) (citing 26 C.F.R. § 301.6402-2(b)(1)).

Under the "variance doctrine," a taxpayer is barred "from raising issues in a suit against the United States that were not first raised in a claim for refund" with IRS. *Carione v. United States*, 291 F. Supp. 2d 141, 146 (E.D.N.Y. 2003) (quotation marks omitted); *see Magnone*, 902 F.2d at 193 ("[I]n pursuing [a refund] suit, a taxpayer may not raise different grounds than those brought to the IRS."). Like other administrative exhaustion requirements, the variance doctrine is based on the need "to prevent surprise, and to give the IRS adequate notice of the claim and its underlying facts so that it can make an administrative investigation and determination regarding the claim." *Boyd v. United States*, 762 F.2d 1369, 1371 (9th Cir. 1985) (citing *Burlington N. Inc. v. United States*, 684 F.2d 866, 868 (Ct. Cl. 1982)); *see Yates v. United States*, No. 19 Civ. 6384, 2020 WL 2615011, at *4 (N.D. Cal. May 22, 2020); *Carione*, 291 F. Supp. 2d at 148 (citing *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945)). The requirement also "permits [IRS]

to correct claimed errors in the first instance and, if disagreement persists, to limit the litigation to the issues which have been reexamined by [IRS] and which it is prepared to defend." *Ginsburg v. United States*, 17 F.4th 78, 85 (11th Cir. 2021) (alterations and quotation marks omitted). "The failure to file a sufficient claim divests the district court of subject matter jurisdiction." *Carione*, 291 F. Supp. 2d at 146 (citing *Kirsh v. United States*, 258 F.3d 131, 132 (2d Cir. 2001)).

To determine whether the variance doctrine applies, courts examine "whether the claim presented to the district court was previously submitted to [IRS] in a manner that enabled 'an intelligent administrative review of the claim.'" *Carione*, 291 F. Supp. 2d at 148 (quoting *Scovill Mfg. Co. v. Fitzpatrick,* 215 F.2d 567, 569 (2d Cir. 1954)). "In other words, the taxpayer cannot present a new theory to the district court as to why she is entitled to a refund that the IRS did not have a chance to consider at the administrative level; but if the IRS did have that chance, the issue is fair game." *Perkins v. United States*, 464 F. Supp. 3d 519, 522-23 (W.D.N.Y. 2020). "If the claim on its face does not call for investigation of a question, the taxpayer may not later raise that question in a refund suit." *Boyd*, 762 F.2d at 1372.

The argument that IRS did not obtain supervisory approval for the penalty in accordance with I.R.C. § 6751(b)—like other arguments—is barred unless it was specifically raised by the taxpayer in its administrative claim, as numerous courts have recognized. *See Ginsburg*, 17 F.4th at 80, 85 (affirming summary judgment for government where taxpayer "did not exhaust the section 6751(b)(1) supervisory approval issue before he filed his refund lawsuit"); *Rische v. United States*, No. 20 Civ. 33, 2021 WL 2856598, at *7 (W.D. Wash. July 8, 2021) ("Courts applying the variance doctrine to refund claims based on § 6751(b) have held that taxpayers must raise that argument for a refund at the administrative stage, and failure to do so means the court

cannot hear the argument."); *Colliot v. United States*, No. 19 Civ. 212, 2021 WL 2709676, at *6

(W.D. Tex. Mar. 24, 2021) (granting summary judgment to government because taxpayer did not

raise § 6751(b) argument with sufficient specificity in administrative claim); *Yates*, 2020 WL

2615011, at *6 (granting motion to dismiss with respect to taxpayer's argument that IRS failed to

satisfy § 6751(b) because taxpayer did not raise argument until district court action).

Here, Chemoil did not raise an argument about supervisory approval of the penalty under

§ 6751(b) until it filed the complaint in this action. Chemoil's Form 843 claim for refund, its

protests to the Revenue Agent's Reports, and what it calls its "informal administrative claims"[25]

do not mention the supervisory approval requirement in § 6751(b) as a basis for challenging the

penalty. *See* Exs. 71, 77, 78. Nor did the IRS Office of Appeals consider this issue during

Chemoil's administrative appeal; there is no reference to it in the Appeals Case Memoranda

regarding the penalty, which reflects the final determination of that office on that issue. *See* Ex.

91. Because Chemoil failed to administratively exhaust this issue, the Court does not have

subject matter jurisdiction to consider it under the doctrine of variance, and the government is

entitled to summary judgment on the issue.

### C.     The Penalty Was Approved in Accordance with § 6751(b)

However, even if the Court could reach Chemoil's § 6751(b) argument, it should grant

summary judgment to the government on the merits of that issue. The relevant provision states

that "[n]o penalty under this title shall be assessed unless the initial determination of such

---

[25] Chemoil has characterized its Form 843 as its "Formal Claim for Refund" and noted that this form "cross-referenced the full explanation of its position as provided in the Protest." Dkt. No. 63, at 2-3. Chemoil has also described the slides it presented at the IRS Appeals conference as "a detailed written response to the IRS's arguments, disputing the adjustments that had been assessed against and collected from Plaintiff" and characterized them as its "First Informal Claim for Refund." *Id.* at 3. And Chemoil has characterized its written responses to the IRS audit team's annotations as its "Second Informal Claim for Refund." *Id.*

assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." I.R.C. § 6751(b)(1). This approval must be given no later than the date the IRS issues to the taxpayer the notice of deficiency asserting the penalty. *Chai v. Comm'r*, 851 F.3d 190, 221 (2d Cir. 2017).

Chemoil bears the burden to prove that IRS did not comply with § 6751(b). *See Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 165 (D. Conn. 2004) ("In a tax refund suit, the burden of proof is on the taxpayer to prove an overpayment of tax." (quoting *Caplin v. United States*, 718 F.2d 544, 549 (2d Cir. 1983)).[26] It cannot do so.

There is no genuine factual dispute that IRS complied with § 6751(b)'s managerial approval requirement. The record demonstrates that on August 18, 2014, IRS revenue agent Alan Anderson discussed the penalty with his supervisor, Group Manager Tom Deis, that he obtained Deis's approval by telephone, Ex. 74 at -83; Anderson Dep. 133:8-134:24, and that Deis recorded his approval in writing by filling out the supervisor portion of the "E500 Penalty Check Sheet," Exs. 75, 76. Specifically, at the bottom this form, there is a check mark next to "Approved," Deis's initials "TD" are typed in the "Group Manager Initials" field, and "8/18/2014" is typed in the date field. *Id.* In addition, one copy of this form also contains Deis's

---

[26] Although the Second Circuit has held that proving compliance with § 6751(b) was part of the government's burden, *see Chai*, 851 F.3d at 221-22, that was in a case involving an individual taxpayer and a provision of the Internal Revenue Code shifts the burden of production to the government "with respect to the liability of *any individual* for any penalty," I.R.C. § 7491(c) (emphasis added). But this provision does not apply to penalties assessed against corporations, and thus Chemoil has the burden of proof and production on this issue. *See Plano Holding LLC v. Comm'r*, T.C. Mem. 2019-140, 2019 WL 5212791, at *7 (2019) ("the burden remains on the taxpayer where the Commissioner has determined a penalty against a corporation"); *Exelon Corp. v. Comm'r*, 147 T.C. 230, 329 (2016) (holding that Section 7491(c) does not apply to a corporation's penalty liability), *aff'd*, 906 F.3d 513 (7th Cir. 2018).

handwritten signature next to his initials.[27] Ex. 76. At his deposition, Deis testified that (while he did not specifically recall completing this particular form), as an IRS group manager, he would have filled out the approval section at the bottom of the form, and would have signed and initialed on the date typed on the form, as was his practice. *See* Ex. 7 ("Deis Dep.") 83:19-84:8, 87:4-89:18 ("When I initial or sign a form, I put the date that I do that on the form."). Because the form indicates that Deis's written approval was provided on August 18, 2014, the day before the IRS sent the notice of deficiency to Chemoil, it is timely. Thus, the Court should grant summary judgment in favor of the government on this issue if it reaches it.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of the United States pursuant to Rule 56 of the Federal Rules of Civil Procedure, and enter judgment in favor of the United States.

Dated:   July 8, 2022
         New York, New York

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:   /s/ Samuel Dolinger
      JENNIFER JUDE
      SAMUEL DOLINGER
      Assistant United States Attorneys
      86 Chambers Street, 3rd Floor
      New York, New York 10007
      Tel.: (212) 637-2663/2677
      jennifer.jude@usdoj.gov
      samuel.dolinger@usdoj.gov

---

[27] As the statute requires a supervisor's written approval but does not require a signature, *see* I.R.C. § 6751(b), any of the copies of the E500 Penalty Check Sheet in the administrative file that contain Mr. Deis's initials (even if they do not also contain his signature) satisfy this requirement.