UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHEMOIL CORP., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | No. 19 Civ. 6314 (LTS) (JW) |
| | § | |
| UNITED STATES OF AMERICA, | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| *Defendant.* | § | |
| | § | |

---

**PLAINTIFF CHEMOIL CORP.'S
RESPONSE TO THE UNITED STATES'
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

Sarah E. Paul
Attorney-in-Charge
Eversheds Sutherland (US) LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: 212-389-5000
Fax: 212-389-5099
SarahPaul@eversheds-sutherland.com

Amish M. Shah
 District of Columbia Bar No. 468530, *pro hac vice*
Daniel G. Strickland
 District of Columbia Bar No. 1531288, *pro hac vice*
Eversheds Sutherland (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001
Tel: 202-383-0100
Fax: 202-637-3593
AmishShah@eversheds-sutherland.com
DanielStrickland@eversheds-sutherland.com
        --Of Counsel--

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 1

    I.    Regulatory Background.................................................................. 1

    II.    Factual Background ..................................................................... 2

        A.    The Astra Transactions ................................................... 4

        B.    The Gunvor Transactions................................................ 7

    III.    Procedural Background ......................................................... 12

ARGUMENT....................................................................................... 13

    I.    The Economic Substance Doctrine Does Not Apply Here; But if it Applied, it Would Favor Chemoil. ...................................................... 13

        A.    Applying the economic substance doctrine to energy tax credits, such as alcohol fuel mixture credits, would frustrate this nation's climate change commitments.............................................................. 13

        B.    The common law economic substance doctrine does not apply. .. 16

        C.    The codified economic substance doctrine favors Chemoil. ........ 18

        D.    The United States' assertion regarding the limited scope of the codified economic substance doctrine is plainly wrong.......................... 21

        E.    Even if the common law economic substance doctrine were applicable here, which it is not, it would support the inclusion of excise tax effects............................................................................. 22

        F.    Even if the Court were to apply a version of the economic substance doctrine that discounted excise tax effects, there are genuine issues of material fact that make summary judgment inappropriate here. 28

    II.    The United States' Arguments Regarding the Section 6426(b) Requirements Fail. .............................................................................. 30

        A.    There are ample facts supporting the conclusion that the Astra-1 and Astra-3 transactions were *bona fide* sales......................................... 30

        B.    There Are No Sales of Ethanol "to Which No Gasoline was Added" ................................................................................. 40

C.     Each of the blends at issue were sold for use as a fuel. ................ 43

D.     Genuine issues of material fact exist as to when the Gunvor-7 sale occurred. ............................................................................................ 45

III.   The United States is Not Entitled to Summary Judgment on any Issues Relating to the Section 6675 Penalty. ................................................................... 49

A.     The United States is not entitled to summary judgment on "reasonable cause". ................................................................................ 50

B.     The doctrine of variance does not bar Chemoil's 6751(b) argument. ........................................................................................... 53

C.     The United States is not entitled to summary judgment regarding whether the IRS supervisor timely approved the section 6675 penalty in writing. ............................................................................................... 57

CONCLUSION ........................................................................................................ 60

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alternative Carbon Res., LLC v. United States,*
   939 F.3d 1320 (Fed. Cir 2019)............................................................................26

*Altria Grp., Inc. v. United States,*
   694 F. Supp. 2d 259 (S.D.N.Y. 2010) ............................................... 17, 19, 23, 33

*Arevalo v. Comm'r,*
   469 F.3d 436 (5th Cir. 2006) ..............................................................................33

*Benenson v. Comm'r,*
   910 F.3d 690 (2d Cir. 2018) ...............................................................................16

*Carione v. United States,*
   291 F. Supp. 2d 141 (E.D.N.Y. 2003)..................................................................53

*Chai v. Comm'r,*
   851 F.3d 190 (2d Cir. 2017) ..........................................................................56, 58

*Clay v. Comm'r,*
   152 T.C. 223 (2019) .......................................................................................56, 58

*Cross Refined Coal v. Comm'r,*
   No. 19502-17 (T.C. Aug. 29, 2019)......................................................................23

*Cross Refined Coal, LLC v. Comm'r,*
   No. 20-1015, 2022 U.S. App. LEXIS 21729 (D.C. Cir. 2022)........................19,23

*Dow Chem. Co. v. United States,*
   435 F.3d 594 (6th Cir. 2006) ..............................................................................17

*Exxon Mobil Corp. v. United States,*
   No. 21-10373, 2022 U.S. App. LEXIS 21513 (5th Cir. 2022).............................55

*Exxon Shipping Co. v. Baker,*
   554 U.S. 471 (2008) .............................................................................................54

*Gilman v. Comm'r,*
   933 F.2d 143 (2d Cir. 1991) ...............................................................................22

*Graev v. Comm'r,*
   147 T.C. 460 (2016) .............................................................................................55

*Historic Boardwalk Hall, L.L.C. v. Comm'r,*
   694 F.3d 425 (3d Cir. 2012) ...............................................................................18

iv

*Hormel v. Helvering,*
    312 U.S. 552 (1941) ..................................................................................................54

*J.J. Powell, Inc. v. United States,*
    125 Fed Cl. 73 (2016) ..............................................................................................50

*Kirchman v. Comm'r,*
    862 F.2d 1486 (11th Cir. 1989),..............................................................................17

*Long Term Capital Holdings v. United States,*
    330 F. Supp. 2d 122 (D. Conn. 2004) ....................................................................23

*Makric Enters. v. Comm'r,*
    T.C. Memo. 2016-44 (Mar. 9, 2016)........................................................................52

*Rice's Toyota World, Inc. v. Comm'r,*
    752 F.2d 89 (4th Cir. 1985) ....................................................................................17

*Sacks v. Comm'r,*
    69 F.3d 982 (9th Cir. 1995) ...................................................................17,19, 25-7

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ................................................................................................54

*Sparkman v. United States,*
    No. 8 Civ 87, 2009 WL 510316 (D. Haw. Dec. 28, 2009)......................................27

*Trebor Sportswear Co. v. Limited Stores, Inc.,*
    865 F.2d 506 (2d Cir. 1989) ...................................................................................12

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) ......................................................................................18

*Valero Mktg. & Supply Co. v. United States,*
    422 F. Supp. 3d 1206 (W.D. Tex. 2019) ................................................................53

**STATUTES**

26 U.S.C.
    §45..........................................................................................................................14
    §45Y........................................................................................................................14
    §45Z........................................................................................................................14
    §48..........................................................................................................................14
    §48E........................................................................................................................14
    § 4083(a)(1)(A) ........................................................................................................2
    §6426(a)(1) ...........................................................................................................1, 2
    § 6246(b)...................................................................................................................1
    § 6426(b)(2)(A)(ii) ...................................................................................................2

§ 6426(b)(3) ....................................................................................................2
§6426(b)(3)(A) ...........................................................................................43-4
§ 6426(b)(4)(A) ..............................................................................................2
§ 6426(b)(4)(B) ..............................................................................................2
§6426(k) ........................................................................................................14
§6427 ............................................................................................................14
§6427(e) .....................................................................................................1, 2
§6751(b) ........................................................................................................58
§6861 ............................................................................................................21
§7701(a) ........................................................................................................20
§7701(a)(12)(B) ............................................................................................20
§7701(a)(16) ..................................................................................................20
§7701(a)(28) ..................................................................................................20
§7701(a)(36) ..................................................................................................21
§7701(a)(43) ..................................................................................................20
§ 7701(a)(44) ................................................................................................23
§7701(a)(49)(C) ............................................................................................21
§7701(b)(1) ....................................................................................................20
§7701(g) ........................................................................................................20
§ 7701(o) ............................................................................................19-20, 22
§ 7701(o)(1) .............................................................................................21, 22
§ 7701(o)(5)(C) ............................................................................................21

Crude Oil Windfall Profit Tax Act of 1980, Pub. L. No. 96-223, 94 Stat. 230 (Apr. 2, 1980).......1

Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152,
124 Stat. 1029 (Mar. 30, 2010) ...................................................................16

Inflation Reduction Act of 2022, Pub L. No. 117-169 (Aug. 16, 2022) ......................................13

U.C.C. § 2-401(1) ......................................................................................................47

**REGULATIONS**

Treas. Reg. § 1.6664-4(b)(1) ................................................................... 50, 52

**LEGISLATIVE HISTORY**

Staff of J. Comm. on Tax'n, JCS-1-81, General Explanation of the Crude Oil Windfall
Profit Tax Act of 1980 (Comm. Print 1980), available at
https://www.jct.gov/publications/1981/jcs-1-81/...................................................2

Staff of J. Comm. on Tax'n, JCS-2-11, General Explanation of Tax Legislation Enacted
in the 111th Congress ("Blue Book") (Comm. Print 2011), available at
https://www.jct.gov/publications/2011/jcs-2-11/...........................................24, 25

Staff of J. Comm. on Tax'n, JCX-18-10, Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010" (Comm. Print 2010), available at https://www.jct.gov/publications/2010/jcx-18-10/ .................................................. ...................19

## OTHER AUTHORITIES

Bipartisan Policy Center, Inflation Reduction Act (IRA) Summary: Energy and Climate Provisions (Aug. 4, 2022), https://bipartisanpolicy.org/blog/inflation-reduction-act-summary-energy-climate-provisions/ ...................................................................................14

Clean Air Task Force, Inflation Reduction Act of 2022, https://cdn.catf.us/wp-content/uploads/2022/08/15115751/ira-tax-incentives.pdf ...................................................14

*Delivered Duty Paid (DDP)*, Investopedia.com, https://www.investopedia.com/terms/d/delivery-duty-paid.asp ................................................6

*Ex Works (EXW)*, Investopedia.com, https://www.investopedia.com/terms/e/exw.asp .................4

Fed. R. Evid. 408(b) ........................................................................................................12

I.R.S., Active Fuel Terminals @ 7/31/2022, https://www.irs.gov/pub/irs-utl/tcn-db.pdf ...........31

I.R.S. Notice 2006-92, 2006-2 C.B. 774 ...............................................................................43

I.R.S. Priv. Ltr. Rul. 202219007 (Feb. 16, 2022) .......................................................................34

Nat'l Renewable Energy Lab., High Octane Fuel: Terminal Backgrounder (Feb. 2016), https://afdc.energy.gov/files/u/publication/hof_terminal_backgrounder.pdf ..........................31

Senate Democratic Majority, Summary of the Energy Security and Climate Change Investments in the Inflation Reduction Act of 2022, https://www.democrats.senate.gov/imo/media/doc/summary_of_the_energy_security_and_climate_change_investments_in_the_inflation_reduction_act_of_2022.pdf ........................................14

U.S. Dep't of State & Exec. Off. of the President, The Long-Term Strategy of the United States: Pathways to Net-Zero Greenhouse Gas Emissions by 2050 (2021), https://www.whitehouse.gov/wp-content/uploads/2021/10/US-Long-Term-Strategy.pdf......................................................................................... 15, 16

## PRELIMINARY STATEMENT

The United States is not entitled to summary judgment on any of the questions posed in its motion. Indeed, the United States' positions in its motion, if sustained, would frustrate this nation's climate change goals and commitments, increase the supply cost of fuels in the US market, and provide the United States with a windfall. As discussed below, the United States sets forth facts that are not only disputed, but also incomplete. Moreover, the United States' legal assertions are frequently in error. As a result of these inaccuracies, the United States spends 59 pages mistakenly asserting that it is entitled to summary judgment in this case. It is not. The United States' motion should be denied.

## BACKGROUND

### I.    Regulatory Background

Under the Internal Revenue Code of 1986, as in effect for the taxable quarter ending December 31, 2011, a taxpayer was entitled to an alcohol fuel mixture credit (also known as the Volumetric Ethanol Excise Tax Credit ("VEETC")) if it produced a mixture of gasoline and ethanol (or other alcohol fuel) and either sold such mixture to any person for use as a fuel or itself used such mixture as a fuel. Secs. 6426(a)(1), 6246(b), 6427(e).[1] The purpose of the alcohol fuel mixture tax credit was to provide an incentive for taxpayers to produce, sell, and use such mixtures as fuels, which furthered the United States' clean energy goals.

Congress introduced the alcohol fuel mixture credit as part of the Crude Oil Windfall Profit Tax Act of 1980 Pub. L. No. 96-223, 94 Stat. 230 (Apr. 2, 1980), in order to create an economic incentive for taxpayers to add an alternative fuel—*i.e.*, ethanol or other alcohol fuels— into the nation's gasoline supply. At its time of enactment, a reduced rate of excise tax was

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (26 U.S.C.) as amended and in effect for the period in issue.

available for blends of gasoline and alcohol, commonly referred to as gasohol, containing at least 10% alcohol. Because of the way that the reduced-rate benefit was available for gasohol at a minimum concentration of 10% alcohol, taxpayers had no economic incentive to use anything other than exactly 10% alcohol. Stated otherwise, using less than 10% alcohol provided no tax benefit; using more than 10% provided no additional tax benefit; so taxpayers typically produced gasohol at exactly 10%. Congress concluded that gasohol with concentrations of alcohol other than 10% also met its goal of encouraging the production and use of alternative fuels. Thus, Congress, enacted the alcohol fuel mixture credit, which provided a tax credit based on the number of gallons of alcohol fuel that were blended with gasoline, no matter the concentration. Staff of J. Comm. on Tax'n, JCS-1-81, General Explanation of the Crude Oil Windfall Profit Tax Act of 1980, at 85–92 (Comm. Print 1980).

The alcohol fuel mixture tax credit was calculated as the product of 45 cents and the number of gallons of alcohol used by the taxpayer in producing the alcohol fuel mixture. Sec. 6426(b)(2)(A)(ii). "Alcohol fuel mixture" is defined as a mixture of "alcohol" and a "taxable fuel". Sec. 6426(b)(3). "Alcohol" includes, *inter alia*, ethanol. Sec. 6426(b)(4)(A). "Taxable fuel" includes, *inter alia*, gasoline. Secs. 6426(b)(4)(B), 4083(a)(1)(A).

Alcohol fuel mixture credits were generally first claimed under section 6426(a)(1) as a tax credit against a taxpayer's excise tax liability imposed by section 4081 (and only to the extent of such tax liability, if any). Alcohol fuel mixture tax credits in excess of a taxpayer's excise tax liability imposed by section 4081 were generally claimed under section 6427(e)(1). Both the alcohol fuel mixture tax credit claimed under sections 6246(a)(1) and 6427(e)(1) and excise taxes imposed by section 4081 were reported on, *inter alia*, an IRS Form 720.

## II.   Factual Background

Plaintiff, Chemoil Corp. ("Chemoil"), is a corporation organized and existing under the

2

laws of the State of California and whose principal place of business is in New York. In 2011, Chemoil's business involved the purchase, production, and sale of a wide array of fuel products. In this connection, Chemoil produced and sold alcohol fuel mixtures.

John Skrinar led Chemoil's renewables operations. (Ex. 1 ("Skrinar Dep.") 22:11–:13.) Steven Basler was a renewables trader on Skrinar's team and reported directly to Skrinar. (Ex. 2 ("Basler Dep.") 17:23–:25, 18:1–15.) Aaron Parrish, who also reported directly to Skrinar, was an ethanol trader. (*Id.* at 39:9–:17; (Ex. 3 ("Parrish Dep.") 56:17–:22, 57:9–:13.) Chemoil traded ethanol, biodiesel, and other renewable fuels. (Skrinar Dep. 22:4–:10.) In 2011, Chemoil entered into various contracts to purchase ethanol and gasoline, and various contracts to sell alcohol fuel mixtures in the fourth calendar quarter. Those contracts involved a number of parties. One of those parties was Astra Oil Company ("Astra"), a US-based energy-trading company, with which Chemoil entered into contracts to buy ethanol. Chemoil also entered into contracts with Astra to sell alcohol fuel mixtures. The United States uses the terms "Astra-1", "Astra-2", and "Astra-3" to refer to particular sales of alcohol fuel mixtures to Astra that are at issue in this case, but the United States also includes in each of "Astra-1," "Astra-2", and "Astra-3", respectively, Chemoil's acquisition of component fuels. This nomenclature minimizes the separate purchase and sale transactions; Chemoil uses the same naming here for clarity despite the fact that each contract stands on its own. Chemoil also entered into a sales contract with Gunvor S.A. ("Gunvor"), a Swiss energy-trading company, to make a series of sales of alcohol fuel mixtures to Gunvor. These sales will be referred to as "Gunvor-4", "Gunvor-5", "Gunvor-6", and "Gunvor-7", respectively. All of the aforementioned transactions took place at the Vopak Deer Park Terminal in Deer Park, Texas, outside of Houston, where Chemoil leased shore tanks from Vopak, the terminal operator. *See* (Ex. 13; *see generally* Ex. 9 ("Leister Rpt.") § 5.)

3

A.       The Astra Transactions

In the Astra-1, Astra-2, and Astra-3 transactions, Chemoil (1) purchased ethanol from Astra on three separate occasions in the taxable quarter ending December 31, 2011, and (2) also sold alcohol fuel mixtures to Astra during the same quarter in three separate sales transactions. Aaron Parrish, who oversaw these transactions, expected the ethanol-gasoline mixtures sold to be used as a fuel. (Parrish Dep. 43:25–44:9)

*Astra-1*

In the transactions referred to as "Astra-1," Chemoil purchased 72,000 barrels of ethanol from Astra via an in-tank (Tank 503) transfer on December 21, 2011, for $2.46 per gallon. (Ex.14.) Astra delivered the ethanol to Chemoil "EXW[2] (Ex-Works Incoterm) at Vopak Deer Park, TX via in-tank no. 503." (*Id.*) Chemoil used the ethanol it purchased from Astra and gasoline it purchased from Sun Coast (an entity unrelated to Chemoil and Astra) to create alcohol fuel mixtures in Tank 503, which was leased by Astra. (Ex. 18; Ex. 93 ("TK503 Rpt.".) To assist in the mixing process, at the request of Chemoil, Astra sent a nomination to Vopak instructing Vopak to discharge Chemoil's gasoline trucks into Tanks 503. (Ex. 52.)

On December 27, 2011, Chemoil sold 72,000 barrels of alcohol fuel mixture to Astra via an in-tank (Tank 503) transfer for $2.06 per gallon. (Ex.51.) Astra obtained title and risk of loss of the alcohol fuel mixture upon the in-tank transfer. *Id.* (specifying title and risk of loss would transfer "at time and date of in-tank transfer date as agreed between the parties).

Producing the alcohol fuel mixtures in Astra's tanks was more efficient than transferring the purchased ethanol across the Vopak terminal into Chemoil's tanks. Parrish Dep. 95:19-96:10.

---

[2] Ex works (EXW) is an international trade term that describes when a seller makes a product available at a designated location, and the buyer of the product must cover the transport costs. International Chamber of Commerce Incoterms 2020, https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-2020/ (last visited September 16, 2022).

In-tank transfers, minimizing the number of transfers of fuel between tanks, and loading vessels from multiple tanks are common practices in the commodity trading industry that are used to increase efficiency, and save time and money. *E.g.*, Basler Dep. 93:2–95:18. In-tank title transfers did not require any notification to the Vopak Deer Park Terminal. *Id.* at 150:8–151:4.

As was common practice in the commodity trading industry, Chemoil invoiced Astra a net invoice reflecting the net amount due from the two separate transactions engaged in by the parties—the purchase of ethanol and later sale of alcohol fuel mixture—which is more efficient than each party separately paying both invoices. (*See* Ex.20; Parrish Dep. 150:18-25, 151:1-6.) Chemoil paid Astra the difference between the purchase price for the ethanol on December 21 and the sales price of the alcohol fuel mixture on December 27. (Ex.20.) This was not unique to the Astra-1 transactions. (Parrish Dep. 150:18-25, 151:1-6.)

The United States emphasizes the fact that the same "volume" of ethanol purchased from Astra on December 21 was later present in the alcohol fuel mixture sold to Astra on December 27. However, once Chemoil owned the purchased ethanol from Astra, Chemoil was not required to sell any specific batch of fuel back to Astra in a subsequent alcohol fuel mixture. (Skrinar Dep. 155:20–156:18 ("I have an obligation to purchase and I have an obligation to sell. What I do in between does not have anything to do with Astra or anybody else. It has to do with me in my position.").) Under the contract's terms, Chemoil clearly had title to and risk of loss of the ethanol once the in-tank transfer was complete. (Ex.14.) While Chemoil was required to use the same "volume" of ethanol as it purchased from Astra in order to blend the proper amount of alcohol fuel mixture, it was not obligated to use the same molecules of ethanol purchased from Astra on December 21. (Parrish Dep. 61:2-62:11; 156:12-15.) Chemoil held title to the ethanol for seven days, representing value to Chemoil. *See* (Parrish Dep. 61:2–62:11 (noting that holding

additional product [in Astra's tanks] created value as "an insurance policy" against logistics

issues acquiring fuel to satisfy those other obligations); Skrinar Dep. 132:15-133:12 (noting the

volatility in the market in December 2011); 155:20–156:18.)

*Astra-2*

In the transactions referred to as "Astra-2," Chemoil purchased 27,000 barrels of ethanol

from Astra on December 20, 2011, for $2.45 per gallon. (Ex. 16; Ex. 17.) Astra delivered the

ethanol to Chemoil "DDP[3] (Incoterms) at Vopak Deer Park, TX . . . via [Astra's] barge to

[Chemoil's] designated tanks." *Id.* Pursuant to an order from Chemoil, Vopak moved the ethanol

into Tank 538 and Tank 615 on December 19–20, 2021. (Ex. 28 ("TK538 Rpt"); Ex. 30 ("TK615

Rpt.").) Chemoil used the ethanol it purchased from Astra and gasoline it purchased from Sun

Coast to create alcohol fuel mixtures over December 19–20. (Ex.18.)

On December 20, 2011, Chemoil sold 27,000 barrels of alcohol fuel mixture to Astra for

$2.05 per gallon. (Ex.19.) As in the Astra-1 transactions, Chemoil netted the invoices from its

purchase of ethanol from Astra and the sale of the alcohol fuel mixture to Astra, reflecting a net

price of $440,380.80. (Ex.20.) Further, just like in Astra-1, Chemoil was not obligated to use the

ethanol purchased from Astra to create the alcohol fuel mixture. (Skrinar Dep at 155:20–156:18.)

*Astra-3*

In the transactions referred to as "Astra-3," Chemoil purchased 26,000 barrels of ethanol

from Astra via an in-tank (Tank 531) transfer on December 24, 2011, for $2.48 per gallon.

(Ex.21; Ex.22.) Astra delivered the ethanol to Chemoil "EXW(Ex-Works Incoterm) at Vopak

---

[3] Delivered duty paid (DDP) is a delivery agreement whereby the seller assumes all of the
responsibility, risk, and costs associated with transporting goods until the buyer receives
or transfers them at the destination port. International Chamber of Commerce Incoterms 2020,
https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-2020/ (last visited
September 16, 2022).

Deer Park, TX via in-tank no. 531." (*Id.*; Ex. 23 ("TK531 Rpt.").) Chemoil used the ethanol it purchased from Astra and gasoline it purchased from Sun Coast on December 23, 2011, to create alcohol fuel mixtures in Astra Tank 531. (*See* Ex. 53; Ex.81; TK531 Rpt.)

On December 30, 2011, Chemoil sold 26,000 barrels of alcohol fuel mixture to Astra via an in-tank transfer for $2.08 per gallon. (Ex.24; Ex.25.) Chemoil delivered the alcohol fuel mixture to Astra "EXW (Ex-Works Incoterm) at Vopak Deer Park, TX via in-tank no. 531." *Id.*

Chemoil invoiced Astra for the sale of 1,098,279 gallons of product on December 30, recording a delivery date of December 23, 2011. (Ex. 26.) Similar to Astra-1, Chemoil made a single net payment to Astra of $437,263.23, representing the difference between the purchase price of ethanol from Astra and the sale price of alcohol fuel mixture to Astra. (*Id.*)

Like Astra-1, Chemoil used the ethanol it purchased from Astra and gasoline it purchased from Sun Coast to create alcohol fuel mixtures in Astra's Tank 531, because creating the mixtures in Astra's tanks was more efficient than transferring the purchased ethanol across the Vopak terminal into Chemoil's tanks. (Parrish Dep. 95:19-96:10.)

B.    The Gunvor Transactions

Chemoil and Gunvor executed a sale contract on August 17, 2011, for a series of sales of blended product from Chemoil to Gunvor, all to be completed by the end of 2011. (Ex. 27.) The parties contracted for whole blends in each transactions, which were tested as composites since none of Chemoil's tanks were large enough to blend the entire volume. (*Id.* at 12; Herndon Dep. 88:7-89:6 (noting composite testing was used).) Aaron Parrish categorized the ethanol-gasoline mixtures sold as only available for use as a fuel. (*E.g.*, Parrish Dep. 43:25-45:9.)

*Gunvor-4*

In the transactions referred to as "Gunvor-4," Chemoil loaded its alcohol fuel mixture from Tanks 538, 614, and 615 onto Gunvor's vessel. (TK538 Rpt.; Ex. 29 ("TK614 Rpt.");

TK615 Rpt.) The Vopak tank reports for Tanks 538 and 615 show that gasoline was blended with ethanol in 2011 and that on September 28, 2011, both tanks had a running balance that exceeded 80,000 gallons of alcohol fuel mixtures. (TK538 Rpt.; TK615 Rpt.) Chemoil then subleased Tanks 538 and 615 to Mansfield Oil ("Mansfield") beginning September 28, 2011, as evidenced by the tank reports back-to-back in-tank sales and in-tank purchases on September 28 and October 14, 2011. *Id.* When Chemoil received the tanks after subleasing to Mansfield, the heels were at capacity, and a small volume of additional fuel remained above the heel. (Ex. 31.) Because the tanks contained fuel leftover from the Mansfield lease, the addition of ethanol into the tanks created the alcohol fuel mixture. As explained by the government's expert, "the bottom is fuel when you start. So if you put stuff in there, that means some of the bottom stuff goes up. . . . So you don't have too much of the ethanol [in the heel], the gasoline [will be] going down into it." (Ex. 7 ("Leister Dep.") 120:4–20.)

The Vopak report for Tank 748 shows that Chemoil blended ethanol and gasoline on November 1, 2011. (Ex. 32 ("TK748 Rpt.").) Chemoil moved a specific portion of this blend into Tank 614, ensuring that the composite blend of the alcohol fuel mixtures contained in Tanks 538, 614, and 615 would remain within the specifications required by Gunvor, (TK614 Rpt; Basler Dep. 85:11-90:12.)

*Gunvor-5*

In the transactions referred to as "Gunvor-5," Chemoil loaded its alcohol fuel mixture from Tank 538 onto Gunvor's vessel. (TK538 Rpt.) In order to create this alcohol fuel mixture, Chemoil took a portion of the alcohol fuel mixtures from Tanks 614 and 748 that were produced for the Gunvor-4 sale and transferred them into Tank 538. (TK 538 Rpt.; TK614 Rpt.; TK748 Rpt.) The three alcohol fuel mixtures were combined to produce a new mixture that met the

contractual specifications for Gunvor-5. (*Id.*; Ex. 33.) On November 20, 2011, Chemoil sold the Gunvor-5 product to Gunvor. (Ex.33.)

*Gunvor-6*

In the transactions referred to as "Gunvor-6," Chemoil ordered additional ethanol, which was placed into Tank 538, Tank 614, Tank 615, and Tank 748. (TK538 Rpt.; TK614 Rpt.; TK615 Rpt.; TK748 Rpt.) To create the alcohol fuel mixtures, on November 28, Chemoil purchased 1,995 gallons of gasoline from Sun Coast. (Ex. 34.) The gasoline was placed into Tank 748, which already held ethanol, thereby, creating the alcohol fuel mixture. (TK748 Rpt.) On December 2, 2011, Chemoil transferred the alcohol fuel mixture product from Tank 748 to Tank 538. (*Id.*; TK538 Rpt.)

From December 12 to 14, 2011, Chemoil transferred the Gunvor-6 product from Tanks 538, 614, and 615 onto Gunvor's vessel. (Ex. 35; TK538 Rpt.; TK614 Rpt.; TK615 Rpt.)

*Gunvor-7*

Pursuant to the sale contract with Gunvor executed on August 17, 2011, all sales had to be completed by the end of 2011. (Ex. 27; Ex. 36.) In the transactions referred to as "Gunvor-7," Gunvor was prepared to take delivery of product by December 21, 2011, via its vessel, the Nord Nightingale. (Ex. 37 at -43.)

Originally, the contract provided that title to the product transfers as the vessel was loaded. (Ex. 27.) However, delays at the Vopak terminal prevented Chemoil from fulfilling the order. (Parrish Dep. 97:2–99:24; 224:17–225:12; Ex. 4 ("Herndon Dep.") 32:23–33:3; 95:6–:24.) To ensure that the sale was completed in 2011, the parties agreed to change the delivery point, and that title would pass in-tank within the period identified in the contract—*i.e.*, on December 31, 2011. (Ex. 38 (email confirmation of contract modification); Ex. 39 (contract confirmation).)

The United States concocts a conspiracy theory regarding the timing of the in-tank title transfer. (Def.'s Mem. Supp. Summ. J. at 5–10, ECF No. 95 (hereinafter "Br.").) In reality, the decision to revise the delivery point as provided for in the original contract to an in-tank title transfer proceeded as follows:

Gunvor's vessel, the Nord Nightingale, was in the harbor and ready to take delivery of the product by December 21, 2011. (Ex. 27 at -43 (referencing original tendered "Notice of Readiness" dated December 21, 2011, which confirmed "vessel is in all respects ready to commence loading/discharging her nominated cargo grade and quantity of 17250cbm Ethyl Alcohol" on "21-12-2011").) On December 29, 2011, John Skrinar emailed Aaron Parrish to inquire about the Gunvor-7 transaction, as Chemoil's internal transaction tracking system reflected the product as being unsold. (Ex. 40.) Parrish replied that the barrels would be "add[ed] to this [G]uvnor boat loading in the next few days." *Id.* Skrinar recognized that the Gunvor-7 product had to be sold to Gunvor prior to 2012. *Id.* Skrinar also noted that it was his "understanding that it needs to be sold by Dec. 31. What constitutes a sale, whether that be an invoice or payment, I'm not sure." *Id.* As noted by the United States, Parrish attempted to consult with Phillip Lau, Chemoil's tax manager, on the situation. (Br. at 53.)

Gunvor issued a purchase undertaking to the bank on December 29, 2011, regarding the Gunvor-7 transaction. (Ex. 41 ("Gunvor covered themselves on their next purchase by issuing a purchase undertaking to the bank…").) And Chemoil completed a loading nomination form for Vopak on December 30, 2011, asking for the Nord Nightingale to be loaded with the product on December 30, 2011. (Ex. 42.) However, as stated above, the product for the Gunvor-7 transaction could not be loaded onto the vessel before year's end due to Vopak-caused delays at the Vopak Deer Park Terminal. *See, e.g.*, Herndon Dep. 32:17–33:3. Therefore, under the

original terms of the contract, which provided for title to pass at loading, Chemoil would not have been able to fulfill the sale in 2011. (Ex. 27.)

To ensure that the Gunvor-7 product was sold in 2011, Parrish spoke to Wayne Herndon, an Ethanol Consultant at Gunvor. (Herndon Dep. 38:8–39:8.) Parrish asked Herndon if "[Gunvor] can take title before the end of the year." (Parrish Dep. 252:17–253:5; *see also* Herndon Dep. 34:11–:18.) While the exact date of this conversation is unconfirmed, Herndon stated during his deposition that, "I have to think [Parrish] had to have asked me [about in-tank title transfer] . . . but because of the holidays [Parrish] wasn't able to get around to sending me anything official until the end of the first week of January." (Herndon Dep. 35:3–:25.) After the holidays, Chemoil sought to update its system regarding title to the Gunvor-7 product, as the system had not been updated for the December 31, 2011 sale. (Ex. 43.) On January 9, 2011, Parrish emailed Herndon to memorialize title transfer to the Gunvor-7 product effective December 31, 2011. (Ex. 44.) Herndon confirmed on behalf of Gunvor that the title transfer took effect on December 31, 2011. (Herndon Dep. 118:21–119:3; Ex. 38.)

The United States focuses on the fact that the final invoice was not generated for the Gunvor-7 product until 2012. However, Chemoil determined that final invoices to Gunvor could not be generated until the product was loaded. (Ex. 40; Ex. 44 (Chemoil confirmed with Gunvor that it "would not be invoiced until the product has loaded").) Further, in typical commercial relationships there is nothing unusual about sending an invoice for sale of a product after delivery. The alcohol fuel mixture was loaded onto the Nord Nightingale from January 9, 2012 to January 14, 2012. (Ex. 45 ("TK723 Rpt."); *see also* Herndon Dep. 105:7–:21.)

Parrish understood that the sale of the Gunvor-7 product from Chemoil to Gunvor occurred as of the title transfer on December 31, 2011. (Parrish Dep. 255:19-256:8.) Chemoil's

controller, Robert Morant, confirmed that "[s]ince title transferred in December and we are just storing it for Gunvor until they can take delivery, this should be a December sale." (Ex. 46.)

## III.   Procedural Background

Chemoil filed its claim for refund on the Form 843 on September 23, 2014. (Compl. Ex. D, ECF No. 1-4.) By the date of Chemoil's claim for refund, the IRS had proposed to disallow the tax credits and to assert an excessive claims penalty, but had not yet assessed either the tax or the penalty. (Ex. 47.) IRS revenue agent Alan Anderson sent Chemoil a Notice of Proposed Adjustment ("NOPA") on August 19, 2014. (Ex. 48).

The IRS assessed the tax and penalty on October 13, 2014. (Ex. 47.) Following the penalty assessment, Chemoil appealed the matter within the IRS and presented its arguments to the IRS Office of Appeals. Subsequently, the Appeals Officer made a settlement offer to Chemoil, whereby the IRS would concede the entirety of the penalty and 30% of the claimed credits.[4] (*Compare* Ex. 10 (entry dated 12/14/2016 (noting that the Appeals Officer had arrived at the proposed 30% concession) and entry dated 04/17/2017 (noting the communication to Chemoil's representative that the counteroffer of a 75% concession was outside of the settlement range and that "the 30% settlement previously offered was the highest end of the range"); Ex. 12.) Chemoil and the IRS had an additional Appeals conference. On August 30, 2017, Appeals again offered to concede the penalty in full and 30% of the tax credits at issue.

On October 6, 2017, Chemoil declined the settlement offer and the IRS issued two

---

[4] Pursuant to Federal Rule of Evidence 408, Chemoil is offering evidence of this settlement offer not to prove the validity or amount of its claims, but rather, for another purpose: namely, in response to the United States' variance argument, to show that Chemoil had no reason to dispute the penalty during the period when the settlement offer included a concession of the penalty. *See* Fed. R. Evid. 408(b) (noting that evidence of a settlement offer may be admitted for "another purpose"). Federal trial courts have "broad discretion as to whether to admit evidence of settlement negotiations offered for 'another purpose.'" *Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989).

Notices of Disallowance, which formally disallowed Chemoil's claim for refund on the credits and upheld the assessed excessive claims penalty. (Compl. Ex. D.) This litigation followed.

## **ARGUMENT**

I.   **The Economic Substance Doctrine Does Not Apply Here; But if it Applied, it Would Favor Chemoil.**

The United States first contends that Chemoil cannot recover any alcohol fuel mixture tax credits in this case because the transactions at issue "lack economic substance." (*See* Br. at 22–33.) This argument runs contrary to a 40+ year effort by Congress to encourage taxpayers to produce and use clean energy through the use of tax incentives. The argument is also wrong on the law and on the facts. For the multiple reasons discussed below, the United States' motion for summary judgment on this ground should be denied.

A.   Applying the economic substance doctrine to energy tax credits, such as alcohol fuel mixture credits, would frustrate this nation's climate change commitments.

As an initial matter, the United States' attempt to apply the economic substance doctrine to a case involving energy tax credits undermines the goals of Congress. Congress has a long history of incentivizing the production and use of clean energy through very substantial federal tax incentives. That history goes back to at least 1980, when the Windfall Profit Tax Act was enacted, which provided incentives for the use of ethanol and other alcohol fuels. And, that history continues, most recently, with the passage of the Inflation Reduction Act of 2022, Pub. L. No. 117-169 ("IRA") on August 16, 2022, which provides about $369 billion for energy security and climate change, primarily through clean energy tax credits that are available for more than the next decade. The IRA includes very substantial extensions, expansions and other changes to the tax incentives available for clean energy projects.

A few illustrative examples of the clean energy tax incentives include:

- Wind, solar and other renewable electricity projects are eligible for a tax credits of up to

13

55% of their capital costs. Secs. 45, 48, 45Y, 48E.

- Projects that capture carbon dioxide from the atmosphere and store such carbon dioxide in EPA approved "Class VI" storage sites are entitled to tax credits of $180 per metric ton of carbon dioxide captured and stored during the first 12 years of operations. Because that carbon dioxide is only captured and stored, there is no commercial transaction that would provide any non-tax benefits.

- Alternative fuels are entitled to a tax credit of up to $1.75 per gallon of fuels produced or blended. Secs. 6426(k), 6427, 45Z.

These substantial clean energy tax benefits are provided by Congress to incentivize the production and use of clean energy in the United States. In that regard, the US has committed to reduce greenhouse gas emissions (GHGs), including the Administration's strategy for the US to reduce net GHG emissions 50-52% below 2005 levels by 2030 and achieve net zero greenhouse gas emissions by 2050,[5] and through membership in the United Nations Paris Agreement, a legally binding international treaty on climate change. The US is seeking to meet those commitments by (1) decarbonizing electricity; (2) use of clean fuels and causing products to be powered by electricity; (3) reducing carbon dioxide in the atmosphere; (4) reducing methane and other non-carbon dioxide emissions; and (5) cutting energy waste through energy efficiency.[6] The US incentivizes taxpayers to undertake these activities primarily through tax credits.[7]

---

[5] U.S. Dep't of State & Exec. Off. of the President, The Long-Term Strategy of the United States: Pathways to Net-Zero Greenhouse Gas Emissions by 2050 (2021), https://www.whitehouse.gov/wp-content/uploads/2021/10/US-Long-Term-Strategy.pdf.
[6] *Id.* at 5–6.
[7] Senate Democratic Majority, Summary of the Energy Security and Climate Change Investments in the Inflation Reduction Act of 2022, at 3, https://www.democrats.senate.gov/imo/media/doc/summary_of_the_energy_security_and_climate_change_investments_in_the_inflation_reduction_act_of_2022.pdf (Referencing tax credits in IRA that "will reduce [GHG] emissions in every sector of the economy"); Clean Air Task Force, Inflation Reduction Act of 2022, https://cdn.catf.us/wp-content/uploads/2022/08/15115751/ira-tax-incentives.pdf (the IRA "includes a number of tax incentives that together play a central role in driving greenhouse gas emissions reductions"); *see also* Bipartisan Policy Center, Inflation Reduction Act (IRA) Summary: Energy and Climate Provisions (Aug. 4, 2022), https://bipartisanpolicy.org/blog/inflation-reduction-act-summary-energy-climate-provisions/.

As further discussed below, the United States, asserts that investments in clean energy must have a pre-tax profit, sufficient to satisfy the economic substance doctrine, in order to be entitled to the clean energy tax credits made available by Congress. In other words, under the United States' view, Congress provided tax credits to encourage investments in clean energy projects by taxpayers that already could do so profitably, but not for taxpayers that could only profitably make such investments by availing themselves of the clean energy tax credits. But if the United States' position is sustained, which position is that the <u>only</u> taxpayers that are entitled to those incentives are those that could profitably invest in clean energy projects absent the tax credits provided by Congress, this nation's commitment to GHG reductions would be frustrated.

For example, as provided above, one of the ways that the US is seeking to meet those commitments is by reducing carbon dioxide in the atmosphere. Since 2008, Congress has incentivized taxpayers to capture and store carbon dioxide by providing a tax credit under section 45Q, and Congress increased the tax credit benefits in 2018 and again the IRA. That tax credit is available, *inter alia*, for capturing carbon dioxide from the air and storing it underground. The amount of the tax credit is up to $180 per metric ton of carbon dioxide captured and stored (increased from $50 per metric ton prior to enactment of the IRA). Because of the nature of the activities giving rise to the credit—*i.e.*, making substantial investments in equipment to draw carbon dioxide from the air, transporting that carbon dioxide to a storage site, and storing carbon dioxide deep underground—there are capital and operating expenses, but there is no revenue source other than the section 45Q tax credits.

Under the United States' view here, that credit would not be allowed to <u>any</u> taxpayers because there is no possible pre-tax profit. That clearly was not what Congress envisioned when providing taxpayers with clean energy tax credits to help meet the United States climate change

commitments. Rather, Congress provided these substantial credits—including up to 55% of capital costs for clean electricity, up to $1.75 per gallon for clean fuels, and up to $180 per metric ton for the carbon capture and storage credit—to encourage taxpayers, including those that otherwise could not profitability do so without tax credits, to undertake the activities necessary for the US to achieve its GHG emissions reductions goals.

B.   The common law economic substance doctrine does not apply.

Next, in addition to wrongly applying the economic substance doctrine, the United States applies the wrong version of the doctrine. To the extent the economic substance doctrine is even relevant to this case (which it is not), the correct version of the doctrine is the version codified in section 7701(o) as part of the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, section 1409, 124 Stat. 1029, 1067 (Mar. 30, 2010). Section 7701(o) applies to transactions entered into after March 30, 2010, and there is no dispute that the transactions involved here occurred in late 2011. The United States nevertheless seeks, erroneously, to apply the old common law economic substance doctrine, which has been replaced by section 7701(o).

1.   *The historic common law economic substance doctrine.*

The common law economic substance doctrine historically was applied by the Courts using a two pronged test—(1) whether the taxpayer had a nontax business purpose or objective for entering into the disputed transaction (the subjective prong); and (2) whether the transaction had economic substance beyond the anticipated tax benefits (the objective prong). The two prongs enabled "courts to question the validity of a transaction and deny taxpayers benefits to which they are technically entitled under the Code if the transaction at issue lacks economic substance." *Benenson v. Comm'r*, 910 F.3d 690, 699 n.8 (2d Cir. 2018) (quoting *Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 113 (2d Cir. 2015)).

Over time, the appellate circuits began to diverge in their application of the two prongs.

16

Some circuits applied them disjunctively, requiring only one to be satisfied to show economic substance. *See, e.g.*, *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91–92 (4th Cir. 1985). Other circuits applied them conjunctively, requiring both to be satisfied. *See, e.g.*, *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006). A third group of circuits, including the Second Circuit, collapsed the prongs into a single, comprehensive inquiry. *See, e.g.*, *Altria Grp., Inc. v. United States*, 694 F. Supp. 2d 259, 271 (S.D.N.Y. 2010), *aff'd*, 658 F.3d 276 (2d Cir. 2011) (instructing the jury that in the Second Circuit, "the economic substance test was flexible" and that while it could find economic substance based on satisfying a single prong, it was nonetheless required to "consider both the 'business purpose' and 'economic effects' inquiries before reaching a conclusion as to the economic substance of a transaction."); *Sacks v. Comm'r*, 69 F.3d 982, 988 (9th Cir. 1995), *rev'g* 64 T.C.M. (CCH) 1003 (1992); *Kirchman v. Comm'r*, 862 F.2d 1486, 1492 (11th Cir. 1989), *aff'g Glass v. Comm'r*, 87 T.C. 1087 (1986).

This divergence necessitated congressional action. Accordingly, in 2010, Congress provided certainty to taxpayers by codifying the economic substance doctrine in section 7701(o).

2.   *The codified economic substance doctrine supplanted the common law doctrine.*

The economic substance doctrine, codified in section 7701(o), provides in pertinent part:

(o) CLARIFICATION OF ECONOMIC SUBSTANCE DOCTRINE

(1) APPLICATION OF DOCTRINE. In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—

(A) the transaction changes in a meaningful way (apart from **Federal income tax** effects) the taxpayer's economic position, and

(B) the taxpayer has a substantial purpose (apart from **Federal income tax** effects) for entering into such transaction.

(Emphases added.) As relevant here, section 7701(o) requires only that federal <u>income</u> tax

effects are excluded in determining whether a transaction satisfied the economic substance doctrine, and not the federal <u>excise</u> tax benefits that are at issue here.

This codified doctrine was made effective for "transactions entered into after the date of the enactment [of section 7701(o)]", which was March 30, 2010. Pub. L. No. 111-152, § 1409(e)(1), 124 Stat. 1029, 1070. Accordingly, as a matter of law, the codified economic substance doctrine—rather than the common law doctrine—applies to post-March 30, 2010, transactions. *Cf. United States v. Coplan*, 703 F.3d 46, 92 n.41 (2d Cir. 2012) (noting that "[i]n 2010, Congress finally codified the economic substance doctrine at 26 U.S.C. § 7701(o)" and that "[t]he codified version applies prospectively to transactions entered into after March 30, 2010" before applying the common law doctrine because the transaction at issue was entered into before March 30, 2010); *Historic Boardwalk Hall, L.L.C. v. Comm'r*, 694 F.3d 425, 431 n.7 (3d Cir. 2012) (noting that "[s]ection 7701(o) applies to all transactions entered into after March 30, 2010" and applying the common law doctrine rather than the statutory doctrine to transactions entered into before that date). There is no dispute that the transactions at issue in this case were entered into by Chemoil after March 30, 2010. (Leister Rpt. at 11–12 (identifying Chemoil's contracts); Pl.'s Mot. Partial Summ. J. ("Pl.'s MPSJ") Ex. 2, ECF No. 85-2 (compiling Chemoil's identified contracts).) Accordingly, the codified economic substance doctrine in section 7701(o), rather than the common law doctrine, applies to the transactions at issue.

C.    The codified economic substance doctrine favors Chemoil.

Although section 7701(o) superseded the common law economic substance doctrine with respect to *how* the doctrine is applied, Congress was careful to explain that "[t]he determination of *whether* the economic substance doctrine is relevant to a transaction is made in the same manner as if the provision had never been enacted." Sec. 7701(o)(5)(C) (emphasis added). Stated otherwise, Congress wanted to provide a consistent test while also making sure that the codified

18

doctrine "d[id] not change present law standards in determining *when* to utilize an economic substance analysis." Staff of J. Comm. on Tax'n, Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010." (Comm. Print 2010), https://www.jct.gov/pub lications/2010/jcx-18-10 (emphasis added). That consistent test recognizes that the doctrine is not relevant to all transactions. Thus, before applying the economic substance doctrine, this Court should first determine whether, as a matter of law, the doctrine is relevant to transactions involving alcohol fuel mixture excise tax incentives. It is not.

As noted above, section 7701(o) does not apply to all transactions, but rather only to a transaction for which the "economic substance doctrine is relevant." Section 7701(o)(1). Transactions that Congress specifically sought to incentivize with a tax benefit are not transactions for which the "economic substance doctrine is relevant." *Id.* Because taxpayers who are blending ethanol into the nation's gasoline supply and selling those alcohol fuel mixtures for use as a fuel are engaging in exactly the activity that Congress sought to incentivize with this credit, the economic substance doctrine is inapplicable to this case as a matter of law. *See, e.g.*, *Altria Grp., Inc.*, 694 F. Supp. at 284 ("[T]he economic substance doctrine simply has no application if it is clear that a claimed deduction is within the intent of a provision of the Code."); *Cross Refined Coal, LLC v. Comm'r*, No. 20-1015, 2022 U.S. App. LEXIS 21729 (DC Cir. 2022); *Sacks*, 69 F.3d at 991 ("Absence of pre-tax profitability does not show 'whether the transaction had economic substance beyond the creation of tax benefits,' where Congress has purposely used tax incentives to change investors' conduct." (citation omitted)).

Moreover, section 7701(o) specifically provides that only federal <u>income</u> tax effects are excluded in determining whether a transaction satisfied the economic substance doctrine, and not federal <u>excise</u> tax benefits. Title 26 of the U.S. Code, the Internal Revenue Code, provides for

various types of federal taxes, including income taxes under Subtitle A, estate and gift taxes under Subtitle B, employment taxes under Subtitle C, certain excise taxes under Subtitle D, and alcohol, tobacco and certain other excise taxes under Subtitle E. Subtitle F addresses "Procedure and Administration" with respect to those various types of taxes and includes section 7701(o). The phrase "Federal income tax" used in section 7701(o) refers to taxes imposed under Subtitle A of the Internal Revenue Code. The alcohol fuel excise tax mixture credits at issue here are not "Federal income tax" effects; rather, they are part of Subtitle D, "other excise taxes" (as an offset against excise taxes imposed by Subtitle D) and the relevant provision, section 6426, is part of Subtitle F, the same subtitle that includes section 7701. Accordingly, assuming, arguendo, that this Court finds that the economic substance doctrine is relevant to the transactions at issue in this case, the benefits from these credits may still be considered in determining whether the transactions at issue had economic substance, because the alcohol fuel mixture credits do not have any "Federal income tax" effect. Indeed, the United States does not suggest that any Federal income tax effect exists here.

It would be illogical to expand the term "income tax" that Congress used in section 7701(o) to include other types of taxes. Indeed, where Congress intends to reference all Federal tax provisions, it uses the phrase "this title" to reference the entirety of Title 26. *See, e.g.*, section 7701(a), (b)(1), (c), (d), (f). And where Congress intends to reference specific portions of Title 26, it uses other phrases.[8] Based on the words used by Congress, in analyzing either prong of the

---

[8] The instances of specific references throughout Title 26 are legion. *See, e.g.*, sec. 7701(g) ("subtitle A" referencing sections 1 through 1564); sec. 7701(b)(1) ("subtitle B" referencing sections 2001 through 2801); sec. 7701(a)(28) ("this subtitle" referencing subtitle F, which includes sections 6001 through 7874); sec. 7701(a)(12)(B) ("taxes imposed by chapters 1, 2, and 21"); sec. 7701(a)(16) (referencing "any tax under the provisions of sections 1441, 1442, 1443, or 1461"); sec. 7701(a)(43) and (44) (both addressing the basis of property under "any provision

economic substance doctrine, only income tax effects are excluded from consideration.

Finally, the exclusion of excise tax benefits from section 7701(o) makes sense. As noted below, the economic substance doctrine is intended to deter unintended consequences. "If the realization of tax benefits of a transaction is consistent with the Congressional purpose or plan that the tax benefits were designed by Congress to effectuate, it is not intended that such tax benefits be disallowed" under the codified economic substance doctrine. Staff of J. Comm. On Tax'n, JCS-2-11, General Explanation of Tax Legislation Enacted in the 111th Congress 378–379, n. 1034 (Comm. Print 2011) (hereinafter "Blue Book"). Examples include clean energy credits such as the section 45 and section 48 tax credits for producing clean electricity, tax credits for investing in low income housing (section 42), tax credits for investing in lower income communities (section 45D), and tax credits for investing in renovating historic structures (section 47). Similarly, excise tax benefits are limited to specific exemptions to excise taxes and tax credits similar to the examples provided by the Committee, including tax credits provided by Congress for the use of clean fuels, including the alcohol fuel mixture credit at issue here.

Accordingly, as a matter of law, other tax effects, such as federal excise tax effects, may be taken into account.

D.   The United States' assertion regarding the limited scope of the codified economic substance doctrine is plainly wrong.

The United States attempts to sidestep the application of the codified economic substance doctrine by asserting in a footnote that section 7701(o) only applies to income tax benefits, and that the common law economic substance doctrine still applies to excise tax benefits. (Br. at 23

---

of subtitle A (or under any corresponding provision of prior income tax law"); sec. 7701(a)(36) (using the term "tax" without grammatical modification to include "any . . . tax imposed by this title"); sec. 7701(a)(49)(C) (referencing "excise tax exemptions"); sec. 6861 (titled "Jeopardy assessments of income, estate, gift, and certain excise taxes").

n.12.) In other words, the United States' view is that when Congress included the phase "Federal income tax effects" in section 7701(o), its intent was to resolve the uncertainty arising from the common law economic substance doctrine for federal income taxes, but to retain that same uncertainty for application of the economic substance doctrine to federal excise tax effects.

The United States' contention defies logic and Congressional intent. In codifying the economic substance doctrine, the Joint Committee on Taxation stated the following as the "reasons for [the] change": "The Congress believes it is . . . desirable to provide greater clarity and uniformity in the application of the economic substance doctrine in order to improve its effectiveness at deterring unintended consequences." Blue Book at 378. And, in its "explanation of provision", the Joint Committee on Taxation states: "The provision provides a uniform definition of economic substance . . . ." *Id.* "This clarification eliminates the disparity that exists among the Federal circuit courts regarding the application of [the economic substance] doctrine." *Id.* at 380. If excise tax benefits were treated as still subject to a common law economic substance doctrine, that would be wholly inconsistent with Congress's reasons for codifying the economic substance doctrine, which were to provide the clarity that was lacking under the prior common law economic substance doctrine.

E. <u>Even if the common law economic substance doctrine were applicable here, which it is not, it would support the inclusion of excise tax effects.</u>

Even assuming *arguendo* that the common law economic substance doctrine were applicable here, as the United States contends, that doctrine would not permit disallowing the alcohol fuel mixture tax credits to Chemoil.

As noted above, the Second Circuit historically employed a "flexible" economic substance analysis, where both prongs were factors to consider in the overall inquiry into a transaction's practical economic effects. *See Gilman v. Comm'r*, 933 F.2d 143, 148 (2d Cir.

22

1991); *Altria Grp., Inc.*, 694 F. Supp. 2d at 282; *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 171 (D. Conn. 2004), *aff'd*, 150 F. App'x 40 (2d Cir. 2005) (summary order). Thus, "a finding of either a lack of a business purpose other than tax avoidance or an absence of economic substance beyond the creation of tax benefits can be but is not necessarily sufficient to conclude the transaction a sham." *Long Term Capital Holdings*, 330 F. Supp. 2d at 171. None of these cases addressed excise tax effects, and none concluded that excise tax benefits are not taken into account in determining whether a transaction had economic substance.

However, case law outside of the Second Circuit clarifies that tax incentives created by Congress, such as excise tax credits, are permitted even if a taxpayer has a pre-tax loss since the taxpayer is engaging in the behavior Congress is attempting to encourage. Some representative examples of that case law include the following:

### *Cross Refined Coal, LLC v. Commissioner*[9]

The US Tax Court held in a bench opinion that pre-tax profit is an inappropriate indicia of the validity of an investment in clean coal. *Cross Refined Coal v. Comm'r*, No. 19502-17 (Aug. 29, 2019), *aff'd* 2022 U.S. App. LEXIS 21729 (D.C. Cir. 2022). Instead, the court found it appropriate to "look to the post-tax profits" given section 45's nature and purpose. *Id.* at 45.

In that case, the Taxpayer purchased unrefined coal from Santee Cooper, refined it, claimed a section 45 tax credit, and sold the refined coal back to Santee Cooper for 75 cents less per ton than it purchased the unrefined coal, "ensuring that [the taxpayer] would lose money on each sale". The refined coal tax credit under section 45 incentivized taxpayers to refine coal in a manner that would result in substantially reduced emissions of certain harmful substances. The

---

[9] Available at https://plus.lexis.com/api/permalink/2bc744b2-72c5-42c6-8273-6680944ffd4d/?context=1530671 (last visited July 7, 2022).

credit was added by Congress "for the purpose of incentivizing the refined coal activity; it did so because the market, unassisted by credits, was not producing refined coal on the scale that Congress thought beneficial. Congress manifestly decided that, if refined coal was to be produced in sufficient quantity, money beyond that which the market would offer would need to be added to the mix." *Id.* at 53. The Tax Court acknowledged that although the IRS was correct that pre-tax losses were generated on "the sale of every ton of coal refined," the government's position "deliberately disregards the obvious economic reality of the situation". *Id.* at 43. "Without the credits, the refined coal activity was a losing proposition; but that fact cannot mean that the activity, undertaken by someone who gains by claiming the credits, lacks economic substance; rather, that fact is the reason for the credits." *Id.* at 54.

The facts presented by Cross Refined Coal showed that "the partners deliberately and conscientiously pursued the economic goal that Congress incentivized them to seek—that is, an after-tax (and after-tax-credit) profit." *Id.* at 45. Accordingly, the incentive offered by after-tax profits was the very purpose of the credit: as Congress understood, and as the facts demonstrated, "[w]ithout the credits, the operation would have always necessarily been a losing proposition." *Id.* at 27. Accordingly, the credits were "a necessary predicate for the entire arrangement." *Id.* at 43–44. The court acknowledged that "[t]here are indeed abusive situations in which the tax law will disregard transactions that lack substance apart from tax manipulations, but this is not such a circumstance." *Id.* at 44.

On August 5, 2022, the United States Court of Appeals for the District of Columbia Circuit issued a precedential opinion affirming the decision of the Tax Court. The DC Circuit noted that "[the IRS'] chief objection is that [the taxpayer] did not pursue business activity to obtain a *pre*-tax profit. Instead, tax credits were its sole profit driver, and the production of those

credits thus permeated every aspect of its business model." The DC Circuit disagreed with the IRS' objection, stating that the "pursuit of after-tax profits can be legitimate business activity" and that it is "especially true in the context of tax incentives, which exist precisely to encourage activity that would not otherwise be profitable".

*Sacks v. Commissioner*

In *Sacks*, the IRS disallowed tax credits claimed by an investor in a solar water heating business. 69 F.3d 982, 990 (9th Cir. 1995). The Tax Court upheld the determination, finding that the taxpayer's investment was a sham transaction because the taxpayer was "unlikely to make money from his solar water heaters, but for the tax benefits." *Id.* But the Court of Appeals for the Ninth Circuit reversed the Tax Court, finding that a "tax advantage such as Congress awarded for alternative energy investments is intended to induce investments which otherwise would not have been made." *Id.* at 992 ("If the government treats tax-advantaged transactions as shams unless they make economic sense on a pre-tax basis, then it takes away with the executive hand what it gives with the legislative.").

The Ninth Circuit concluded that the "[a]bsence of pre-tax profitability does not show 'whether the transaction had economic substance beyond the creation of tax benefits,' where Congress has purposely used tax incentives to change investors' conduct." *Id.* at 991 (citation omitted). Stated otherwise, when Congress creates a tax credit for participating in a particular activity that would be uneconomical without the credit, the economic substance of the activity should be evaluated to include the credit. *Id.* The court explained that in creating the tax credit at issue, Congress "purposely skewed the neutrality of the tax system . . . because [it] sought to induce people to invest in solar energy." *Id.* "[Using] the reason Congress created the tax benefits as a ground for denying them," as the IRS proposed to do, would "violate[] the principle

that statutes ought to be construed in light of their purpose." *Id.* at 992.

The *Sacks* transaction's lack of pre-tax profitability was not evidence of abuse by the taxpayer—rather, it was evidence that the transaction was consistent with Congress' purpose of "induc[ing] investments which otherwise would not have been made." *Id.* "If the Commissioner were permitted to deny tax benefits when the investments would not have been made but for the tax advantages, then only those investments would be made which would have been made without the Congressional decision to favor them." *Id.*

Following the decision in Sacks, the IRS acknowledged that "a lack of pre-tax profitability will not, by itself, prevent a refined coal credit transaction from satisfying either the pre-enactment economic substance doctrine or § 7701(o)." AM 2018-002.

The United States does not point to a single case where a court excluded excise taxes from the determination of whether a transaction satisfied the economic substance doctrine. And the cases cited by the United States are inapposite. The United States cites to *Alternative Carbon Res., LLC v. United States,* 939 F.3d 1320 (Fed. Cir 2019), for the proposition that "a 'careful review' under the economic substance doctrine is appropriate 'where a taxpayer engages in a transaction that is otherwise unprofitable in order to collect tax credits." The United States takes that statement wholly out of context. The relevant question in that case was whether the taxpayer satisfied the statutory requirement that the fuel mixture must be <u>sold</u>. That question arose because the taxpayer entered into an agreement whereby it <u>paid</u> over $1.6 million in fees to another person to dispose of its fuel mixture, and then according to the court, entered into a separate agreement to receive only $8,950 in administrative fees to purportedly satisfy the requirement that the fuel mixture be sold. The court concluded that "the 'sales' price did not have an independent business purpose and only served to qualify the transactions as sales for

purposes of the alternative fuel mixture credit" and that "even if this fee might be technically characterized as a price, or as meaningful consideration, it lacked economic substance and should be disregarded." In short, the court concluded that simply because transactions involve alternative energy tax credits such transactions are not exempt from a review to confirm that the substance of a transaction is consistent with its form for purposes of determining whether the requirements for the credit are satisfied. But, unlike *Cross Refined Coal* and *Sacks*, *Alternative Carbon Resources* did not address the question present here—*i.e.*, whether energy tax credits may be disallowed because a taxpayer has a pre-tax loss.

The United States also cites *Sparkman v. United States*, No. 8 Civ 87, 2009 WL 510316 (D. Haw., Dec. 28, 2009) in support of its position. In that case, the court considered whether certain tax statements made by the taxpayer to customers regarding the availability of clean energy tax credits were false. The court's analysis actually supports Chemoil's position. In that regard, the court states: "The fact that tax benefits are taken into account in a decision to enter a transaction is not a reason to disallow the benefits; the Ninth Circuit has recognized that 'tax laws affect the shape of nearly every business transaction.' *Sacks*, 69 F.3d at 987 (citation omitted). Also, if the government is deliberating [sic] distorting the market to induce certain behavior, a court must analyze the transaction on post tax basis. *Id.* 991–992."

In this case, as in other cases involving energy tax incentives, Congress "deliberat[ely] distorted the market to induce certain behavior." *Id.* Here, Congress enacted a tax credit for blending alcohol fuels with gasoline as part of the Windfall Profits Tax Act in order to create an economic incentive for taxpayers to add an alternative fuel—*i.e.*, ethanol or other alcohol fuels— into the nation's gasoline supply. Consistent with Congress's intentions, Chemoil purchased ethanol, blended the ethanol with gasoline, sold the blended ethanol, and claimed an alcohol fuel

mixture tax credit incentive provided by Congress. Accordingly, Chemoil is entitled to the alcohol fuel mixture credit even if it suffers a pre-tax loss, just as the taxpayer in Cross Refined Coal was entitled to the section 45 refined coal tax credit.

In sum, even if the common law economic substance doctrine applied in this case, which it does not, that doctrine would preclude a claim for alcohol fuel mixture excise tax credits simply because a taxpayer has a pre-tax loss.

F.   <u>Even if the Court were to apply a version of the economic substance doctrine that discounted excise tax effects, there are genuine issues of material fact that make summary judgment inappropriate here.</u>

Finally, even if this Court were to apply the common law version of the economic substance doctrine, and to then decline to consider excise tax effects in that analysis, this Court still should not grant the United States' motion for summary judgment as genuine issues of material fact would remain.

As noted above, the United States' positions show a fundamental misunderstanding of the fuels industry. Companies like Chemoil enter into thousands of transactions annually for the purchase and sale of fuels products. Some of those transactions are physically settled (*i.e.*, where product is transferred between parties) and others are financially settled (where payments are made based on the difference between a floating price on the settlement date and a pre-determined fixed price). (Skrinar Dep. 100:14–:24.) The timing of those contracts for purchases and sales of fuels products—which cannot be viewed in a vacuum, including a vacuum that includes only the transactions at issue in this case—may be entered into well before or just around the time of delivery or settlement. Through these contracts, the resulting purchases and sales of fuels, and financial settlements, companies like Chemoil seek a gain through long, medium, and short term planning to ensure access to fuels products at a favorable price and to ensure the ability to sell those fuel products an economic gain. (*E.g.*, Skrinar Dep. 58:8–20,

99:25–100:13, 101:7–:13, 132:13–133:12, 160:15–:24.) The consideration of whether to enter into any transactions involving fuels encompasses planning for various options that may be available to generate an economic gain. (*E.g.*, Parrish Dep. 58:22–59:5, 82:23–83:16.)

Chemoil undertook that analysis in determining whether to enter into the transactions at issue in this case. Beginning with the date that Chemoil entered into contracts for the purchase of any of the ethanol at issue in this case, which was weeks before delivery, Chemoil had the ability to immediately (or at any time) sell the rights to that ethanol to any person to provide the greatest opportunity for an economic gain. (Skrinar Dep. 155:20–156:18.) Similarly, beginning with the date that Chemoil entered into contracts for the sale of any of the ethanol at issue in this case, which contracts also were entered into weeks before Chemoil's delivery obligation, Chemoil had the ability to immediately (or at any time) buy rights to ethanol that would be used to meet its obligation from any person, again to provide the greatest opportunity for an economic gain. *Id.* That is the nature of a commodities trading business such as Chemoil. Here, there are genuine issues of material fact as to whether, irrespective of the tax incentives, Chemoil had an objectively reasonable expectation of making a profit on these transactions, taking into account, *inter alia*, the value of having additional available inventory and the profit potential built into a fixed price contract. (Parrish Dep. 61:2-62:11; Skriner Dep. 154:5-23).

Although the United States' economic substance argument relies heavily on the report of its proffered economics expert, Evan Cohen[10], there are important facts that Mr. Cohen failed to consider, which would need to be presented to a jury. For instance, Mr. Cohen failed to consider the extent of the value of holding additional inventory and whether there was any value created

---

[10] Chemoil reserves its right to challenge the expert qualifications of Mr. Cohen at a later date through a separate motion in limine.

by entering into fixed-price contracts during a period of volatility. *E.g.*, Cohen Dep. 261:3–264:4 (failing to account for inventory benefit), 272:14–:23 (failing to account for futures market), 276:24–277:5 (failing to account for RINs). Mr. Cohen also failed to consider how a commodity trader as large as Chemoil might seek to balance long, medium, and short-term exposure. *Id.* And Mr. Cohen did not consider the fact that the contract between Chemoil and Gunvor provided for the sales price to be increased by $0.45 per gallon if the excise tax credits were not available, thus ensuring that Chemoil would make a profit irrespective of the existence of the section 6426(b) alcohol fuel mixture credit. (Ex. 8 ("Cohen Dep.") 235:23–236:7, 237:20–:23.)[11]

As noted above, the Second Circuit applied a holistic approach to the common law economic substance doctrine. The inferences drawn in favor of Chemoil as the non-moving party make clear that summary judgment is entirely inappropriate even if the common law doctrine is held to be applicable, and even if excise tax benefits are excluded from the analysis.

## II.     The United States' Arguments Regarding the Section 6426(b) Requirements Fail.

The United States further contends that it is entitled to summary judgment because Chemoil has not met all of the statutory requirements for the credits under Section 6426(b). (*See* Br. at 34–50.) The United States is wrong.

### A.     There are ample facts supporting the conclusion that the Astra-1 and Astra-3 transactions were *bona fide* sales.

The United States first argues that Chemoil is not entitled to the credit for the Astra-1 and Astra-3 transactions because "those transactions did not involve bona fide sales." (Br. at 34–42.) Notably, the United States does not raise this argument with respect to the Astra-2 transactions, which it characterizes in terms substantively identical to the Astra-1 and Astra-3 transactions,

---

[11] For these—and for many other reasons—Chemoil reserves its right to challenge the expert qualifications of Mr. Cohen.

with one distinction: the sales in Astra-1 and Astra-3 were "in tank" sales, while the sale in Astra-2 was not. The United States' apparent view that "in tank" sales cannot be *bona fide* is misguided and, if accepted as true, would harm consumers by increasing fuel supply costs. Moreover, the question of whether the Astra-1 and Astra-3 sales were *bona fide* is a fact intensive question involving a review of multiple factors, many of which weigh in Chemoil's favor; it cannot be resolved on summary judgment.

1.   *Adoption of the United States' view that in-tank transfers should not be respected as sales would increase the supply cost of fuels in the US.*

The United States takes exception to the fact that the sales of ethanol in Astra-1 and Astra-3 occurred "in-tank"—*i.e.*, the sale of such ethanol occurred without moving the fuel from the fuel storage tank of the seller to a fuel storage tank of the buyer. That view demonstrates a fundamental misunderstanding of the fuel supply chain. In-tank sales are a common occurrence in the fuels industry and are necessary to reduce this nation's fuel supply costs.  (*See, e.g.*, Parrish Dep. 75–78; *see also* Parrish Dep. 133:9-22.)

The United States has over 1200 fuels terminals.[12] The United States National Renewable Energy Lab provides a clear description of the role of fuels terminals[13]:

> Terminals are an important part of the transportation fuel supply chain, moving products to end user markets. Their primary function is to store and distribute fuels. A typical terminal serving the on-road transportation fuels market would store regular and premium gasoline blendstock for oxygenate blending, diesel, denatured ethanol, and additives. These fuel types are stored in individual tanks. The number of tanks and the capacity for each fuel type are dependent on demand for the market the terminal serves. Terminals are constantly receiving and dispensing fuel—the mode of fuel receipt varies and may include pipeline, truck, barge/ship, and rail. A single terminal will serve many different customers through established contracts. Trucks arrive at a terminal and select fuels for their customer. Based on the fuels selected, products are pulled from various tanks to dispense a finished

[12] I.R.S., Active Fuel Terminals @ 7/31/2022, https://www.irs.gov/pub/irs-utl/tcn-db.pdf; Nat'l Renewable Energy Lab., High Octane Fuel: Terminal Backgrounder (Feb. 2016), at 5, https://afdc.energy.gov/files/u/publication/hof_terminal_backgrounder.pdf.
[13] High Octane Fuel: Terminal Backgrounder, at 1.

transportation fuel into the truck. Note that trucks can have multiple compartments and transport several fuels at one time.

A fuels terminal may have numerous tanks that are leased by multiple companies. For example, at the fuels terminal at which the ethanol that is the subject of this case was stored, Chemoil, Astra, Gunvor, and Mansfield all leased tank space.

In the Astra-1 and Astra-3 transactions, the fuel was sold in-tank—*i.e.*, Chemoil purchased ethanol from Astra in Astra's tank, purchased gasoline from Suncoast and had it delivered into the same tank as its ethanol, and then later sold an alcohol fuel mixture to Astra in the same tank. Selling products in-tank is common in the industry because terminal owners charge for moving fuel between tanks and because it may require the buyer to lease additional tank space (while the seller may then have excess tanks space capacity) during what may be a short period before a buyer delivers the product to their customers for removal from the terminal. (*See, e.g.*, Parrish Dep. 75–78 (describing circumstances for Chemoil's sublease to Mansfield Oil); *see also* Parrish Dep. 133:9-22.) Requiring product to make an extra movement between fuel storage tanks to be respected as a sale, as the United States asserts, would unnecessarily increase the cost of fuels that are ultimately sold to retail customers. Indeed, even the United States' proffered economics expert, Even Cohen, agrees that there is a potential economic risk in moving a fuel out of a storage tank to another location, "[r]elative to not moving" that fuel. (*See* Cohen Dep. at 91:8–93:11.)

The United States' view that in-tank transfers should not be respected as sales should, therefore, be rejected.[14]

---

[14] Moreover, if it is the United States' contention that Astra, not Chemoil, owned the product in the Astra-1 and Astra-3 transactions, then the tax credits should have been available to Astra. But, as the United States is well aware, Astra is now statutorily barred from claiming alcohol fuel mixture credits for the fourth quarter of 2011. Accordingly, the United States would reap, and is

**2.** *Multiple genuine issues of material fact preclude granting summary judgment in favor of the United States on the Astra-1 and Astra-3 transactions.*

Further, whether the Astra-1 and Astra-3 transactions were *bona fide* sales is a fact-intensive question that cannot be resolved on summary judgment. In support of its argument that it is entitled to summary judgment, the United States relies entirely on the benefits and burdens factors set forth in *Arevalo v. Comm'r*, 469 F.3d 436 (5th Cir. 2006), taking the position that application of these factors results in the conclusion that the Astra-1 and Astra-3 sales were not *bona fide* sales. But as the United States concedes, a benefits and burdens assessment involves a "highly fact intensive inquiry." (Br. at 36 (quoting *AT&T Advert, L.P. v. United States*, 147 F3d. Cl. 478, 486 (2020).) The United States agrees, as it must, that the question of which party has the benefits and burdens of ownership is "a question of fact to be determined by reference to the written agreements and the attendant facts and circumstances." (Br. at 35 (quoting *Upham v. Comm'r*, 923 F.2d 1328, 1334 (8th Cir. 1991).) And the United States notes that it is the factfinder—here, the jury—who "must consider 'all the relevant facts and circumstances.'" (Br. at 35 (quoting *Altria, Group, Inc. v. United States*, 658 F.3d 276, 286 (2d Cir. 2011)).)

The nonexclusive *Arevalo* factors that may be considered by a reviewing factfinder are:

(1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation and disposition of the property.

*Arevalo v. Comm'r*, 469 F.3d 436, 439 (5th Cir. 2006) (quoting *Upham*, 923 F.2d at 1334). "No one of these factors controls, as the determination of ownership is based on all the facts and

---

seeking, a windfall in this case by seeking to deny the tax credit to Chemoil while aware that Astra cannot now claim the credit.

circumstances of a particular case, and some factors may be 'ill-suited or irrelevant' to a

particular case." (Br. at 35 (quoting *Route 231, LLC v. Comm'r*, 810 F.3d 247, 260 (4th Cir.

2016) (quoting *Calloway*, 691 F.3d at 1327).)

    With respect to Astra-1 and Astra-3, the written agreements, as well as "the attendant

facts and circumstances," provide ample evidence from which a jury could conclude that the

Astra-1 and Astra-3 purchases of ethanol and gasoline, and sales of alcohol fuel mixtures, did

occur and must be respected. Based on the undisputed facts, the United States' concessions, and

the inferences drawn properly in Chemoil's favor, this factual analysis cannot be found to favor

the United States. Instead, it should be determined by the finder of fact to favor Chemoil.

    **a.**    *Chemoil took title to Astra's ethanol, combined it with gasoline, and transferred title of the alcohol fuel mixtures back to Astra.*

    Holding title is not merely "formalistic," as suggested by the United States. (Br. at 41.)

Rather, the question of title is critically important, as recognized and emphasized by the IRS.

*See, e.g.*, I.R.S. Priv. Ltr. Rul. 202219007 (Feb. 16, 2022) (finding that holding state law title

was a super-factor and concluding that the person entitled to claim electric vehicle credits was

not the tax owner; it was the person holding state law title to the vehicle) (attached as Ex. 12).

    Here, there is no reasonable dispute as to which party held title and when. With respect to

Astra-1, title to the ethanol contained in Astra's Tank 503 transferred from Astra to Chemoil at

12:01am on December 21, 2011. (Ex. 49 at ¶¶ 6, 13.) This was the base of the Astra-1 alcohol

fuel mixture. To that ethanol, Chemoil added gasoline, which the United States concedes was

purchased by Chemoil from Sun Coast. (Br. at 7 (stating that Sun Coast "invoiced Chemoil for

its purchase of 2,988 gallons of gasoline")); Ex.50.) After Chemoil's gasoline was discharged

into tank 503, which already contained Chemoil's ethanol, the two fuels were blended. (TK503

Rpt.) Since Chemoil held title to both component fuels at the time they were combined, title to

the mixture of ethanol and gasoline that Chemoil produced vested immediately in Chemoil. Further, the sales contract for Astra-1 notes that title to the blended product would transfer from Chemoil to Astra at an agreed-upon date, no later than December 27, 2011. (Ex. 51 at ¶¶ 6, 13.) Chemoil's invoice to Astra confirms that Chemoil delivered this alcohol fuel mixture to Astra on December 23, 2011. (Ex. 84.) Thus, title to the Astra-1 blend transferred from Chemoil to Astra on December 23, 2011.

The undisputed facts with respect to Astra-3 are substantially similar. The United States concedes that "Chemoil purchased ethanol from Astra." (Br. at 9.) To be more specific, title to the ethanol contained in Astra's Tank 531 transferred from Astra to Chemoil at 12:01am on December 24, 2011. (Ex. 22 at ¶¶ 6, 13.) This was the base of the Astra-3 alcohol fuel mixture. To that ethanol, Chemoil added gasoline, which the United States concedes was purchased by Chemoil from Sun Coast. (Br. at 10 (stating that "Chemoil purchased" gasoline from Sun Coast)); Ex. 81.) After Chemoil's gasoline was discharged into Tank 531, which already contained Chemoil's ethanol, the two fuels were blended. (TK531 Rpt.) Since Chemoil held title to both component fuels at the time they were combined, title to the mixture of ethanol and gasoline that Chemoil produced vested immediately in Chemoil. The United States implicitly acknowledges that Chemoil held title to this alcohol fuel mixture when it conceded that Chemoil "sold [the ethanol-gasoline mixture] to Astra." (Br. at 9.) Moreover, the sales contract for Astra-3 notes that title to the blended product would transfer from Chemoil to Astra at an agreed-upon date. (Ex. 25 at ¶¶ 6, 13.) Chemoil's invoice to Astra confirms that Chemoil delivered this alcohol fuel mixture to Astra on December 23, 2011. (Ex. 26.) Thus, title to the Astra-3 blend transferred from Chemoil to Astra on December 23, 2011.

      **b.**     *Chemoil and Astra treated the component transactions as purchases and sales.*

The United States also asks this Court to improperly draw inferences in the United States' favor, and to conclude that because Chemoil and Astra netted certain invoices against one another, the parties did not intend to treat the purchases and sales as separate transactions. (Br. at 39.) This argument misunderstands the purpose of netting invoices. In the commodity trading industry, invoice netting is a common, standard practice. (*See, e.g.*, Parrish Dep. 150:18–151:6; Basler Dep. 197:13–21.) It is simply an instance of two counterparties deciding to write one check instead of two, which is a more efficient use of funds and avoids unnecessary wire transfer fees based on the amount wired. No further conclusions should be drawn from it.

Looking more specifically at what the parties intended—and what actually transpired—here, it is clear that there were three separate transactions within each of Astra-1 and Astra-3: (1) a purchase of ethanol; (2) a purchase of gasoline; and (3) a sale of blended product. The record shows that Chemoil and Astra held Chemoil out as owner of the ethanol after the purchases, and owner of the gasoline before it was blended with Chemoil's ethanol. It also shows Chemoil as the owner of the alcohol fuel mixtures from the moment the mixtures were produced until the moment they were sold to Astra. (Ex.14, Ex. 51; Ex. 53; Ex. 85; Ex. 24; Ex. 25.)

   **c.**  *Chemoil had an equity interest in the gasoline and ethanol it purchased with respect to Astra-1 and Astra-3.*

The United States next conflates its economic substance argument with the question of whether Chemoil acquired an equity interest in the gasoline and ethanol it purchased. (Br. at 39–41.) The United States incorrectly infers that there was some sort of unspoken agreement that Chemoil was required to return the same molecules of ethanol or that Chemoil was prohibited from fulfilling its sales obligations prior to its purchasing obligations. That is not the case.

Chemoil and Astra entered into the Astra-1 and Astra-3 purchase contracts at fixed prices. (Ex. 49; Ex. 22.) Whether Chemoil or Astra got the better deal is inapposite to the fact

that Chemoil, through these purchases, acquired an equity interest in the ethanol that was inside of Astra's Tanks 503 and 531. Astra did not retain any future interest in that fuel. As Mr. Skrinar testified, "I have [a window of time] to do whatever I want with that product. I can sell it to somebody else, I can buy back even more product, I can replace the product. I have an obligation to purchase and I have an obligation to sell. What I do in between does not have anything to do with Astra or anybody else. It has to do with me in my position." (Skrinar Dep. 155:20–156:18; *see also* Parrish Dep. 61:2–62:11.) If Chemoil had sold this ethanol to another third party, there is no question that Chemoil would retain all monies from such sale.

> **d.** *Chemoil had control of its fuel while the fuel was stored in Astra's tanks.*

The United States incorrectly argues that "Astra indisputably maintained control over the fuel throughout the Astra-1 and Astra-3 transactions." (Br. at 36.) As an initial matter, multiple former Chemoil employees testified to the contrary, which alone creates a question of fact. (*See* Parrish Dep. 61:2–62:11 (noting that holding additional product [in Astra's tanks] created value as "an insurance policy" against logistics issues acquiring fuel to satisfy those other obligations); Skrinar Dep. 155:20–156:18.) Their testimony is further supported by communication between Astra and Chemoil confirming that Chemoil was in control of the blending process. (*See* Ex. 55.)

Despite the United States' attempt to infer Astra's control over the ethanol that it sold to Chemoil in Astra-1 and Astra-3, the only evidence of Astra control during these periods are the nominations that Astra sent to Vopak instructing Vopak to discharge Chemoil's gasoline trucks into Tanks 503 and 531.[15] (*E.g.*, Ex. 52; Ex. 56; Ex. 57.) But here, the proper inference drawn in

---

[15] To the extent the United States is also suggesting that Astra had control because the parties did not notify Vopak of the in-tank title transfer, this argument fails on the facts. The consistent testimony during the depositions in this case is that it was "not standard operating procedure" to request permission or otherwise notify the terminal of a tank sublease when there was an in-tank title transfer. *See, e.g.*, Basler Dep. 150:19–151:17.

Chemoil's favor is that Astra was acting as Chemoil's agent. Astra did not attempt to move or otherwise control the fuel that it sold to Chemoil. Nothing in the record suggests otherwise.

> **e.**   *Chemoil bore the risk of loss of its fuel stored in Astra's tanks.*

The United States concedes that the "risk of loss" factor favors Chemoil. (Br. at 41 (stating that this "factor[] provide[s] formalistic support for Chemoil's contention that it acquired ownership").) But contrary to the suggestion that risk of loss is somehow unimportant, it is substantial and part of the reality of both Astra-1 and Astra-3.

In Astra-1 and Astra-3, the contracts for Chemoil purchasing ethanol were clear. (Ex. 49 at ¶ 13; Ex. 22 at ¶ 13.) Risk of loss passed from Astra to Chemoil at the same time title transferred. *Id.* As noted above, Chemoil could have done anything it wanted with these batches of ethanol. In fact, Chemoil did do something: Chemoil added its gasoline to both and blended the mixtures. (TK503 Rpt.; TK531 Rpt.) From the moment Chemoil took title of the ethanol in these tanks until the moment that Chemoil sold the two mixtures, Chemoil was free to transfer the fuel into its own tanks or sell it to another party. (Ex. 49; Ex. 22.)

Chemoil and Astra executed two contracts for the sale of ethanol from Chemoil to Astra, which provide for the risk of loss to transfer from Chemoil to Astra as title transfers. (Ex. 51 at ¶ 13; Ex. 54 at ¶ 13.) These contracts did not specify the identity of the fuel that Chemoil was required to sell to Astra. Accordingly, based on these contracts, if there had been a loss event after Chemoil acquired ethanol from Astra with respect to either Astra-1 or Astra-3, Chemoil would continue to be obligated to fulfil the separate sales contracts. *Id.* Although the periods where Chemoil bore the risk of loss for Astra-1 and Astra-3 were ultimately brief, the respective contracts provided for the possibility of much longer periods of risk borne by Chemoil. (Ex. 49; Ex. 51; Ex. 22; Ex. 25.) The United States does not address the gasoline that Chemoil purchased and does not suggest that Astra somehow bore the risk of loss for Chemoil's gasoline. Nothing in

the record indicates anything other than Chemoil bearing the risk of loss in either Astra-1 or Astra-3 during the period when Chemoil held title to the fuel.

        **f.**    *Chemoil had the benefit from the disposition of the alcohol fuel mixtures it sold to Astra.*

The United States cites *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, at 1244 (1982), to suggest that if tax benefits were the only benefits that could be expected, the transaction should be disregarded. (Br. at 41.) But this inference misses on multiple levels. First, the Astra-1 and Astra-3 fuel mixtures created operational opportunities simply based on the increased inventory held by Chemoil. Second, these mixtures created dispositional benefits because Chemoil was compensated for both sales to Astra.

The United States incorrectly asserts that "[t]he record does not reflect that Chemoil had any ability to use or otherwise sell the fuel during the period of its ownership". (Br. at 41.) To the contrary, Chemoil had a number of options to choose from. (Skrinar Dep. 155:20–156:18.) Chemoil should not be penalized for electing to proceed with the option that cost the least. With respect to Astra-1, Chemoil acquired the ethanol and gasoline on December 20, 2011. (Ex. 19; Ex. 50; TK503 Rpt.) At that time, Chemoil was obligated to sell the Astra-1 alcohol fuel mixture by December 27, 2011. (Ex. 51.) This is the option Chemoil chose. But Chemoil could also have simply transferred the fuel into its own tanks. *See* TK538 Rpt.; TK614 Rpt.; TK615 Rpt.; TK748 Rpt. (all showing significant available storage space between December 20 and 27, 2011). Chemoil also could have used the alcohol fuel mixture in Astra's tank 503 to satisfy its existing obligations that existed in Astra-2, Astra-3, or Gunvor-7. (*See* Ex. 19; Ex. 25; Ex. 63.) Finally, Chemoil could have sold the alcohol fuel mixture to another third party. If Chemoil had elected any of those other options, it could have used other alcohol fuel mixtures to satisfy its obligation under the Astra-1 sales contract either on or before December 27, 2011. (*See* TK538 Rpt.;

TK614 Rpt.; TK615 Rpt.; TK748 Rpt.)

The ethanol Chemoil purchased from Astra on December 23, 2011, similarly could have been moved into Chemoil's tanks or used to satisfy Chemoil's existing obligations under the Astra-2 or Gunvor-7 contracts. (*See* TK538 Rpt.; TK614 Rpt.; TK615 Rpt.; TK748 Rpt.; Ex. 19; Ex. 63.) Or Chemoil could have sold the alcohol fuel mixture to another third party. If Chemoil had elected any of those other options, it could have used other alcohol fuel mixtures to satisfy its obligation under the Astra-1 sales contract either on or before December 27, 2011. (*See* TK538 Rpt.; TK614 Rpt.; TK615 Rpt.; TK748 Rpt.)

These options for both volumes of fuel that Chemoil held in Astra's tanks were of great benefit to Chemoil. (*See* Parrish Dep. 61:2–62:11; Skrinar Dep. 155:20–156:18.)

In sum, taken together, these six non-exclusive *Arevalo* factors require detailed factual findings that themselves require inferences and weighing in order for the fact finder to then be able to determine whether the Astra-1 and Astra-3 transactions are *bona fide* sales. This is not susceptible to resolution on summary judgment. Drawing the facts and inferences properly in Chemoil's favor, the United States' motion must be denied.

B.     There Are No Sales of Ethanol "to Which No Gasoline was Added"

The United States next erroneously contends that Chemoil is not entitled to the tax credits with respect to a portion of the product that it sold in the Gunvor-4 and Gunvor-7 transactions because "there is no evidence that [Chemoil] added gasoline to the ethanol in certain [of the] tanks" used in those transactions. (Br. at 42–43.) The United States is wrong.

First, each of the blends at issue in this case is properly viewed as a whole, not on an individual tank basis. The parties contracted for whole blends in both the Gunvor-4 and Gunvor-7 transactions. (Ex. 58.) The blends were tested as composites because it was often physically impossible to blend the entire volume in a single tank due to the tank volumes. (Ex. 27 at 12;

40

Herndon 88:7-89:20.) It would have been prohibitively expensive to use a single tank or to attempt to have each separate tank with an identical chemical composition. (*E.g.*, Basler Dep. 93:2–95:18 (describing reasons for blending in multiple tanks and minimizing fuel movement between tanks).) That is why the composite testing uses varying percentages and why the individual tanks are only partially loaded onto the vessels. (*Id.*) Indeed, the government's own proffered fuels expert did not analyze the transactions on a tank-by-tank basis. (Leister Rpt. § 3.) He looked at the composite SGS reports and the contractual language. *Id.* Ultimately, the parties intended—and did—sell whole blends rather than bits and pieces. (Ex. 63; Ex. 60; Ex. 58; Ex. 61.) Although the tanks were loaded sequentially, that was simply a function of logistics. The whole blends in the Gunvor-4 and Gunvor-7 transactions contained gasoline.

Second, with respect to the Gunvor-4 transaction, there is also a genuine dispute of material fact as to whether the individual tanks identified by the United States contained gasoline. Specifically, with respect to Gunvor-4, the United States suggests that "[t]here is no record of any gasoline being transferred into Tanks 538 or 615 before the product from those tanks was transferred into the vessel." (Br. at 43.) This statement is incorrect. The Vopak tank records for Tanks 538 and 615 clearly show that during the course of 2011, Chemoil blended significant amounts of gasoline into ethanol in these tanks, creating alcohol fuel mixtures. (TK538 Rpt.; TK615 Rpt.) Further, although the Vopak tank records periodically show the tanks being "zeroed out"—*i.e.*, there was at times a paper balance of zero gallons in each tank—the United States' own fuels expert agrees that the "zero" number did not reflect the volume of fuel contained in the heels, or bottoms, of each tank. (Leister Dep. 129:6–:9.) Indeed, as explained by the United States' expert, these heels could contain up to 20% of the total tank volume, and the gasoline in the alcohol fuel mixtures created in the top portion of the tank would partially end up

in the heel below. (Leister Rpt. § 5.2; Leister Dep. 130:4–:12.)

Looking at the Vopak tank reports for Tanks 538 and 615 shows that gasoline was blended with ethanol in 2011 and that on September 28, 2011, both tanks had a running balance that exceeded 80,000 gallons of alcohol fuel mixtures. (TK538 Rpt.; TK615 Rpt._ Chemoil then subleased these two tanks to Mansfield for a short period of time beginning later that day. (Ex. 62.) This sublease is reflected on the tank reports by the back-to-back in-tank sales and in-tank purchases on September 28 and October 14, 2011. (*Id.*) When Chemoil subleased the tanks to Mansfield, the tanks were "zeroed out," as reflected on the tank reports. But, as discussed above, the "zero" number on the tank reports did not include the heels of each tank, which contained gasoline that had previously been delivered into that tank. Moreover, records show that at the end of the sublease, not only were the heels still at capacity, but there was also a small volume of additional fuel. (Ex. 31 (Mansfield email confirming fuel remaining after the sublease).)

In sum, as confirmed by the United States' expert, the fuel remaining in the heel of a tank retains a portion of the gasoline that was delivered into the tank above the heel. Thus, the proper inference drawn in this instance is that when Chemoil subleased its tanks to Mansfield, some amount of Chemoil's gasoline was contained in the tanks' respective heels. Neither heel was drained while Mansfield held its two-week sublease. (Ex. 31.) Accordingly, when Mansfield returned control of the tanks to Chemoil, some (albeit a smaller) amount of the gasoline and ethanol previously added to the tanks by Chemoil was still in the heels. Both tank reports also show that Chemoil added ethanol to the tanks before loading Gunvor's vessel in the Gunvor-4 transaction. (TK538 Rpt.; TK615 Rpt.) When Chemoil added that ethanol to the tanks, the ethanol mixed into and became comingled with the ethanol and gasoline that was already in the heels. This created further alcohol fuel mixtures, which were then sold and loaded onto Gunvor's

vessel in conjunction with Gunvor-4.

C.   <u>Each of the blends at issue were sold for use as a fuel.</u>

Among the statutory requirements for taxpayers to qualify for entitlement to alcohol fuel

mixture credits is the requirement that the mixture be sold by the taxpayer producing such

mixture to any person for use as a fuel. Sec. 6426(b)(3)(A). The parties agree that, under the

relevant IRS guidance, (1) a mixture is "used as a fuel" under the statute when it is "consumed in

the production of energy," *e.g.*, "consumed in an internal combustion engine to power a vehicle,"

and (2) a taxpayer sells a mixture for "use as a fuel" under the statute if they have "reason to

believe" that the mixture will be used as a fuel, either by the person buying the mixture or by any

later buyer of the mixture. I.R.S. Notice 2006-92, 2006-2 C.B. 774 ("Notice 2006-92"). Here,

although the United States argues that Chemoil did not sell its mixtures for use as a fuel (Br. at

44–46), the record is clear that it did. Accordingly, this Court should deny the United States'

motion on this issue, and instead find that the alcohol fuel mixtures at issue in this case were sold

"for use as a fuel," for purposes of section 6426(b)(3)(A).

The United States' argument turns entirely on its contention that Chemoil did not sell its

mixtures for use as a fuel "because the mixtures could not, in the form in which they were sold,

be used as a fuel." (Br. at 45.) This contention is flatly wrong. The United States' proffered

expert, Michael Leister, characterized the mixtures produced by Chemoil as E99 anhydrous

ethanol, and stated that E99 refers to "anhydrous fuel ethanol containing a minimum of 98.0%

ethanol and up to 2 percent of a denaturant [e.g., gasoline]." (Leister Rpt. at 2, 5.) At his

deposition, Mr. Leister[16] agreed that this type of ethanol is typically used "[a]s a fuel with

gasoline." (Leister Dep. 100:3–:6.) Moreover, he stated that ethanol blended with gasoline is

---

[16] Chemoil reserves its right to challenge the expert qualifications of Mr. Leister at a later date
through a separate motion in limine.

generally not used for any purpose other than as a fuel and noted that it is an "expensive" operation to remove gasoline from ethanol once ethanol has gasoline in it. (*Id.* at 85:5–:17, 100:7–101:16.)

The United States appears to hang its hat on Mr. Leister's assertion, in his report, that anhydrous ethanol, by itself, "is generally not usable as a fuel without further processing or mixing."[17] (Leister Rpt. at pp. 2–3.) But that is not the test, under the relevant IRS guidance, of whether a mixture can be "used as a fuel" for purposes of section 6426(b)(3)(A). Under the guidance, a mixture is "used as a fuel" under the statute when it is "consumed in the production of energy," *e.g.*, "consumed in an internal combustion engine to power a vehicle." Notice 2006-92. At his deposition, Mr. Leister agreed unequivocally that anhydrous fuel ethanol can be consumed in an internal combustion engine to power a vehicle. (Leister Dep. 101:13–:16 ("Q: Do you agree that anhydrous fuel ethanol can be consumed in an internal combustion engine to power a vehicle? A: Yes.").)

The IRS guidance simply does not mandate that the "mixture" be "consumed" as a stand-alone blend, without any further processing or mixing. For a mixture to be "used as a fuel," all the guidance requires is that the mixture be consumed in the production of energy, *e.g.*, consumed in an internal combustion engine to power a vehicle—with or without other additives, which may be blended in later, being "consumed" along with it. Chemoil's mixtures were indisputably capable of meeting that requirement, as even the United States' own proffered expert agrees. Under this test, and as consistently testified by Chemoil's traders, Chemoil clearly

---

[17] Mr. Leister also made some assumptions about the fuels that were present in Brazil at this time. Chemoil reserves the right to challenge these statements and others at trial. For purposes of this motion, however, the United States' arguments would fail even if all of Mr. Leister's assumptions were to be accepted as correct.

had a "reason to believe", and in fact did believe, that its mixtures would be "used as a fuel"—

*i.e.*, consumed in the production of energy—either on their own or in combination with other

additives, given the typical use for mixtures of this type. (*See, e.g.*, Parrish Dep. 41:24–44:9;

Skrinar Dep. 52:9–53:1; Basler Dep. 48:15–49:5. *Cf* Herndon Dep. 19:8–:19 (describing

understanding of Chemoil's counterparty that E99 would be used as a fuel in vehicles).)

The United States' motion for summary judgment on this issue should be denied.

D.     Genuine issues of material fact exist as to when the Gunvor-7 sale occurred.

The United States next argues that Chemoil is not entitled to the credit for the Gunvor-7

transaction because "Chemoil's sale of product in the Gunvor-7 transaction occurred after

December 31, 2011." (Br. at 46–50.) The question of when the sale occurred, however, involves

multiple disputed issues of material fact, which cannot be resolved on summary judgment.

In support of its argument, the United States again relies entirely on the benefits and

burdens factors set forth in the *Arevalo* case, taking the position that application of these factors

results in the conclusion that the Gunvor-7 sale occurred in 2012. But as discussed above, and as

the United States concedes, a benefits and burdens assessment involves a "highly fact intensive

inquiry," which will be "determined by reference to the written agreements and the attendant

facts and circumstances." (Br. at 35–36; *see also* Br. at 35 (noting that "some factors may be 'ill-

suited or irrelevant' to a particular case).) Here, the written agreements, as well as "the attendant

facts and circumstances," provide ample evidence from which a jury could conclude that the

Gunvor-7 sale occurred at the end of 2011.

The original sale contract between Chemoil and Gunvor was executed on August 17,

2011. (Ex. 58.) That contract contemplated Chemoil making a series of sales of blended product

to Gunvor, all of which would be completed by the end of 2011. (*Id.* at § 4.) Under that timeline,

the contract further provided that title and risk of the product would transfer to Gunvor upon

loading the product on the vessel "as the ethanol passes the vessel's permanent hose connection." (*Id.* at § 14.) Also consistent with this timeline, Gunvor's vessel, the Nord Nightingale, was in the harbor and ready to take delivery of the product by December 21, 2011. (Ex. 37 (referencing original tendered "Notice of Readiness" dated December 21, 2011, which confirmed "vessel is in all respects ready to commence loading/discharging her nominated cargo grade and quantity of 17250cbm Ethyl Alcohol" on "21-12-2011").) Chemoil, moreover, completed a loading nomination form for Vopak on December 30, 2011, asking for the Nord Nightingale to be loaded with the product on that date. (Ex. 42.) However, due to delays at the Vopak terminal, which were caused by Vopak, the product for the Gunvor-7 transaction could not be physically loaded onto the vessel before year's end. (*See, e.g.*, Herndon Dep. 32:23–33:3 ("[T]here had been issues at the Vopak Deer Park Terminal regarding their unit-train complex and storage and [] due to those issues, there were delays in us being able to load that fifth contract and [] it was pushed into early 2012.").)

Due to the delays at the Vopak terminal, which prevented loading onto the vessel from being completed by year's end, Chemoil and Gunvor decided to modify the original sale contract to provide that title of the product would transfer to Gunvor on December 31, 2011. The parties memorialized this modification in writing on January 9, 2012, in an email exchange between Wayne Herndon at Cerebrum Capital (Gunvor's agent) and Aaron Parrish at Chemoil. (Ex. 38.) In this exchange, Mr. Parrish sent an email to Mr. Herndon stating that Chemoil had nominated a title transfer of 4,554,000 net gallons of blended ethanol from Chemoil to Gunvor at Deer Park, Texas, effective December 31, 2011. *Id.* In a responsive email, dated January 9, 2012, Mr. Herndon confirmed this title transfer on behalf of Gunvor. *Id.* During his deposition in this case, Mr. Herndon indicated that although he couldn't recall the details, he believes that he and Mr.

46

Parrish discussed this modification to the contract orally, before the end of the year, prior to memorializing it writing. Specifically, Mr. Herndon testified that "I have to think he had to have asked me [about title transfer] . . . but because of the holidays [Aaron] wasn't able to get around to sending me anything official until the end of the first week of January, beginning of the second week." (Herndon Dep. at 35:3–:25.) By taking title as of December 31, 2011, Gunvor immediately acquired certain risks associated with that fuel, potentially including for example, later discovered environmental risks or risks associated with spillage of the fuel.

Under these facts and circumstances, a jury could easily find that the Gunvor-7 sale occurred at the end of 2011, rather than in the beginning of 2012. The first benefits and burdens factor, as set forth in *Arevalo*, is whether legal title has passed. Under UCC § 2-401(1), "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." Here, the parties modified their original sale contract to explicitly agree that title would pass from Chemoil to Gunvor on December 31, 2011. This factor, weighs heavily in favor of the conclusion that the sale occurred at the end of 2011. The United States take issue with the manner of the contract modification, labeling it a "formalistic maneuver" "motivated by the tax treatment of the transaction." (Br. at 48.) But that labeling unfairly presumes that the tax treatment of a transaction cannot be a valid basis for agreeing upon a title transfer date. Chemoil and Gunvor were entitled to agree to a title transfer date that was beneficial for tax purposes, which is exactly what they did. The United States also complains that Chemoil's invoices to Gunvor were backdated to December 31, 2011. (Br. at 48–49.) The record, however, makes clear that the final invoices to Gunvor could not be generated prior to the end of the year because of the difficulties at Vopak that prevented the vessel from being loaded during that time frame. (Ex. 40.) There is no question that Gunvor was obligated to pay Chemoil for the product, as the

47

parties had agreed in their original sales contract. In fact, Gunvor issued a purchase undertaking to the bank on December 29, 2011, regarding the Gunvor-7 transaction. (Ex. 41 (Dec. 29, 2011 email from A. Micheli at UBS AG stating "We have received a Payment Undertaking from Gunvor in [Chemoil's] favour for Enhydrous Ethyl Alochol ANP specs 17'250cbm+/-5%").)

The other benefits and burdens factors, to the extent applicable here, are fact-specific inquiries that are in dispute and must be left for the jury to resolve. For instance, although the United States contends that "the parties treat[ed] the transaction" as if the sale occurred when the product was loaded onto the vessel (Br. at 48), the record suggests otherwise. Contrary to the United States' assertion, Chemoil did not ultimately "treat the sale as if it occurred in January on its books." (Br. at 49.) Rather, while Chemoil's accountant initially indicated that Chemoil would invoice the transaction "on Jan books," Chemoil's controller subsequently confirmed to the accounting team that "[s]ince title transferred in December and we are just storing it for Gunvor until they can take delivery, this should be a December sale." (*Compare* Ex. 63 to Ex. 46 (emphasis in original).) Likewise, Chemoil did not "assure[] Gunvor that it would otherwise treat the transaction as if the sale had occurred upon loading." (Br. at 49.) Instead, Chemoil simply told Gunvor that Gunvor "would not be invoiced until the product has loaded." (Ex. 44.) While the delay in invoicing impacted <u>when</u> Gunvor was required to pay Chemoil for the product, it did not change the fact that Guvnor <u>was</u> obligated to pay, nor did it affect the timing of when the sale occurred. As another example, the United States asserts, without support, that between December 31, 2011 and January 9, 2012, "any damage to the product would have been at Chemoil's risk, not Gunvor's," because the "modification of the contract had not yet been made." (Br. at 50.) This assertion completely ignores the fact that, while the written modification of the contract was memorialized on January 9, 2012, Mr. Herndon believes that the parties discussed the

modification orally before the end of the year. (Herndon Dep. at 35:3–:25.) Who bore the risk of

loss and the benefits of the product during that time period is clearly a question of fact that the

jury will have to decide.

In sum, the question of when the Gunvor-7 sale occurred is not a question that is

susceptible to resolution on summary judgment.[18] Drawing the facts and inferences properly in

Chemoil's favor, the United States' motion must be denied.

### III. The United States is Not Entitled to Summary Judgment on any Issues Relating to the Section 6675 Penalty.

Finally, the United States argues that it is entitled to summary judgment on three issues

related to the $4 million excessive claims penalty, which the IRS assessed against Chemoil in

connection with the Gunvor-7 transaction. (Br. at 51–59.) This argument should be rejected. The

excessive claims penalty should never have been assessed against Chemoil, and the United States

is not entitled to summary judgment on any of the issues it raises.

First, in viewing all facts and inferences in the light most favorable to Chemoil, the

United States is plainly not entitled to summary judgment on the question of whether Chemoil

had reasonable cause when it claimed entitlement to the excise tax credits related to Gunvor-7.

Second, the doctrine of variance does not operate to allow the IRS to hide its head in the sand

with respect to whether it illegally assessed the excessive claims penalty. Third, the United States

is not entitled to summary judgment with respect to whether the IRS satisfied the statutory

prerequisites that would allow the penalty at issue to be legally assessed. Indeed, the United

---

[18] There is also a separate, factual question as to whether a December 23, 2011 transfer of a portion of the Gunvor-7 product from Chemoil to Astra, and then back to Chemoil, would provide an independent basis for Chemoil's entitlement to a portion of credit for this transaction. US000445–446 (reflecting the sale from Chemoil to Astra of an alcohol fuel mixture produced by Chemoil in the amount of 1,674,866,800 gallons, and then the purchase by Chemoil from Astra of this same amount). The United States does not challenge this transfer on summary judgment.

States conveniently tells half of the story and asks this Court to improperly draw the necessary inferences in its favor.

      A.     <u>The United States is not entitled to summary judgment on "reasonable cause".</u>

The United States first argues that it should be granted summary judgment on the question of whether Chemoil had "reasonable cause" to claim the credits associated with Gunvor-7. (Br. at 51–54.) The United States is wrong, for two reasons. *First*, before answering the question of whether Chemoil acted with reasonable cause, the jury must answer the question of when the Gunvor-7 sale occurred. If the Gunvor-7 sale occurred at the end of 2011—as Chemoil asserts it did—then Chemoil properly claimed the Gunvor-7 credits, and certainly acted with reasonable cause in doing so. Because there are multiple material facts in dispute as to the timing of the Gunvor-7 sale, which cannot be resolved on summary judgment, reasonable cause cannot be resolved on summary judgment either. *Second*, even if the question of reasonable cause were ripe for consideration (which it is not), multiple disputed factual issues exist that preclude granting summary judgment for the United States on this issue.

Under section 6675, a taxpayer is not liable for an excessive claims penalty "if it is shown that the claim for such excessive amount is due to reasonable cause." Because reasonable cause is not defined in section 6675, courts have examined "analogous cases to determine the nature and scope of the 'reasonable cause' exception in IRC § 6675." *J.J. Powell, Inc. v. United States*, 125 Fed Cl. 73, 86 (2016). "The range of decisions on the issue of 'reasonable cause' to excuse tax penalties is quite broad, and court decisions appear to vary significantly based on the facts of the case." *Id.* Further, "[w]hether a taxpayer had reasonable cause is a question of fact decided on a case-by-case basis." *Stobie Creek Invs. LLC v. United States*, 603 F.3d 1366, 1381 (Fed. Cir. 2010)*; see also* Treas. Reg. § 1.6664-4(b)(1) ("The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking

into account all pertinent facts and circumstances . . . . Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability.").

Here, an analysis of the pertinent facts and circumstances reveals a number of material factual questions for the jury. Most critically, while the United States argues that Chemoil "expended minimal effort to ascertain whether it could properly claim" the credits for the Gunvor-7 transaction (Br. at 52), the record demonstrates otherwise. Email correspondence between the Chemoil traders and others show that prior to year's end, the Chemoil traders were aware of the potential tax issues presented by Vopak's delays and were actively working to find a solution. (*See, e.g.*, Ex. 65 at -36 (Dec. 30, 2011 email from A. Parrish at Chemoil to M. Mayhugh at Vopak stating: "If we don't have these cars unloaded by days end tomorrow we lose 45c per gallon . . . . Will vopak be compensating chemoil for all moneys lost by lack of railcards being unloaded?"); Ex. 40 (Dec. 30, 2011 email from J. Skrinar at Chemoil to A. Parrish at Chemoil stating: "I would check with Phillip Lau. It's my understanding that it needs to be sold by Dec. 31. What constitutes a sale, whether that be an invoice or payment, I'm not sure. See if Phillip can help.").) As noted by the United States, trader Aaron Parrish made an effort to consult with Phillip Lau, Chemoil's tax manager, on the situation. (Br. at 53.) Thereafter, Chemoil and Gunvor reached what they believed to be an appropriate solution to the problem, which was to modify the original sales contract to transfer title from Chemoil to Gunvor on December 31, 2011. (Ex. 38.) Subsequent email correspondence shows that this solution was blessed by Chemoil's controller, Robert Morant, who confirmed that "[s]ince title transferred in December and we are just storing it for Gunvor until they can take delivery, this should be a December sale." (Ex. 46 (emphasis in original).) The United States may disagree with this solution, but whether the solution was reasonable and reached following a good faith effort is not for the

United States to decide—rather, that is a decision for the jury.

Finally, to the extent the United States is suggesting that Chemoil requires an "opinion letter from an expert" to establish reasonable cause (Br. at 53–54), that is not the law. The United States correctly observes that Chemoil is not asserting an "expert reliance" defense based on advice received from legal counsel. There is no requirement that a company obtain a tax opinion for every position it takes on its return, or even that it rely on the advice of a tax advisor for those positions. *See, e.g.*, *Makric Enters. v. Comm'r*, T.C. Memo. 2016-44 at *65 ("[a] taxpayer that prepares its returns without relying on the advice of a tax adviser can also demonstrate that its tax reporting was in good faith"). Accordingly, while reliance on a tax advisor is one way of demonstrating reasonable cause, it is not the only way. For instance, "[c]ircumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Treas. Reg. § 1.6664-4(b)(1).

Here, Mr. Lau, who filed Chemoil's Form 720, followed established procedures for filing claims for excise tax credits. [19] Lau Declaration § 8, 9. His practice for preparing the Form 720 was to consult the Enterprise Resource Planning systems ("Systems"), as well as the persons responsible for inputting the data into the System, that were used to prepare Form 720 in the periods before he joined Chemoil. Lau Declaration § 5. The Systems tracked when Chemoil purchased components and sold fuels, with unique codes recorded for each type of transaction. *Id.* The accounting and operations department was in charge of recording and coding the

---

[19] Chemoil identified Mr. Lau in its Initial Disclosures to the United States on January 23, 2020, as the first person on its list of individuals who would be "likely to have discoverable information that Chemoil may use to support its claims." Notwithstanding this identification, the United States declined to depose Mr. Lau.

transactions in the Systems. Lau Declaration § 6. Where he had questions regarding transactions giving rise to the excise tax credit, Mr. Lau consulted with the appropriate Chemoil department with specialized knowledge of that transaction. Lau Declaration § 7. Mr. Lau's conduct in preparing the Form 720 for the taxable quarter ending December 31, 2011, was in accordance with the standards for CP As set forth in the AICPA Code of Professional Conduct as well as the California Rules of Professional Conduct. Lau Declaration § 8, 9.

Based on all the facts and circumstances, Chemoil's treatment of the Gunvor-7 transaction made sense and was the product of reasonable cause and good faith. This Court should deny the United States' motion with respect to "reasonable cause".

B.    The doctrine of variance does not bar Chemoil's 6751(b) argument.

The United States next attempts to hide behind the doctrine of variance to suggest that this Court lacks jurisdiction to consider whether the IRS illegally assessed—and then took from Chemoil—more than $4 million in a single, section 6675 penalty. (Br. at 55–57.) The United States presents a question of first impression in the Second Circuit: Is a taxpayer in the IRS administrative process required to raise an argument in a supplemental filing that (1) was not ripe or able to be properly raised in its initial filing; and (2) was unnecessary given that the IRS offered to concede the penalty? The answer to both of those questions should be no.

To determine whether the variance doctrine applies, courts examine "whether the claim presented to the district court was previously submitted to [IRS] in a manner that enabled 'an intelligent administrative review of the claim.'" *Carione v. United States*, 291 F. Supp. 2d 141, 148 (E.D.N.Y. 2003) (quoting *Scovill Mfg. Co. v. Fitzpatrick,* 215 F.2d 567, 569 (2d Cir. 1954)). Here, Chemoil's administrative claim, which included a challenge to the excessive claims penalty, was presented in a manner that enabled the IRS to conduct an intelligent administrative review of it. *See Valero Mktg. & Supply Co. v. United States*, 422 F.Supp. 3d 1206 (W.D. Tx.

2019) (finding that a claim of "$1.00 Plus" for four different taxable quarters was sufficient information to support a refund suit of almost $122 million).

Although the United States cites to out-of-circuit cases where the doctrine of variance was applied to bar the taxpayers section 6751(b) argument (Br. at 56–57), those cases do not bind this Court and should not bind it under the facts and circumstances at issue here. "Rules of practice and procedure are devised to promote the ends of justice, not to defeat them." *Hormel v. Helvering*, 312 U.S. 552, 557 (1941). As a general rule, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). But as Justice Black, writing for the Court, recognized more than seventy years ago, "[t]here may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below." *Hormel*, 312 U.S. at 557 (electing to consider new argument on appeal, which was not presented in administrative proceedings before Board of Tax Appeals, where judicial interpretation of existing law had changed in the interim). More recently, the Supreme Court reaffirmed this approach, stating that whether to deviate from the waiver rule is "a matter 'left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008) (citing *Singleton*, 428 U.S. at 121)).

In this case, the United States attempts to abuse the variance doctrine by asking this Court to bless an illegal penalty assessment of more than $4 million, which were then improperly taken from Chemoil by the IRS despite its own internal manual requiring that collection action be placed on hold. Importantly, when Chemoil filed its claim for refund on the Form 843 on September 23, 2014, (Compl. Ex. D), the IRS had proposed to disallow the tax credits and to

assert an excessive claims penalty but had not yet <u>assessed</u> either the tax or the penalty. Penalty Transcript. The IRS did not assess either until October 13, 2014. (*Id.*) As of September 23, 2014, the prevailing legal interpretation of section 6751(b) was that the IRS had the ability to obtain written supervisory approval of a penalty, in compliance with section 6751(b), up until the time that the penalty was assessed. *See, e.g.*, *Graev v. Comm'r*, 147 T.C. 460 (2016) (holding that until assessment, any argument under section 6751(b) that the IRS failed to properly obtain written supervisory approval was premature). Accordingly, the suggestion by the United States that Chemoil should have challenged the supervisory approval of the penalty in its September 23, 2014, claim for refund, before the penalty was assessed, is absurd. The argument was plainly premature at that time. Further, without evidence to support a reasonable basis for Chemoil to suggest that the approval was improper, Chemoil could have been subjected to an additional penalty under section 6676. *E.g.*, *Exxon Mobil Corp. v. United States*, No. 21-10373, 2022 U.S. App. LEXIS 21513, at *18 (5th Cir. 2022) (noting that "[t]he IRS can levy a [section 6676] penalty 'if a claim for refund is made for an excessive amount'" but that such penalty can be avoided by showing that the refund request was reasonably based on the application of one or more legal authorities applied to the taxpayer's facts).

Following the October 13, 2014, assessment of the penalty, Chemoil presented its arguments to the IRS Office of Appeals. By that time, even though the penalty had been assessed, Chemoil had no reason to believe that the IRS had failed to properly obtain written supervisory approval of the penalty under the then-prevailing legal interpretation of 6751(b)— *i.e.*, sometime prior to the date of the assessment. Indeed, it would have been unfathomable to think that even after Chemoil filed its initial protest, the IRS had still failed to obtain written supervisory approval of the penalty in the nearly three-week period of time that elapsed between

the date of the initial protest (September 23, 2014) and the date of the assessment (October 13, 2014). Such an argument, if made, would rightly have been challenged by the IRS as frivolous. Accordingly, Chemoil did not supplement its initial protest with this argument, or make the argument to the IRS Office of Appeals.

At the Appeals phase, after evaluating the positions of the IRS Revenue Officer and of Chemoil, the Appeals Officer made a settlement offer to Chemoil: the IRS would concede the entirety of the penalty and 30% of the claimed credits. (Ex. 10 (entry dated 12/14/2016 (first noting the proposed 30% concession) and entry dated 04/17/2017 (noting the communication to Chemoil's representative that the counteroffer of a 75% concession was outside of the settlement range and that "the 30% settlement previously offered was the highest end of the range")); Ex. 11.) Between the date that the IRS offered to concede the section 6675 penalty and the date that Chemoil countered that settlement offer, the legal interpretation of section 6751(b) changed.

On March 20, 2017, the Court of Appeals for the Second Circuit issued its decision in *Chai v. Commissioner*, 851 F.3d 190 (2d Cir. 2017), effectively reversing the holding in *Graev* by finding that the taxpayer's challenge to written supervisory approval was not premature before assessment. Indeed, the legion of decisions that followed *Chai* explained that supervisory approval must be given in writing before the first formal communication of the penalty to the taxpayer – which is a much earlier point in time. *See, e.g.*, *Clay v. Comm'r*, 152 T.C. 223, 249 (2019) (holding that the "initial determination" was made no later than the date of the NOPA). But by the time the law changed, the IRS had already offered to concede the penalty in full. The United States is therefore asking this Court to hold that notwithstanding the fact that the IRS had already offered to concede the penalty in full, Chemoil should have nonetheless raised another argument regarding why the IRS should concede the penalty that it already offered to concede.

This does not make sense and it should not be the holding of this Court.

The IRS Office of Appeals invited Chemoil to hold a follow-up Appeals conference, after which, on August 30, 2017, the Appeals Officer reiterated the IRS offer to concede the penalty in full and also 30% of the excise tax credits at issue. (Ex. 10 (entry dated 08/30/2017).) Chemoil declined that offer, and on October 6, 2017, the IRS issued its Notice of Disallowance upholding the assessed section 6675 penalty. Chemoil then asserted the 6751(b) argument at the next available opportunity, which was the date that it filed the Complaint in this case.

Taking all of these facts and circumstances into account, the doctrine of variance should not be applied here. Chemoil should not be required to have been prescient to raise an argument that was not yet ripe; nor, after the IRS had offered to concede the penalty, should have been required to raise an additional argument as to why the penalty could not be sustained.

C.     The United States is not entitled to summary judgment regarding whether the IRS supervisor timely approved the section 6675 penalty in writing.

Lastly, the United States devotes a single paragraph of its 59-page memorandum to unconvincingly arguing that "[t]here is no genuine factual dispute that the IRS complied with § 6751(b)'s managerial approval requirement." (Br. at 58–59.) Not only does this paragraph exclude the very facts that show the IRS did not, in fact, comply with the section 6751(b) requirement, but it also glosses over the sequence of what occurred in broad brush strokes.

Section 6751 imposes both a notice and a supervisory approval requirement on a number of tax penalties, including a penalty for excessive claims with respect to the use of certain fuels under section 6675, which is the penalty at issue in this case. Proper supervisory approval is a necessary prerequisite to the legal assessment of penalties; without it, the statute unequivocally prohibits the IRS from assessing a penalty. In pertinent part, the supervisory approval requirement of section 6751(b) is as follows:

> No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.

Sec. 6751(b)(1). "Because § 6751(b)(1) provides that '[n]o penalty . . . *shall* be assessed' (emphasis added) unless the written-approval requirement is satisfied, it would be inappropriate to impose a penalty where § 6751(b)(1) was not satisfied." *Chai*, 851 F.3d at 222. As discussed above, under *Chai* and the legion of decisions that followed *Chai*, the courts have determined that the supervisory approval must be given in writing before the first formal communication of the penalty to the taxpayer.

There is no dispute that IRS revenue agent Alan Anderson was the individual who made the initial determination to assess the penalty at issue. Nor is there a dispute that Mr. Anderson's immediate supervisor, Group Manager Tom Deis's original signature is on one copy of the E500 Penalty Check Sheet ("E500"). (Ex. 66.) Similarly, there is no dispute that the form is dated August 18, 2014, or that Mr. Deis's initials are typed onto the signature line of the form.[20]

But this is not the whole story. There is ample evidence—even without any inferences properly drawn therefrom in favor of Chemoil's position as the nonmoving party—that Mr. Deis did not timely provide his approval in writing before the first formal communication of the penalty assertion to Chemoil, which was made on August 19, 2014, when Mr. Anderson sent to Chemoil a Notice of Proposed Adjustment ("NOPA"). (Ex. 48.) *See, e.g.*, *Clay*, 152 T.C. at 249 (holding that the "initial determination" was made no later than the date of the NOPA).

---

[20] Although the United States seeks to infer, in footnote 27 of its brief, that Mr. Deis was the one who placed his initials onto the E500 Penalty Check Sheet, Mr. Anderson could have easily been the one to type both the date and Mr. Deis's initials since Mr. Anderson prepared the form. *See* Anderson Dep. 138:7–:16 (stating that he did not recall whether he typed either the date or initials into the form). Mr. Deis's testimony does not clarify this possibility. *E.g.*, Deis Dep. 84:3–85:17. The proper inference in favor of Chemoil is that Mr. Anderson typed the initials.

During the course of the IRS examination, Mr. Anderson and Mr. Deis worked in different offices: Mr. Anderson in Portland Oregon, and Mr. Deis in Salt Lake City, Utah. (Ex. 5 ("Anderson Dep.") 140:3–:11; Ex. 6 ("Deis Dep.") 90:18–:22.) Towards the end of the examination process, Mr. Anderson prepared the E500. (Anderson Dep. 136:8–138:16.) The distance between their offices meant that Mr. Anderson needed to transmit the E500 to Mr. Deis for his written approval. The E500 was sent to Mr. Deis in two ways: first, as part of the digital penalty case file; second, in hard copy when Mr. Anderson mailed the physical file to Mr. Deis. (Ex. 67 (entries dated 09/18/2014 and 09/25/2014).)

Mr. Anderson and Mr. Deis each completed an activity record for the exam case file and the penalty case file. (Ex. 69; Ex. 67; Ex. 68; Ex. 70.) These activity records contain contemporaneous records of the specific actions taken by Mr. Anderson and Mr. Deis. (Anderson Dep. 29:12–:16; Deis Dep. 28:8–:11.) Together, these activity records show what transpired and when. Mr. Anderson's activity record for the penalty case file shows that he created the digital penalty case file on the IRS system on September 18, 2014—one month after the E500 is dated. (Ex. 67 (entry dated 09/18/2014); *see also* Deis Dep. 91:2–92:25.) That activity record also shows that Mr. Anderson mailed the hard copy of the case file to Mr. Deis on September 25, 2014—one week after he created the digital penalty case file. (Ex. 67 (entry dated 09/25/2014).) Mr. Deis's activity record for the penalty case file supports the hard copy mailing date; Mr. Deis notes that he received the file on September 30, 2014. (Ex. 70 (entry dated 10/21/2014).) Accordingly, despite the date on the E500, the undisputed facts show that Mr. Deis did not receive the penalty approval form until after the penalty assertion was first formally communicated to Chemoil on August 19, 2014. Without receiving the E500, it would be impossible for Mr. Deis to add his initials or his signature.

The metadata produced by the United States further supports the conclusion that Mr. Deis did not timely approve in writing the section 6675 penalty at issue here. The only versions of the E500 are unsigned, fillable pdf files, one unsigned hardcopy, and one hardcopy with Mr. Deis's original signature. (Ex. 15, ECF No. 85-20; Ex. 77, ECF No. 85-21; Ex. 71; Ex. 72; Ex. 66.) The two fillable pdf files both contain Mr. Deis's typed initials. The metadata on the native pdfs produced by the United States in this case indicate that the information was "last modified" on September 20, 2014, and September 22, 2014, respectively. (Ex. 15, ECF No. 85-20; Ex. 77, ECF No. 85-21.) The inference properly drawn in favor of Chemoil is that irrespective of who added Mr. Deis's initials, the addition was made on one of these two dates since that would have been the final addition to the standard form. Given that both dates occurred more than a month after the first formal communication, there can be no conclusion other than that the United States is not entitled to summary judgment here.

The United States' only "fact" to counter this is Mr. Deis's testimony that "[w]hen I initial or sign a form, I put the date that I do that on the form." (Br. at 59.) This does not help the United States. While it may well have been Mr. Deis's general practice to put the date that he signed a form on the form, Mr. Deis was also quite clear that he did not recall completing this particular form. (*Id.*) Mr. Deis's testimony about his general practice, accordingly, does not even raise a genuine issue of fact in the United States' favor on this issue, let alone support a finding that the United States should be granted summary judgment on the issue.

## CONCLUSION

For the reasons discussed herein, the United States' motion for summary judgment should be denied in its entirety.

\*      \*      \*

60

Dated: September 16, 2022

Respectfully submitted,

Sarah E. Paul
Attorney-in-Charge
Eversheds Sutherland (US) LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: 212-389-5000
Fax: 212-389-5099
SarahPaul@eversheds-sutherland.com

Of counsel:

Amish M. Shah
 District of Columbia Bar No. 468530, *pro hac vice*
Daniel G. Strickland
 District of Columbia Bar No. 1531288, *pro hac vice*
Eversheds Sutherland (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001
Tel: 202-383-0100
Fax: 202-637-3593
AmishShah@eversheds-sutherland.com
DanielStrickland@eversheds-sutherland.com

*Attorneys for Chemoil Corp.*