```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
```

CHEMOIL CORP.,

                Plaintiff,

  -v-                                                                       No. 19-CV-6314-LTS-JW

UNITED STATES OF AMERICA,

                Defendant.

```
-------------------------------------------------------------X
```

## MEMORANDUM ORDER

       Chemoil Corporation ("Chemoil" or "Plaintiff") brings this action against the United States of America (the "Government" or "Defendant"), asserting causes of action for (1) recovery of an excise tax refund under 26 U.S.C. ("I.R.C.") sections 4081, 6426, and 6427, and (2) recovery of a penalty assessed by the Internal Revenue Service (the "IRS") under I.R.C. sections 6675 and 6751(b).  This Court has jurisdiction of this action pursuant to 28 U.S.C. section 1346(a) and I.R.C. section 7422.

       This case is before the Court on the Government's motion for summary judgment (docket entry no. 77 ("Motion for Summary Judgment")) and Chemoil's cross motion for partial summary judgment (docket entry no. 83 ("Cross Motion")).  The Court has carefully considered the parties' submissions in connection with the instant motions.  For the following reasons, the Government's Motion for Summary Judgment is granted, and Chemoil's Cross Motion is denied.

BACKGROUND

The following facts are undisputed unless otherwise indicated.[1]

Regulatory Background

The Volumetric Ethanol Excise Tax Credit ("VEETC" or the "alcohol fuel mixture credit") was available pursuant to I.R.C. section 6426(b) until the end of 2011 for taxpayers who created qualifying fuel mixtures and met other statutory requirements. That is, the VEETC was "allowed as a credit" against excise tax on non-aviation gasoline "imposed by [I.R.C. §] 4081." I.R.C. § 6426(a).

Between 2009 and 2011, I.R.C. § 6426(a)(1) and (b)(1) allowed a $0.45 credit against a claimant's excise tax liability for each gallon of alcohol used by the claimant to produce an alcohol fuel mixture. The statute defines "alcohol fuel mixture" as a mixture of alcohol (e.g., ethanol, id. § 6426(b)(4)(A)) and a taxable fuel (e.g., gasoline, id. § 4083(a)(1)) that "is sold by the taxpayer producing such mixture to any person for use as fuel" or that "is used as a fuel by the taxpayer producing such mixture." Id. § 6426(b)(3). The VEETC was not available for "any sale, use, or removal for any period after December 31, 2011." Id. § 6426(b)(6).

A taxpayer who produced a qualifying alcohol fuel mixture could receive a tax benefit in one of two ways. Under Section 6426, a taxpayer could claim a credit for the mixture. Alternatively, under Section 6427(e), a taxpayer could claim a direct payment from the IRS,

---

[1] Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements (docket entry nos. 82 ("Def. 56.1 St."), 86 ("Pl. 56.1 St."), 104 ("Pl. 56.1 Resp."), 109 ("Def. 56.1 Resp.")) incorporate by reference the parties' citations to the underlying evidentiary submissions.

equal to the amount of the credit if the taxpayer could not claim a credit under Section 6426. However, "if a claim [was] made under [I.R.C. §] 6427 . . . for an excessive amount, unless it [was] shown that the claim for such excessive amount [was] due to reasonable cause, the person making such claim shall be liable to a penalty in an amount equal to whichever of the following is the greater: (1) Two times the excessive amount; or (2) $10." 26 U.S.C.A. § 6675 (West 2005). This penalty applied both claims for direct payment from the IRS and to claims for credit. An "excessive amount" was the amount of credit claimed that exceeded the amount allowed under the VEETC for the relevant tax period. Id. § 6675(b).

Factual Background

### Chemoil's Renewable Fuels Business

Chemoil was founded as a marine-fuel distribution company in 1981 and began its U.S. renewable fuels business in late 2010. (See docket entry no. 79-1 ("Cohen Rpt.") ¶ 11.) John Skrinar oversaw Chemoil's renewables business from 2011 through 2014. (Docket entry no. 81-1 ("Skrinar Dep.") 14:23-15:2, 22:11-16.) Aaron Parrish, who worked in ethanol trading, and Steven Basler, who provided logistics support for ethanol transactions, reported directly to Mr. Skrinar. (Id. at 39:1-13; docket entry no. 81-2 ("Parrish Dep.") 56:11-25.)

In late 2011, Chemoil engaged in seven transactions in which it created alcohol fuel mixtures that it claimed created an entitlement to VEETC tax credits. These transactions include three transactions ("Astra-1," "Astra-2," and "Astra-3") with Astra Oil Company ("Astra"),[2] a U.S.-based energy-trading company, and four ("Gunvor-4," "Gunvor-5," "Gunvor-

---

2    Chemoil disputes this characterization, asserting that each of the "three transactions" with Astra "involved a separate purchase and sale transaction with Astra, making six transactions in total." (Pl. 56.1 Resp. ¶ 1.) However, in internal emails, Chemoil referred to each pair of purchase and sale transactions as a single "deal" (Def. 56.1 St. ¶ 9; Pl. 56.1 Resp. ¶ 9) or otherwise referred to the purchase and sale transactions in tandem (see

6," and "Gunvor-7") with Gunvor S.A. ("Gunvor"), a Swiss energy-trading company.  (Def. 56.1 St. ¶¶ 1, 46.)  All seven transactions took place in Vopak Deer Park Terminal ("Vopak"), outside of Houston, Texas, where Chemoil and Astra leased shore tanks from the terminal operator.  (See docket entry no. 81-9.)  In each of the seven transactions, Chemoil produced and sold Anhydrous E99: ethanol with low water content with small amounts of gasoline added.  (Def. 56.1 St. ¶ 121.)

### The Astra Transactions

Each of the Astra transactions took place in December 2011 and proceeded in a similar manner.  For each transaction, one contract provided for Chemoil's purchase of ethanol from Astra.  (See Def. 56.1 St. ¶¶ 3, 20, 34; see also Pl. 56.1 Resp. ¶¶ 3, 20, 34.)  In a second contract, Astra agreed to purchase the same amount of ethanol from Chemoil for $0.40 per gallon less than Chemoil had paid for that amount just days earlier.  (See Def. 56.1 St. ¶¶ 4, 21, 35; see also Pl. 56.1 Resp. ¶¶ 4, 21, 35.)  The product specification in both contracts in each transaction was for the sale of "Fuel Grade Ethanol" meeting "ANP latest specifications," a Brazilian ethanol standard.  (Def. 56.1 St. ¶¶ 5, 22, 38; see also Pl. 56.1 Resp. ¶ 5, 22, 38.)  Between the purchase and sale of the ethanol in each transaction, Chemoil added a tiny amount of gasoline to the ethanol—one that was too small to change the product specification—before selling it back to Astra.  (See Def. 56.1 St. ¶¶ 14-18, 30-33, 41, 45; see also Pl. 56.1 Resp. ¶¶ 14-18, 30-33, 41, 45.)  The only payments exchanged by the parties in these transactions were Chemoil's payments to Astra that amounted to the difference between Chemoil's and Astra's

---

docket entry no. 81-13).  For this reason, the Court refers to each purchase and its corresponding sale as one transaction.

respective purchase prices for the ethanol. (Def. 56.1 St. ¶¶ 10, 26, 43; Pl. 56.1 Resp. ¶¶ 10, 26, 43.)

The record indicates that, in structuring the Astra transactions, Chemoil considered the alcohol fuel mixture tax credits. In an email about one of the Astra deals, a Chemoil accountant asked Mr. Parrish if Chemoil was "selling at a Loss? (we bought from Astra @ $ 2.46 / gallon, but we sell back @ $ 2.06/gallon)?" (Def. 56.1 St. ¶ 78.) Mr. Parrish responded: "As far as the price we are blending this product for them and we are collecting a 45c per gallon tax credit. Therefore netting 5c per gallon." (Def. 56.1 St. ¶ 79.) Likewise, Mr. Parrish testified in his deposition that Chemoil "had agreed to sell product back to [Astra] and that we were getting a tax credit for blending product." (Def. 56.1 St. ¶ 81.)

The Gunvor Transactions

All four Gunvor transactions were governed by the same master contract dated August 17, 2011 (the "Master Contract"). (Def. 56.1 St. ¶¶ 47-48.) In the Master Contract, Chemoil agreed to sell Gunvor ethanol in five different deliveries over five different time periods; four of those deliveries are at issue in this case. (Id. ¶ 48.) For each delivery, the Master Contract provided that title and risk to the product would transfer from Chemoil to Gunvor when the product was loaded onto Gunvor's vessel "as the ethanol passes the vessel's permanent hose connection." (Id. ¶ 129.) The price of ethanol per gallon in the Master Contract was pegged to the Chicago Platts ethanol price—a floating standard based on a commercial index—minus $0.125 to $0.15 per gallon, depending on the delivery window. (Id. ¶ 49.) The Master Contract also provided that, if the VEETC was "not available between 1st November/ 31st December 2011 buyer is to pay seller 45c per gallon over the agreed sales price of ethanol loaded." (Id. ¶ 51.) Prices specific to each transaction were later confirmed via term sheets and

email correspondence and, as revised, ranged from $0.1250 to $0.2800 per gallon below the Chicago Platts price. (Id. ¶ 50.) In the first three of the Gunvor transactions, Chemoil mixed a small quantity of gasoline into the ethanol that it ultimately delivered to a Gunvor vessel before the end of 2011. (Docket entry no. 78 ("Def. SJ Mem.") at 12-13.)

Gunvor-7, however, did not go as planned. Because the VEETC expired at the end of 2011, Chemoil had intended to complete the Gunvor transactions by December 31, 2011. (Def. 56.1 St. ¶¶ 131-33; see also Pl. 56.1 Resp. ¶ 132 (admitting that one Chemoil employee told Vopak that it was "imperative" to complete the delivery "by December 31 for tax reasons").) However, logistical issues at Vopak slowed the unloading of the ethanol onto the Gunvor vessel. (Def. 56.1 St. ¶¶ 134, 142.)[3] Indeed, the loading of the product onto the Gunvor vessel did not begin until January 9, 2012, and it was not completed until January 14, 2012. (Id. ¶ 163.)

Emails between Chemoil employees and Gunvor employees reflect conversations about how to date the invoice for the Gunvor-7 transaction. On January 4, 2012, Mr. Parrish instructed a Chemoil accountant, via email, to date the Gunvor-7 invoice "12-31-11" even though "we haven't loaded the vessel yet." (Def. 56.1 St. ¶¶ 144-45.) The Chemoil accountant agreed to "modify the delivery date on the invoice to the customer to read 12-31-11" but noted

---

[3] Email correspondence from late December 2011 indicates that Chemoil was aware of the problems caused by the logistical issues. On December 29, 2011, when Mr. Skrinar asked Mr. Parrish about 20,000 barrels of physical "product that is unsold," Mr. Parrish indicated that the product would be added to a "[G]unvor boat loading in the next few days." (Def. 56.1 St. ¶¶ 135-36.) Mr. Skrinar responded that all of those barrels "need to be sold to Gunvor prior to Dec. 31." (Id. ¶ 137.) When Mr. Parrish asked if they could "load the boat then generate the invoice and back date it to say the 31st?", Mr. Skrinar directed Mr. Parrish to ask Phillip Lau, Chemoil's tax manager, because it was his "understanding that [the product] needs to be sold by Dec. 31" but he was "not sure" "[w]hat constitutes a sale, whether that be an invoice or payment." (Id. ¶¶ 138-39.) The following day, Mr. Parrish emailed a Vopak employee that, if the product was not unloaded on to the Gunvor vessel "by days end tomorrow we lose 45c per gallon." (Id. ¶ 140.)

that Chemoil would internally "invoice [the transaction] in Jan on Jan books" because the product "won't deliver until January 6th." (Id. ¶ 146.) On January 9, another Chemoil employee asked Mr. Parrish to procure an email from Gunvor "that states title passed in December 2011 . . . . Without some documentation, I am not sure whether or not they will allow the accrual to stay as 2011 Sales." (Id. ¶¶ 152-53.) Later that day, Mr. Parrish emailed Wayne Herndon, a Gunvor employee language stating that Gunvor agreed that title to the Gunvor-7 product transferred with an "effective date" of December 31, 2011. (Id. ¶ 156.) In that email, Mr. Parrish wrote, "Please note this i[s] for my back office and tax purposes. This will not be invoiced until the product has loaded. [I] just need you to reply that you agree to this. My back office is requesting it today. Thanks for your swift reply." (Id. ¶ 157.) After requesting and receiving confirmation from two other Gunvor employees, Mr. Herndon responded to Mr. Parrish's email "to confirm on the behalf of Gunvor SA" the title transfer date of December 31, 2011. (Id. ¶¶ 158-60.)[4]

The IRS Audit

In its Form 720, "Quarterly Federal Excise Tax Return," for the quarter ending December 31, 2011, Chemoil claimed VEETC credits totaling $6,682,529.25 from its sale of alcohol fuel mixtures containing a reported 14,850,065 gallons of ethanol. (Docket entry no. 81-70.) The IRS audited Chemoil's return and determined that the company was not entitled to the

---

[4] Mr. Herndon testified that he also discussed the title transfer orally. (Pl. 56.1 Resp. ¶ 148.) While Mr. Herndon did not identify a specific date for the conversation, he stated: "I have to think [Parrish] had to have asked me [about in-tank title transfer] . . . but because of the holidays [Parrish] wasn't able to get around to sending me anything official until the end of the first week of January." (Id.) Chemoil argues based on this testimony that there is an issue of material fact as to whether there was an oral agreement prior to December 31, 2011, changing the contract so that title passed while the fuel was in the tank rather than upon delivery to the Gunvor ship, but provides no documentation or other testimony concerning the alleged agreement.

credits on any of the seven Astra and Gunvor transactions for which Chemoil had claimed the credits.  (Docket entry no. 81-72.)  Indeed, the IRS proposed an excessive claims penalty against Chemoil regarding the Gunvor-7 transaction.  (Docket entry no. 81-73.)  The parties dispute whether the penalty assessment was approved in writing by an IRS supervisor before it was communicated to Chemoil.  (Pl. 56.1 St. ¶ 32; Def. 56.1 Resp. ¶ 32.)

Chemoil responded to both IRS positions with a written protest dated August 29, 2014.  (Docket entry no. 81-71.)  Chemoil then administratively appealed the penalty and the denial of the credits on September 23, 2014.  (Docket entry no. 81-77.)  At no point did Chemoil raise any issues related to whether the penalty had timely been approved in writing by an IRS supervisor.  After efforts to resolve Chemoil's appeal consensually were unsuccessful, the Appeals Office formally disallowed Chemoil's claims relating to the tax and the excessive claims penalty in two letters dated October 6, 2017.  (See docket entry no 81-79.)

Procedural History

Chemoil initiated this action on July 8, 2019.  (Docket entry no. 1.)  In the course of discovery, the Government disclosed two expert witnesses: (1) Evan Cohen, an economist, who opined about the expected economic outcomes of the seven transactions at issue (see Cohen Rpt.) and (2) Michael Leister, an expert in fuel markets, who opined about the types, uses, and specifications for ethanol, as well as customary industry practices for transporting, blending, sampling, and pricing it (see docket entry no. 80-1).  Chemoil did not disclose any experts.

## DISCUSSION

Summary judgment is warranted when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is considered material when it "might

affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court views the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. Ashley v. City of N.Y., 992 F.3d 128, 136 (2d Cir. 2021).  The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" to survive summary judgment but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted).

Chemoil asserts two claims against the United States: one to recover a refund of its VEETC claim ("Count One"), and one to recover the penalty the IRS assessed against it ("Count Two").  As explained below, both of Chemoil's claims fail as a matter of law.

Count One – Refund Claim

Under the economic substance doctrine, Chemoil is not entitled to recover a refund of its excise tax liability.  "The 'economic substance' doctrine is a common law rule that allows courts to question the validity of a transaction and deny taxpayers benefits to which they are technically entitled under the [Internal Revenue] Code if the transaction at issue lacks 'economic substance.'"  Bank of N.Y. Mellon Corp. v. Comm'r ("BONY Mellon"), 801 F.3d 104, 113 (2d Cir. 2015) (citing Gregory v. Helvering, 293 U.S. 465, 468-70 (1935)).  "To be 'valid' and not just a 'sham,'" under the economic substance doctrine, "a transaction must involve more than just tax benefits: it must have independent economic substance."  Id. at 108 (citing DeMartino v. Comm'r, 862 F.2d 400, 406 (2d Cir. 1988)).

Chemoil insists that the economic substance doctrine does not apply to transactions in which "a taxpayer makes the type of investment or undertakes the type of activity

that the credit was intended to encourage." (Docket entry no. 84 ("Pl. Cross SJ Mem.") at 6 (quoting Staff of J. Comm. on Tax'n, JCX-18-10, Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010" 152 (Comm. Print 2010)).) The United States Court of Appeals for the Federal Circuit has characterized this argument as "meritless" and confirmed that the economic substance doctrine applies with equal force to the VEETC. Alternative Carbon Res., LLC v. United States, 939 F.3d 1320, 1330 (Fed. Cir. 2019); see also id. at 1331-32 (emphasizing that, even where Congress "provides tax benefits to encourage socially beneficial activity that would not be pursued absent tax advantages[,]" that activity "demands careful review" (citation omitted)). This conclusion is consistent with the Second Circuit's determination that there are not "categorical exceptions" to the economic substance doctrine. BONY Mellon, 801 F.3d at 114. Therefore, the economic substance doctrine applies to the seven transactions at issue here.

    In applying the economic substance doctrine, the Court must evaluate two factors: "1) whether the taxpayer had an objectively reasonable expectation of profit, apart from tax benefits, from the transaction; and 2) whether the taxpayer had a subjective non-tax business purpose in entering the transaction." BONY Mellon, 801 F.3d at 115 (citing Gilman v. Comm'r, 933 F.2d 143, 147-48 (2d Cir.1991)). The transactions at issue here cannot satisfy either prong.[5]

---

[5]  Perplexingly, Chemoil argues that the Court should consider the effect of the VEETC if it concludes that the economic substance doctrine applies here. This is because, according to Chemoil, when Congress codified the economic substance doctrine at I.R.C. section 7701(o), it clarified that only "Federal income tax effects" are barred from consideration when a court evaluates the economic substance of a claimed transaction. (Pl. Cross SJ Mem. at 9-10 (emphasis in original).) Chemoil's position is meritless. The statute refers only to income taxes because Section 7701(o) applies to income taxes, not excise taxes. See I.R.C. § 7701(o)(5)(A) (stating that statutory version applies to "subtitle A" of the I.R.C., which governs income taxes). In any event, "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."

First, with respect to the objective prong of the economic substance doctrine, the Court must assess both the "pre-tax profit and a consideration of the transaction's overall economic effect." BONY Mellon, 801 F.3d at 119. The breadth of this analysis recognizes the reality that "a legitimate transaction could conceivably lack economic profit." Id.; see also Salem Fin., Inc. v. United States, 786 F.3d 932, 942 (Fed. Cir. 2015). As an initial matter, there is no serious question that Chemoil sold ethanol at a pre-tax loss in each of the seven transactions. (Def. 56.1 St. ¶¶ 54, 64, 67, 72, 74, 76.) Chemoil's unsupported assertion that "there are genuine issues of material fact as to whether, irrespective of the tax incentives, Chemoil had an objectively reasonable expectation of making a profit on these transactions, taking into account, inter alia, the value of having additional available inventory and the profit potential built into a fixed price contract" is not sufficient to preclude summary judgment.[6] (Docket entry no. 103 ("Pl. SJ Opp.") at 29). After all, the nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a summary judgment motion, but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown, 654 F.3d at 358 (citations omitted). A consideration of the "overall economic effect" of the transactions likewise indicates that they lacked economic substance. Indeed, Chemoil has not provided the Court with a reason to conclude that adding a small amount of gasoline to ethanol—an amount that was insufficient to have an effect on the

---

Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952). Therefore, the Court does not consider the VEETC as part of the economic substance of the seven transactions here.

[6] Moreover, Chemoil's statement that the Government's economic expert, Mr. Cohen, failed to consider a number of "important facts" (Pl. SJ Opp. at 29-30) is flatly contradicted by Mr. Cohen's report. (See Cohen Rpt. ¶¶ 60-62 (concluding that the potential for inventory benefits, RINs, and future markets could not create a reasonable expectation of pre-tax profit for any of the transactions).)

specifications of the product—had any legitimate purpose aside from qualifying for the VEETC benefit.

Second, the subjective prong "concerns the motives of the taxpayer in entering the transaction" and asks whether the taxpayer's "sole motivation" for entering a transaction was to realize tax benefits. Altria Grp., Inc. v. United States, 694 F. Supp. 2d 259, 283 (S.D.N.Y. 2010), aff'd, 658 F.3d 276 (2d Cir. 2011) (citation omitted). There is no evidence in the record that Chemoil was motivated by anything other than tax benefits when it agreed to the transactions at issue. Instead, the record is replete with examples of Chemoil employees' focus on the VEETC. (See, e.g., Def. 56.1 St. ¶¶ 78-79, 82, 131-40, 144-46, 152-60.) Therefore, the subjective prong also indicates that the transactions lacked economic substance.

Because there is no genuine factual dispute that the seven transactions lacked economic substance, Chemoil's claim for recovery of the VEETC benefit fails as a matter of law.[7] The Government is entitled to summary judgment as a matter of law on Count One.

Count Two – Penalty Claim

To support its claim to recover the penalty assessed against it for claiming VEETC benefits for the Gunvor-7 transaction, Chemoil argues that (1) it had "reasonable cause" to claim the credits, and (2) the IRS illegally assessed the penalty. Neither argument has merit.

Reasonable Cause

I.R.C. section 6675(a) provides that a taxpayer that makes an excessive claim under the VEETC is liable for a penalty "unless it is shown that the claim for such excessive amount is due to reasonable cause." As an initial matter, the undisputed facts indicate that

---

[7] Because the economic substance doctrine disposes of Count One, the Court does not consider the parties' remaining arguments regarding Chemoil's entitlement to the VEETC credits.

Chemoil was not entitled to VEETC credit in connection with the Gunvor-7 transaction. Not only did that transaction lack economic substance, as discussed above, but Gunvor-7 was consummated after the VEETC had expired. The Master Contract provided that title and risk relating to the product would transfer from Chemoil to Gunvor when the product was loaded onto Gunvor's vessel "as the ethanol passes the vessel's permanent hose connection" (Def. 56.1 St. ¶ 129). Chemoil insists that the contract was modified orally before the end of 2011 (see Pl. 56.1 Resp. ¶ 148), but the Statute of Frauds precludes such oral modification (see Jafari v. Wally Findlay Galleries, No. 89-CV-2390-RWS, 1989 WL 116437, at *4 (S.D.N.Y. Sept. 26, 1989)), and Chemoil has made no nonspeculative showing that there was even a timely attempt to make such an oral modification. Because there is no evidence that the Master Contract was modified before December 31, 2011, and no ethanol was loaded onto a Gunvor vessel until January 2012 (Def. 56.1 St. ¶ 163), title to the product did not pass to Gunvor until after the expiration of the VEETC, rendering the transaction ineligible for the VEETC benefit.[8]

        Furthermore, the undisputed facts in the record indicate that Chemoil did not have "reasonable cause" to claim the VEETC credits for Gunvor-7. The reasonable cause determination is made on a case-by-case basis in consideration of "all the pertinent facts and circumstances," and "the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability, judged in the light of the taxpayer's experience, knowledge, and

---

[8] Chemoil insists that "[g]enuine issues of material fact exist as to when the Gunvor-7 sale occurred." (Pl. MSJ Opp. at 45-49.) This argument is unpersuasive (1) because the disputed "facts" Chemoil points to—i.e., the modification of the Master Contract (see id. at 46-47)—do not alter the conclusion that the Statute of Frauds prohibits the oral contract modification that Chemoil alleges, and (2) because Chemoil's evidentiary proffers fail in any event to frame a genuine issue of material fact.

education." Alternative Carbon, 939 F.3d at 1333 (citations omitted).[9] Chemoil has failed to proffer any facts to suggest reasonable cause. First, Chemoil baldly asserts that "Chemoil properly claimed the Gunvor-7 credits, and certainly acted with reasonable cause in doing so." (Pl. MSJ Opp. at 50.) For the reasons stated above, Chemoil did not properly claim VEETC credits for the Gunvor-7 transaction.

Chemoil also argues that "multiple disputed factual issues exist" regarding the effort Chemoil exerted to ascertain whether it could claim the credits. (Pl. MSJ Opp. at 50-52.) However, none of the evidence that Chemoil cites—emails indicating (1) knowledge among Chemoil traders of the potential tax issues presented by the delays to the Gunvor-7 shipment (Def. 56.1 St. ¶¶ 135-40) and (2) intent to discuss the situation with Phillip Lau, Chemoil's tax manager (id. ¶¶ 138-39)—is relevant to the question of "the taxpayer's effort to assess the taxpayer's proper tax liability." Alternative Carbon, 939 F.3d at 1333. While these emails reveal efforts to determine how Chemoil might have been able to claim the VEETC credits despite the Vopak delays, Chemoil has not proffered any evidence of its efforts to determine whether the delays might have barred its claim to the credits.[10] Therefore, Chemoil's claim cannot survive the Government's summary judgment motion.

---

[9] A taxpayer's good faith reliance on objectively reasonable professional advice concerning the tax laws can also establish the defense of reasonable cause for a tax position. Goldman v. Comm'r, 39 F.3d 402, 408 (2d Cir. 1994). Chemoil, however, has explicitly disclaimed reliance on such a defense. (Pl. MSJ Opp. at 52.)

[10] Chemoil also submitted a declaration from its tax manager, Phillip Lau, representing that he followed established procedures for filing claims for excise tax credits in Chemoil's Form 720. (Docket entry no. 105.) This is insufficient to create a dispute of fact related to "reasonable cause" because "[t]he mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein." Neonatology Assocs., P.A. v. Comm'r, 115 T.C. 43, 98, 100 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Variance Doctrine

Chemoil argues that the penalty was illegally assessed because the IRS failed to comply with I.R.C. section 6751(b), which imposes a notice and supervisory approval requirement on a penalty assessment under Section 6675. (Pl. Cross SJ Mem. at 20-24.) Chemoil does not dispute, however, that it raised this argument for the first time in its Complaint.

Because the United States may not be sued without its consent, "actions against the United States for tax refunds may be brought [only] under a narrowly construed set of guidelines set forth in 26 U.S.C. § 7422(a) and its accompanying guidelines." Carione v. United States, 291 F. Supp. 2d 141, 145-46 (E.D.N.Y. 2003). Under Section 7422(a), an administrative claim for a refund filed with IRS is a jurisdictional prerequisite to bringing a tax refund suit in federal court. Magnone v. United States, 902 F.2d 192, 193 (2d Cir. 1990). The refund claim must "set[] forth in detail the ground for the refund and facts sufficient to apprise the IRS of the basis for the refund." 303 W. 42nd St. Enterprises, Inc. v. IRS, 181 F.3d 272, 277-78 (2d Cir. 1999) (citing 26 C.F.R. § 301.6402-2(b)(1)). Under the variance doctrine, "a taxpayer may not raise different grounds than those brought to the IRS." Magnone, 902 F.2d at 193.

Because Chemoil did not argue that the IRS illegally assessed the penalty by failing to comply with I.R.C. section 6751(b) in any of its proceedings before the IRS, this Court lacks jurisdiction to entertain that argument now.

For the foregoing reasons, Chemoil's claim to recover the IRS penalty fails as a matter of law. Therefore, the Government is granted summary judgment dismissing Count Two.

CONCLUSION

The Government's Motion for Summary Judgment is granted, and Chemoil's Cross Motion is denied. This Memorandum Order resolves docket entries number 77 and 83. The Clerk of Court is respectfully requested to enter judgment in dismissing Chemoil's complaint and close this case.

SO ORDERED.

Dated: New York, New York
September 26, 2023

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge